# Exhibit C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN R. HARTMAN<br><br>Plaintiff,<br><br>vs.<br><br>BAYER A.G., et al.<br><br>Defendants. | No. 02-00358 MDL 1431 |

DEPOSITION OF JENNIFER NEFF, M.D.

CARLSBAD, CALIFORNIA

JULY 17, 2006

LINDA E. FENN
CSR NO. 11874

ORIGINAL

JENNIFER NEFF, M.D.

Having been administered an oath, testified as follows:

EXAMINATION

BY MS. WRIGHT:

Q. May we have your full name for the record.
A. Jennifer Anne Neff.
Q. Where are you currently living?
A. I'm living in Vista, California.
Q. Could you give us your home address?
A. Sure. 1430 Montgomery Drive, Vista, California 92084.
Q. Do you plan to be there for the next year or so?
A. Yes, I do.
Q. Okay. Have you been deposed before, Doctor?
A. Not officially.
Q. Okay. We talked for a couple minutes before we went on the record, and you told me that you had been deposed as a participant in training at William Mitchell Law School; is that correct?
A. That is correct.
Q. And when you say "not officially," is that what you're referring to?
A. Yes.
Q. So in terms of actually being sworn and giving

that the appropriate laboratory maintenance had been done in relation to the drug.

Q. And would you also review the record to see if they had -- the patient had a successful experience with -- let me rephrase that.

Would you also review the chart to determine whether the patient had exhibited any side effects that you would attribute to that drug?

A. During the chart review, if that came up, then I would basically look at the last couple physician visits. And if it seemed appropriate that the patient would receive a refill without another visit, then I would refill the medication.

Q. Okay. Was it your intent in doing the chart review to make sure that you could safely allow this patient to continue taking the drug?

A. Yes.

Q. Okay. And one of the factors in determining whether the patient could continue to take it safely was whether they had reported any side effects with that drug?

A. Yes.

Q. Okay. Now, you say you authorized a refill of Mr. Hartman's Baycol on June 27th, 2000, correct?

A. That is what it says in the chart.

Q. Okay. And in terms of authorizing the refill of a statin, what would you have looked for specifically in Mr. Hartman's chart?
A. I would have made sure that someone had checked liver function tests within the last six months and made sure that they were within normal range.
Q. Okay. What else?
A. I would make sure that there was an evaluation of total cholesterol to make sure that the medication was working and/or being used --
Q. Okay.
A. -- appropriately.
Q. Anything else you would look for before renewing a refill of a statin for Mr. Hartman?
A. If my partners had been refilling that medication and if those other factors I mentioned were satisfied, then I would authorize a refill.
Q. Okay. And the conclusion that you would draw from your partners having refilled a statin medication for a patient was that the patient was doing just fine on it with no complications?
A. Yes.
MR. GIEBEL: Objection. Object to the form of the question.

BY MS. WRIGHT:

Q. And is that your recollection when -- that when you authorized a refill of Mr. Hartman's Baycol prescription on 6/27/2000, that he had not reported any complications that you would attributed to Baycol?

A. That was my assumption. And I also never saw anything in the chart relating to that.

Q. And when you say that, relating to complications of Baycol?

A. Or symptoms.

Q. Have you ever -- at the time that you were at East Metro Family Practice, did you ever have any patients that you diagnosed with statin-induced myopathy?

A. Well, myopathy is different from rhabdomyolysis.

Q. Yes.

A. Myopathy can just mean soreness of muscles. And so, yes, there were people that I started on statin medication that had muscle soreness, and I then discontinued that medication or tried a different medication to avoid the symptoms of muscle soreness.

Q. Could muscle weakness also be included in the definition of myopathy?

A. Muscle weakness could be included in the

A. Yes. In the margin it says -- well, partly says hemoglobin A1c renal profile, and then I believe it said -- well, EB is -- should have said NEB, N-E-B, which means nebulizer. Those were notes I was making to myself for what I wanted to do during the patient visit for the patient.

Q. Okay. Would you typically dictate your note immediately following a patient visit, or when would that be done?

A. At the end of the day.

Q. Okay. Are you able to tell from reviewing this note what the purpose of Mr. Hartman's visit was on January 10, 2000?

A. Yes.

Q. What was that?

A. He was coming in with respiratory symptoms that I diagnosed as bronchitis and interstitial pneumonia. He was also coming in for review of his diabetes medications.

Q. Do you see any evidence of, in a particular note, that he was reporting to you any complaints that you would have attributed to Baycol?

A. No.

MR. GIEBEL: Object to the form of the question.

BY MS. WRIGHT:

Q. What does it mean to have uncontrolled diabetes mellitus?

A. Mellitus.

Q. Mellitus, excuse me.

A. All right. Uncontrolled diabetes means that the blood sugar's extremely high and that the medications being used to control the diabetes either are not being taken appropriately or are not strong enough to control the blood sugar levels.

Q. And by not taken appropriately, that could mean not taken often enough?

A. Yes.

Q. Or not taken in the appropriate dose?

A. Yes.

Q. What are the potential health effects of uncontrolled diabetes?

A. There are many.

Q. What are the main ones?

A. There are many. Uncontrolled diabetes can result in blindness, in kidney failure, in vascular disease leading to strokes or heart attacks, can lead to nerve degeneration and numbness in the extremities. Diabetes can also lead to decreased blood flow to the extremities, poor healing from infections. The list

goes on.

Q. Is peripheral neuropathy, is that nerve degeneration in the extremities?

A. Peripheral neuropathy means that the nerves in the extremities have been damaged in some way and that the person either has pain or decreased sensation.

Q. Can peripheral neuropathy lead to weakness?

A. If nerves affected are leading to muscles.

Q. What is the effect of decreased blood flow to the extremities?

A. Decreased blood flow to the extremities will decrease the healing of wounds on the extremities. Decrease blood flow also will -- can cause the peripheral neuropathy or decreased sensation in the extremities. Decreased blood flow can cause -- well, the blood is necessary to deliver oxygen to fuel the muscles and to do normal cellular processes.

Q. Okay. So from the decreased blood flow could also account for weakness in the extremities?

A. It could.

Q. And I think most people are familiar with stroke and heart attack. Those can kill you.

A. Yes.

Q. Are strokes and heart attacks, is that also a risk of uncontrolled hypercholesterolemia?

A. Mr. Hartman was noncompliant in his use of medications in that he frequently -- well, in that he would run out of the medication and not get more.
BY MS. WRIGHT:
Q. Do you recall him being noncompliant in terms of you would recommend insulin for him and he would refuse insulin?
A. On at least two occasions he refused the use of insulin or blood sugar testing to evaluate his diabetes.
Q. And that was two occasions with you treating him?
A. Yes.
Q. Are you aware of instances where your colleagues recommended insulin that was refused?
A. Yes. Dr. McCamy recommended insulin, and that was refused. I don't remember which date that note was.
Q. Okay. Why were you recommending insulin for Mr. Hartman?
A. Because his diabetes was so extremely out of control. The insulin is used in addition to by-mouth medication for blood sugar control.
Q. Is your next note from January 12th of 2000?
A. The next note that I have, that note was taken by my nurse.

Q. Okay. Was it your understanding -- did you have an understanding as to why?
A. I don't recall.
Q. Okay. Were you aware that Mr. Hartman had been diagnosed with peripheral neuropathy?
A. Yes.
Q. And had he been -- he had been diagnosed with peripheral neuropathy before he first saw you?
A. Yes.
Q. Okay. And that was in his feet and his legs?
A. In his -- you know, from the notes from Dr. McCamy, I assumed it was in his feet. I can't say for sure without rereading the note.
Q. Okay. But you knew by the time you saw him on January 10th of 2000 that he had been diagnosed with peripheral neuropathy --
A. Yes.
Q. -- in his lower extremities?
A. Yes.
Q. When was the next note where there's either your handwriting or it reflects that you saw or somehow treated Mr. Hartman?
A. 6/13/2000 -- oh, wait, no. I'm sorry. Five -- it looks like 12/20/00. I okayed a refill for sodium bicarbonate.

Q. What is sodium bicarbonate typically prescribed for?

A. It was prescribed for his kidney stone condition.

Q. Mr. Hartman had a fairly extensive history of kidney stones?

A. Yes.

Q. And even at one point leading to kidney failure?

MR. GIEBEL: Objection to form on both questions.

A. Mr. Hartman had history of multiple episodes of kidney stones. During his hospitalization in April of 2000, he had kidney failure as a result of a kidney stone.

BY MS. WRIGHT:

Q. And associated with his kidney stones, he often had hematuria; is that correct?

A. Yes.

Q. And hematuria is blood in his urine?

A. Yes.

Q. Okay. So what's the next note where it either reflects that you saw Mr. Hartman or somehow authorized a refill?

A. 6/13/2000.

Q. Okay.
A. I saw him in the clinic for a visit.
Q. Is that your handwriting?
A. That is my handwriting interspersed with that of my nurse Jean.
Q. Okay. What -- are you able to tell from looking at this June 13th, 2000, note what was the purpose of the visit?
A. Patient was having blood in his urine and was having shortness of breath episodes.
Q. Any other complaints?
A. Swollen legs and ankles.
Q. Did you attribute any of those symptoms to his use of Baycol?
A. No.
Q. As you sit here today, do you attribute any of those symptoms to his use of Baycol?
A. No.
Q. What was your assessment of his complaints?
MR. GIEBEL: Object to the form of the question.
A. During the visit -- during the visit of June 13th, 2000, my assessment was that his shortness of breath episodes were related to fluid overload.

BY MS. WRIGHT:
Q. Did that also explain the edema in his ankles and legs?
A. Yes.
Q. And in layperson's terms, what's edema?
A. Edema is fluid in the tissues, usually in the tissues of the feet, ankles, and legs.
Q. And can that make the feet, ankles, and legs look swollen?
A. Yes.
Q. Okay. Okay. And so did you have a plan then?
A. The plan at that time was to do laboratory work to check the patient's kidneys, to make sure that the -- his previous renal problem was not causing fluid overload.
Q. And there was no complaints of muscle weakness or muscle pain at this time, correct?
A. No.
Q. Could we -- I think we already talked about the June 27th refill. Could we go on to the next time that you treated, evaluated, or refilled for Mr. Hartman.
A. March 5th, 2001.
Q. And that's a typewritten note from your dictation?

A. That is a typewritten note and some handwritten notes by my nurse Jean.

Q. Okay. Are you able to tell from reviewing the transcription of your dictation or the handwritten notes what the purpose of the visit was?

A. Yes. It was for flank pain or back pain, abdominal pain, diabetes, and symptoms related to benign prostatic hypertrophy, or BPH.

Q. And what is that, BPH?

A. BPH is the enlargement of a gentleman's prostate gland, usually age-related.

Q. Does it have any symptoms?

A. Yes. It causes urination at night, decreased flow of urination, or a difficulty starting or stopping the stream.

Q. Can it cause kidney failure?

MR. GIEBEL: Object to the form of the question.

A. Benign prostatic hypertrophy in its extreme can cause postrenal kidney failure, which would be kidney failure related to an obstruction.

BY MS. WRIGHT:

Q. Would that be similar to kidney failure related to a kidney stone?

A. Kidney failure related to a kidney stone is

also postrenal or related to an obstruction, just higher up in the urinary system.

Q. Based on your examination, did you form a diagnosis as to his reports of flank or back pain and abdominal pain?

A. I was concerned that the flank pain and abdominal pain were related to recurrent kidney stones.

Q. Did you do anything to evaluate that?

A. Let me see. Let me check the notes. Let me correct myself. According to my note, patient believed that his flank pain and abdominal was related to his diabetes medication. The patient altered the medication on his own and had some improvement in his pain.

Q. Did you agree with Mr. Hartman's assessment that his pain could be due to his diabetes medication?

MR. GIEBEL: Object to the form of the question.

A. That particular correlation didn't make sense to me then, and it doesn't make sense to me now.

BY MS. WRIGHT:

Q. Okay.

A. However, when a patient reports that there's a problem and improvement after an alteration, I do take that into account.

Q. Okay. Did you consider whether the bilateral

flank pain and abdominal pain might be related to his use of Baycol?
A. No.
Q. Would that be a presentation of statin-induced myopathy that would be extremely unusual?
MR. GIEBEL: Object to the form of the question.
A. I did not consider Baycol as a possible contributor to the flank pain and abdominal pain, because those symptoms were ameliorated by a change in his diabetes medication. Occasionally, myopathy can present as low back pain, but that was not my assessment at this time.
BY MS. WRIGHT:
Q. In fact, you didn't order a CPK examination, correct, or a CPK test, correct?
A. No.
Q. And there wasn't anything to -- he didn't mention any discoloration of his urine at that time?
MR. GIEBEL: Object to the form of the question.
A. There's no notation in my note that patient described any discoloration in his urine.
BY MS. WRIGHT:
Q. And he didn't describe any thigh muscle pain

or weakness?

MR. GIEBEL: Objection, form of the question.

A. Not during this visit. In review of my note, I see that under the objective there's a notation that said the urinalysis showed trace ketones.

BY MS. WRIGHT:

Q. What does that mean?

A. Trace ketones means that the body is using ketones for fuel. That indicates that the patient either had not had much to eat that day or that his diabetes was undercontrolled. But the urinalysis did not at that time show any white blood cells or red blood cells, or I would have included in that in my dictation.

Q. Did it show any myoglobin?

A. That's not tested for in a normal urinalysis.

Q. Okay. If the urine had been extremely dark colored, is that something that would have been typically noted in the lab report of a urinalysis test?

MR. GIEBEL: Object to the form of the question.

A. If the urine would have been extremely dark colored, the laboratory person would have come and explained that to me or would have noted that somewhere.

BY MS. WRIGHT:

Q. Okay.

A. Called that to my attention.

Q. And in your practice, that would have been noted in this note from March 5th, 2001?

A. Yes.

MR. GIEBEL: Same objection.

A. My nurse would have written it down somewhere or would have told me about it.

BY MS. WRIGHT:

Q. What do you have as being the next note of any examination or treatment that you had for Mr. Hartman?

A. 3/12/01.

Q. And again, that's a typewritten note of your dictation --

A. Yes.

Q. -- from a visit on that date?

A. Yes, it is.

Q. Okay. What was the purpose of that visit?

A. The purpose of that visit was to evaluate the patient's response to a medication, Flomax, that he was started on for benign prostatic hypertrophy. The visit was also intended to check the patient's blood pressure and evaluate laboratory test results. Also during that visit, the patient discussed the use of Viagra.

Q. And did you evaluate him to determine whether he could use Viagra safely?

A. Yes.

Q. Okay. At that -- I don't see in here any notes regarding muscle pain or weakness. I take it, given your practice, if he would have reported it at that time, I could have expected to have seen it in this note?

A. Yes.

MR. GIEBEL: Object to the form of the question.

A. If that was a presenting complaint or a complaint discussed during the visit, it would have been noted either in my nurse's note or in my note or both.

BY MS. WRIGHT:

Q. Is it anywhere in your nurse's note from March 12th, 2001?

A. No, it is not. It says "occasional pounding in feet."

Q. What did you understand that to mean?

A. I associated that with -- well, I did not officially associate that with anything in the chart. I would associate that with his peripheral neuropathy.

Q. Okay. Any more handwriting on that page where your typewritten note is at the top? And I'm talking about your 3/12/01 typewritten note. Is there any handwriting on that page that's yours?

A. Yes.
Q. Okay. When is -- what is --
A. It is underneath the heading "DOT physical - see form."
Q. Is that your handwriting?
A. No.
Q. Okay.
A. That's Jean Fredericks' handwriting, my nurse. But I made a notation saying was -- let's see -- but at the end of the note it says, "Gets weak off and on, tired legs -- or tired, legs give out, weak, losing hair," and I made a notation, "Was using Glucophage XL BID," which means twice a day. "Now only using once a day and feels fine."
Q. Can you explain what that note means to me -- or to you? Excuse me. First of all, the handwriting where it says "Gets weak off and on, tired, legs give out, weak," is that your nurse's handwriting?
A. Yes.
Q. Okay. And what you're saying is from there there's a dash and it indicates "was using Glucophage," is that XL BD?
A. BID.
Q. "Now only QD, feels fine," that's your handwriting?

A. Yes.
Q. Okay. So I take it your handwriting is explaining this complaint that your nurse has recorded of tired legs and weakness?
A. Yes.
MR. GIEBEL: Object to the form of the question.
BY MS. WRIGHT:
Q. Okay. And what does your note indicate about that complaint?
MR. GIEBEL: Same objection.
A. About the same thing as the previous note we discussed, that patient changed his use of his diabetic medication and noticed changes in the symptoms discussed.
BY MS. WRIGHT:
Q. And those changes were that they went away?
MR. GIEBEL: Object to the form of the question. Is that what "feels fine" means?
THE WITNESS: I assume that that's what "feels fine" means.
BY MS. WRIGHT:
Q. So just to summarize, he was -- he reported that he had been getting weak legs and that they would give out and that once he reduced his Glucophage dose,

BY MS. WRIGHT:
Q. On the roads in the U.S.?
A. Yes.
MR. GIEBEL: Same objections.
Madam Court Reporter, are you getting my objections?
COURT REPORTER: Yes, I am.
MR. GIEBEL: Thank you.
BY MS. WRIGHT:
Q. Do you have the form of the DOT physical in front of you?
A. I do.
Q. Did you fill that form out?
A. Yes.
Q. Is all of the handwriting on that form yours?
A. No.
Q. What isn't?
A. Some of the handwriting is that of my nurse. The words "Had cataract surgery both eyes, 1-01," and "2-01, doesn't need glasses," that's my nurse's handwriting. My nurse also wrote underneath health history, "occasional stones" next to the word "kidney." My nurse also wrote my name and the address of the clinic at the bottom of the form and filled in the urinalysis results and the dates of the patient's last

X-rays and EKG.

Q. Other than that, the handwriting is yours?

A. Oh, my patient -- oh, my nurse also filled in patient's height and weight. Yes, other than that, it's my handwriting.

Q. Okay. And then you had to sign it as the medical examiner that was certifying him as being able to drive?

A. Yes.

Q. Okay. Did you agree with the information that your nurse had put onto this form?

A. Yes, I did.

Q. And did Mr. Hartman himself fill out any portions of this form, do you know?

A. No.

Q. Okay. Would the information necessary to fill out this form in terms of symptoms that he had recently in part come from Mr. Hartman?

A. Yes.

Q. Under -- you can see on the right-hand side -- or left-hand side it says "extremities" near the lower third of the page.

A. Yes.

Q. And it says "upper," and is that NL next to it?

A. Normal, yeah, NL.
Q. Is that your handwriting?
A. Yeah. NL is my notation for normal.
Q. Okay. And lower NL is normal?
A. Yes.
Q. So his legs were normal at that time?
A. Yes.
Q. If he had been reporting myalgia or weakness or difficulty getting out of the chair, would you have indicated that his lower extremities were normal?
MR. GIEBEL: Object to the form of the question.
A. If the patient was having difficulty with strength in his legs or using his legs, I would not have been able to find him fit to drive or pass this exam.
BY MS. WRIGHT:
Q. Okay. And so you would not have indicated normal?
A. No.
MR. GIEBEL: Objection.
A. I would not have indicated normal.
MR. GIEBEL: Same objections.
BY MS. WRIGHT:
Q. And by -- you wouldn't have signed at the very bottom of the page certifying him as able to drive

safely?

MR. GIEBEL: Objection.

A. If the patient's legs were weak, I could not -- I could not say that he was fit to drive.

BY MS. WRIGHT:

Q. But you did say he was fit to drive as of this date, correct?

A. Yes, at that time I did.

Q. Can you tell approximately when you filled out this DOT form?

A. The date on my copy of the notes is cut off, but what I can see, it said something /27/01.

Q. Okay. And in that note your nurse indicates that he passed kidney stones as recently as March 22, correct?

A. Yes.

Q. And that was since the last visit, which was 3/12/01?

A. Yes.

Q. Can we conclude from this that this DOT physical form was completed sometime on or after March 22 of 2001?

MR. GIEBEL: Object to the form of the question.

A. Oh, it says here in the margin of the DOT,

"Physical examination form, exam," although the E of "exam" is cut off, "3/01." So this DOT exam was in March of '01.

BY MS. WRIGHT:

Q. Okay.

A. And I assume that was March 27th.

Q. Because that's what indicates he had a DOT physical on something 27/01?

A. Yes.

Q. Okay. What's your next note in your chart?

A. The next note -- by myself or by somebody else?

Q. What do you mean by somebody else?

A. Okay. You said what's my next note.

Q. Oh, for you, where you either examined or treated or made any notation whatsoever concerning Mr. Hartman.

A. Okay. The next notation was -- again, the margin is cut off, but something /30/01, okay, "Refill Flomax .4, one QD." That's -- and then below that, another refill for Flomax again. The date in my copy is cut off.

Q. Okay.

A. Next time that I actually saw the patient for a visit was 8/30/2001.

include -- or when there are symptoms, they are muscle pain, sometimes muscle weakness. Rhabdomyolysis indicates rapid breakdown of large amounts of muscle tissue.

Q. What would be necessary to conclude that there had been rapid breakdown of large amounts of muscle tissue?

A. A CPK that was elevated.

Q. How much elevated?

A. Above normal range.

Q. Anything above normal?

A. Anything above normal.

Q. So if it was one point above the normal reference range, that would be significant -- that would be enough for a diagnosis of rhabdomyolysis?

MR. GIEBEL: Objection, form of the question.

A. Yes.

BY MS. WRIGHT:

Q. Anything else that indicates a rapid breakdown of a large muscle besides an elevated CPK?

A. Rhabdomyolysis can also cause kidney failure because of overload -- because of myoglobin and breakdown products of muscle overloading the kidney and causing it to malfunction or function poorly.

Q. Okay. Did Mr. Hartman have any evidence of

MR. GIEBEL: Object to the form of the question.

A. The patient had already discontinued his Baycol medication, which would have been the only medication that could have caused muscle damage or myopathy or rhabdo -- well.

BY MS. WRIGHT:

Q. Did he have any evidence -- you ordered a CPK test, correct?

A. Yes.

Q. When you got the results of that CPK test, was there any evidence of it, of rapid breakdown of large amounts of muscle?

A. No.

MR. GIEBEL: Object to the form of the question.

A. The CPK was 104. The reference range for CPK, according to the laboratory at Health East Medical Laboratory, was 30 to 190 being a normal range.

BY MS. WRIGHT:

Q. And so his CPK as of August 30th, 2001, was entirely within the normal range?

A. Yes.

MR. GIEBEL: Object to the form of the question.

BY MS. WRIGHT:
Q. And based on your definition of rhabdomyolysis, could he have been diagnosed with rhabdomyolysis given that CPK?
MR. GIEBEL: Same objections.
A. No.
BY MS. WRIGHT:
Q. Did you in fact diagnose him with rhabdomyolysis at that time?
A. I did not diagnose him with rhabdomyolysis. I remained suspicious and wanted to do laboratory testing to confirm or rule out the diagnosis.
Q. Okay. And did the laboratory testing either confirm or rule out the diagnosis?
A. It ruled out the diagnosis.
Q. Okay.
MR. GIEBEL: I'll object to the form of the question.
BY MS. WRIGHT:
Q. Did you do anything further to evaluate the complaints he said that he had that he attributed to Baycol?
A. The renal profile was done to evaluate for kidney function. A urinalysis was done to evaluate the patient's complaint of strands and streaks in his urine.

name -- maybe we should go off record for a moment.

(Discussion off the record.)

MR. GIEBEL: I have nothing further. Thank you, Dr. Neff.

FURTHER EXAMINATION

BY MS. WRIGHT:

Q. Doctor, just a few minutes of follow-up.

Going back to your 8/30/2001 typewritten note, the statement "Patient I do believe has had some rhabdomyolysis symptoms," I had understood your earlier testimony that was not a diagnosis, but more something to follow up on. It was part of your differential diagnosis.

MR. GIEBEL: Object to the form of the question.

A. That was a description of the patient's symptoms. Differential diagnosis -- yes, that was a possible differential diagnosis.

BY MS. WRIGHT:

Q. Okay. And when you obtained the normal CPK test from 8/30/2001, that enabled you to rule out rhabdomyolysis, correct?

MR. GIEBEL: Object, form.

A. With the normal CPK drawn 8/30/2001, I was no longer worried about rhabdomyolysis.

BY MS. WRIGHT:

Q. Were you able to rule it out?

MR. GIEBEL: Object, form of the question.

A. Yes.

MS. WRIGHT: I don't have anything further. Thank you.

MR. GIEBEL: I have one other question. I don't know if Mr. Horwitz does.

FURTHER EXAMINATION

BY MR. GIEBEL:

Q. But are you saying, Doctor, that you didn't need any subjective evaluation, no objective evaluation to rule, quote-unquote, rule out rhabdomyolysis?

MS. WRIGHT: Object to form.

A. I was confident with the normal laboratory results at that time that there was no evidence of rhabdomyolysis.

BY MR. GIEBEL:

Q. Okay. You say at that time. If you did have the follow-up checkup, or recheck as you characterized it, and there were either subjective evidence or objective evidence, would that have affected your comfort level at that point regarding rhabdomyolysis?

MS. WRIGHT: Object to form.

A. Yeah, if I was still suspecting rhabdomyolysis

at a follow-up visit, I would have retested and probably referred.

MR. GIEBEL: I have nothing further. Thank you, Doctor.

FURTHER EXAMINATION

BY MS. WRIGHT:

Q. When you say retested, you mean retested his CPK levels?

A. Yes.

Q. And those were retested in November of 2001, correct?

MR. GIEBEL: Object to the form of the question.

A. I don't have those laboratories, or I don't have that laboratory evaluation.

BY MS. WRIGHT:

Q. Showing you the November 1, 2001, lab report from Healthy Care System, it indicates that the referring physician was Dr. McCamy. The specimen was drawn on November 1, 2001. And does that particular report indicate a CPK test having been done?

A. Yes, it does.

MR. GIEBEL: Object to the form of the question.

BY MS. WRIGHT:

Q. And the CPK test was normal?

MR. GIEBEL: Object to the form of the question.

A. The CPK test result was 125, which falls within the normal range.

BY MS. WRIGHT:

Q. Did that confirm your earlier conclusion that Mr. Hartman did not have rhabdomyolysis?

MR. GIEBEL: Object to the form of the question.

A. With two normal CPK results, I would conclude that there was no rhabdomyolysis present.

MS. WRIGHT: I have nothing further, Doctor.

MR. GIEBEL: And I object to the form of that last question.

I have nothing further.

MS. WRIGHT: Thank you. You are off the hook. You are done.

(The deposition was concluded at 12:18 p.m.)

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

In re: BAYCOL PRODUCTS LITIGATION

MDL No. 1431
(MDJ/JGL)

---

DEPOSITION OF

JOHN R. HARTMAN

September 26, 2002

Reported by Alan Kunde

JOHN R. HARTMAN,

called as a witness, being first duly sworn,
testified as follows:

EXAMINATION

BY MR. MIZGALA:

Q. Good morning, Mr. Hartman.
A. Good morning.
Q. Could you please state your name for the record.
A. It's John Richard Hartman.
Q. Do you go by any other names, Mr. Hartman?
A. Yeah, Jack.
Q. Okay. Jack Hartman that would be?
A. Jack Hartman.
Q. And your date of birth, sir?
A. 2/15/35.
Q. Your current address?
A. 674 East Orange Avenue, St. Paul.
Q. Okay. Your zip code?
A. 55106.
Q. And your Social Security number, please?
A. 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.
Q. Mr. Hartman, have you ever been deposed before?
A. You mean like one of these?
Q. Yes.

suppose like a month later I had to park it.
Q. Okay. So you saw some document or -- what was it Fargo --
A. Fargo Forum newspaper.
Q. You saw a newspaper in which you learned that Baycol had been withdrawn from the market, correct?
A. Yeah, it was a headline news, said Baycol taken off market. And so I'm sitting there and I says Baycol, hey, I'm taking Baycol, so I went out to my truck and picked up the thing, says Baycol. I says, yeah -- I couldn't believe it. You know, they had about a two-page thing in the newspaper about it so.
Q. You stopped taking it that day?
A. Right.
Q. Okay. And it was about a month later that you couldn't drive your truck anymore, is that correct?
A. Right.
Q. So Baycol was withdrawn, an announcement was made on August 8th. Was that about the time you saw this, August 8th of 2001?
A. Right.

Q. If you look on page 67, the other page, in that note where it says, "DOT physical, see form." And you look to the right it says, "Passed kidney stones times 3 since last visit." And your last visit was 3/22.
A. Of?
Q. Of 2002 -- 2001, I'm sorry.
A. No, it would have to be two years before that.
Q. Well, you saw Dr. Neff for more than just your Department of Transportation physicals, right?
A. Yeah, she was my regular -- she was the regular -- see, there is five doctors in the office, and when -- my regular doctor is McCamy. When he's on vacation or something, Neff fills in for him. That must have been one of the times when I seen her because, you know, like for this physical and this -- renew my DOT.
Q. Now, sir --
A. But she wasn't my regular doctor.
Q. Okay. You've had kidney stones for quite sometime, correct?
A. Yeah, yes.
Q. When do you remember first having kidney stones?
A. I would guess maybe 10 years.

A. That could be.
MR. GIEBEL: I'll object to the form of the question, but you can answer.
Q. Could be as far as '84?
A. Yeah.
Q. One time your kidney stones were so bad you had renal failure, is that correct?
A. I was pretty sick. I don't know what you call it.
Q. You were hospitalized?
A. Yeah, then they took the kidney stone out. It was one that was so big it wouldn't pass, so they had to take it out.
Q. And you don't remember if they called it renal failure or not?
MR. GIEBEL: Let me object to the form of the question. Do you understand what renal failure is?
MR. MIZGALA: Counsel, objection to the form, but don't -- okay?
A. I don't know what renal is.
Q. You don't know what renal is. Okay. Did they say you had kidney failure at that time?
A. I think they just said you had a kidney stone

Went in there, grabbed it, and pulled it out of there. If they call that renal failure, I don't know.
Q. Okay. Looking at this note, Doctor, does that refresh your recollection that you passed three kidney stones in March of 2001?
MR. GIEBEL: I'm going to object to the form of the question. I think you said "doctor." Would you read that back for me, please.
BY MR. MIZGALA:
Q. Strike the last question. Mr. Hartman, does that refresh your recollection that you passed three kidney stones in March of 2001?
A. Yeah, I must have, yes.
Q. Mr. Hartman, what's it like to pass a kidney stone?
A. Well, it's probably the most pain I've ever -- can I give you an illustration?
Q. Go ahead sir. I want you to tell me what you experience when you pass a kidney stone.
A. It's a whole lot of failure, but I was passing one in Pennsylvania one time and a woman doctor come in and was telling me, she says, I was

you're going through because I have kidney stones, too, that I passed and I've had three kids, and them kidney stones are worse than any of them kids, so. If that will give you some kind of indication of the pain. Severe pain.
Q. Severe pain. Where do you feel the pain?
A. Mostly in your back back in here.
Q. Lower back?
A. Yeah, about here.
Q. Both sides?
A. Well, it depends, there is two kidneys, depends on which one it's going through.
Q. Have you had it on both sides at any time or just one side?
A. I think, I'm guessing now, but I think probably both sides that have passed, have gone through.
Q. Does the pain go down into your legs at all or does it stay just in your back?
A. No, it's in your back. Belt high.
Q. And can you estimate, sir, how regularly do you pass kidney stones? How often does this occur?
A. I don't know. Sometimes you can go a year or two years and you don't ever have one. All of a sudden you'll get one. When you get one, you

then there it says, Baycol taken off the market. And it just rung a bell in my head right there. I thought, well, this must be why my legs are going bad. Because I never had it before I took Baycol and I had it after. So a truck driver's opinion, that's my opinion.
Q. Sir, do you remember making complaints before you ever used Baycol --
A. No.
Q. -- to your physicians about your legs?
A. No. I can't -- can't remember that.
Q. Okay. Would it surprise you if the medical records showed you made previous complaints before you ever took Baycol about your legs?
MR. GIEBEL: I'll object to the form of the question. You may answer.
A. It could be, but I can't recall it.
Q. Sir, you characterized your diabetes as borderline, correct?
MR. GIEBEL: I'll object to the form of the question. Mischaracterizes the testimony. You may answer.
Q. You called your diabetes borderline, sir?
A. That's in my opinion. But I ain't no doctor or

people take insulin shots several times a day and all that. That's what I call real diabetes. Me, I don't take no shots, I don't check my blood sugar, I don't do any of that. He just put me on these couple pills, take one of them every day, you know.

Q. You're not checking your blood sugar now?

A. Never checked it in my life. He has, the doctor has when you go into the office.

Q. What does he tell you when he checks your blood sugar?

A. Well, sometimes he says it's higher than it's supposed to be. Supposed to be like, I don't know, 150 or 120 or something like that. I don't even know the figures.

Q. There are times it has been up around 400, 500, right?

A. Yeah, one time there when I was drinking a lot of coffee. I think that's when that 25 cups of coffee come into play. And I was putting sugar in the coffee and made it home and probably went to the doctor the next day for some other reason, and he said your blood sugar is high. So it added up, but I mean I did all that to get home.

your diabetes?
A. I can't remember dates. I imagine it has been four, five years anyway.
Q. But you were diagnosed with diabetes long before then, right?
A. Before the five years?
Q. Yes.
A. Whenever he said that I had diabetes, I think he put me on a pill.
Q. Okay. Did he ever offer insulin to you? Did your doctor offer you insulin shots?
A. Well, he asked me, would you like to go on insulin he says because it would bring it down faster than what the pills will do. The pills will take three, four days to bring it down to normal or whatever, safe or whatever they used. And I said no, I ain't. I don't want to be sticking myself with needles, with the insulin.
Q. All right. Did he ever advise you to check your blood sugar regularly?
A. Well, he does it, but I don't stick myself in the fingers. I mean that's worse than anything, almost as bad as kidney stones in my estimation.
When they come out with this new

# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE BAYCOL PRODUCTS LITIGATION | : | MDL NO. 1431 (MJD) |
| THIS DOCUMENT RELATES TO: | : | |
| JOHN HARTMAN V. BAYER A.G., ET AL. | : | CASE NO. 02-cv-00358-MJD |

DEPOSITION OF THOMAS L. LUNDSTEN, M.D.

JULY 11, 2006

9:10 A.M.

COPY

REPORTED BY: HART ERICKSON
ERICKSON COURT REPORTING
2902 KEATING CIRCLE
BURNSVILLE, MINNESOTA 55337
PHONE: 952.890.0265 * FAX: 952.426.2265

THOMAS L. LUNDSTEN, M.D.,

a witness in the above-entitled matter, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. WRIGHT:

Q. Dr. Lundsten, we met briefly off the record. I'm Elizabeth Wright, I'm from Dorsey & Whitney, and we represent Bayer in this litigation.

A. Okay.

Q. And when I say "this litigation," I'm referring to lawsuits against Bayer relating to Baycol.

A. Okay.

Q. Could we just have your full name for the record?

A. Sure. Thomas Lawrence Lundsten.

Q. Where are you currently living?

A. I'm living in South St. Paul, Minnesota, 2223 Florence Lane.

Q. Do you intend to stay there for the foreseeable future?

A. Uh-huh.

Q. Is that a yes?

A. Yes. I'm sorry.

Q. Have you been deposed before?

A. One other time, yes.

problems he attributes to his use of Baycol?
A. Yes.
Q. Has Mr. Hartman been a patient of yours at any point?
A. Just going over the chart, first of all, the name is vaguely familiar. I probably could be sitting at the table here and not quite know which one is John, however, because I don't readily recall what he looks like. The name is familiar. I did see him a few times in the '80s, I believe '87, according to the chart here.
Q. Do you see any other entries in the chart after '87 that you made?
A. I refilled a Baycol prescription in 2000.
Q. Are you able to tell the month?
A. I can find it here. I did have it marked. Okay. 9/7/2000.
Q. And how long did you refill that for?
A. I refilled it for a year.
Q. Did you see Mr. Hartman before you refilled the prescription?
A. I did not.
Q. This is a situation where someone called in and asked for a refill?
A. Correct.

Q. Okay. What's your procedure, generally, when somebody calls in and asks for a refill?
A. It depends on the patient. If we haven't seen the patient within the last six months or, you know, depending on the prescription, even a year, we certainly will not refill it. If a patient has been quite regular about coming in, then we'll go ahead and refill it.
Q. Okay. Now, if it's a patient that you have not seen in, say, the past year, do you have a procedure that you usually use before you authorize a refill?
A. I would refill it for probably one to two months, depending on the medicine, because if it's a hypertensive medicine, you definitely want them to stay on that, or if it's a heart medicine, you don't want to just not give it to them, but then I will attach a note that, please, you need to be seen in the next one to two months.
Q. Do you typically review the patient's chart before authorizing a refill?
A. Correct.
Q. And do you recall doing that in Mr. Hartman's case?
A. I do not recall.

Q. Do you recall any of the events surrounding your refill of his Baycol prescription?
A. I don't recall. I guess my procedure would be to look at when he was last seen, is he a regular patient, when his lab levels were checked and that sort of thing.
Q. And if you had seen anything in the chart that suggested that he had any problems that you would attribute to Baycol or possibly attribute to Baycol, would you typically permit a refill?
A. I would expect him to come in.
Q. Okay.
A. I would expect him to come in. I would probably refill it again maybe for a month or so, but I would expect him to come in if I attributed a problem.
Q. Does the fact that you authorized a one-year refill suggest to you that you had not noted any problems on Baycol?
A. Correct.
Q. Okay. Other than your review of the chart and your training and experience as a physician, did you rely on anything else in authorizing the refill of Mr. Hartman's Baycol prescription?
A. No.

# Exhibit F

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

In Re: BAYCOL PRODUCTS LITIGATION | MDL 1431

This Document Relates to:

Name of Plaintiff: [ John ("Jock") Hartmann

**CASE SPECIFIC EXPERT REPORT PURSUANT TO PTO 114**

1. My name is: Allan E. McLaney M.D.

2. My curriculum vitae, including all my publications for the past ten years, is attached. My charges for this review and report are $__________.

3. Attached is a list of cases in which I have testified as an expert, either at trial or in deposition, in the past four years. If no such list is attached, I have not testified as an expert in the past four years. – none –

4. I have reviewed the following medical records of the above patient. My opinion is based on my review of these records. [CHECK HERE IF APPLICABLE: X My opinion is based on my examination of the patient.] I understand that there may be other records for this patient beyond those which I have reviewed:

a. I have also been extensively involved in Mr. Hartmann's hospital care

b. __________

5. It is my opinion that this patient has suffered injuries or damages related to this patient's ingestion of Baycol. These injuries include the following:

a. Baycol associated myopathy, primarily involving the proximal musculature of his legs.

SPFS000002jh

b. There has been no evidence for rhabdomyolysis, since muscle

c. enzymes and renal function were normal. Baycol myopathy (inflammation) or myalgia (pain) need not demonstrate lab abnormalities. The diagnosis

6. The grounds for my opinion are as follows: and myopathy may only show biopsy abnormalities. Biopsy wasn't done and wasn't in Mr. Hordorn's case.

yes a. There is a claim of injury as described above in the patient's medical records.

yes b. The claim of injury in the medical records is reasonably contemporaneous with the patient's ingestion of Baycol.

c. There is no other explanation for this injury apparent in the medical records I have reviewed.

yes d. The injury described is of new onset with the taking of Baycol.

yes e. The described injury did not grow worse after Baycol was removed.

f. ____________________

g. ____________________

7. I understand, pursuant to PTO 114, that I may supplement this report pursuant to ongoing discovery, including my review of additional medical records.

Date: 6/3/04

NAME: Allan E. McCorry MD
ADDRESS: Maryland Clinic
911 E. Maryland Avenue
St. Paul, Minn. 55106

Addendum: Dr. Neff left our practice several years ago and now resides in California. Since I have cared for Mr. Hordorn extensively since then as well as periodically before then, I am also well aware of his issues and symptoms concerning baycol. My opinions are based on our evolving understanding of baycol (and other "statin" drugs) muscle related side effects, and Mr. Hordorn's well documented clinical symptoms.

# Exhibit G

# BAYCOL™
## (cerivastatin sodium tablets)

PZ500041 9/97

### DESCRIPTION

Cerivastatin sodium is sodium [S-[R*,S*-(E)]]-7-[4-(4-fluorophenyl)-5-methoxymethyl)-2,6bis(1-methylethyl)-3-pyridinyl]-3,5-dihydroxy-6-heptenoate. The empirical formula for cerivastatin sodium is $C_{26}H_{33}FNO_5Na$ and its molecular weight is 481.5. It has the following chemical structure:



Cerivastatin sodium is a white to off-white hygroscopic amorphous powder that is soluble in water, methanol, and ethanol, and very slightly soluble in acetone.

Cerivastatin sodium is an entirely synthetic, enantiomerically pure inhibitor of 3-hydroxy-3-methylglutaryl-coenzyme A (HMG-CoA) reductase. HMG-CoA reductase catalyzes the conversion of HMG-CoA to mevalonate, which is an early and rate-limiting step in the biosynthesis of cholesterol.

BAYCOL™ (cerivastatin sodium tablets) is supplied as tablets containing 0.2 or 0.3 mg of cerivastatin sodium, for oral administration. Active Ingredient: cerivastatin sodium. Inactive Ingredients: mannitol, magnesium stearate, sodium hydroxide, crospovidone, povidone, iron oxide yellow, methylhydroxypropylcellulose, polyethylene glycol, and titanium dioxide.

### CLINICAL PHARMACOLOGY

Cholesterol and triglycerides circulate as part of lipoprotein complexes throughout the bloodstream. These complexes can be separated via ultracentrifugation into high-density lipoprotein (HDL), intermediate-density lipoprotein (IDL), low-density lipoprotein (LDL) and very-low-density lipoprotein (VLDL) fractions. In the liver, cholesterol and triglycerides (TG) are synthesized, incorporated into VLDL, and released into the plasma for delivery to peripheral tissues.

A variety of clinical studies have demonstrated that elevated levels of total cholesterol (total-C), LDL-C, and apolipoprotein B (apo-B, a membrane complex for LDL-C) promote human atherosclerosis. Similarly, decreased levels of HDL-C (and its transport complex, apolipoprotein A) are associated with the development of atherosclerosis. Epidemiologic investigations have established that cardiovascular morbidity and mortality vary directly with the level of total-C and LDL-C and inversely with the level of HDL-C.

In patients with hypercholesterolemia, BAYCOL™ (cerivastatin sodium tablets) has been shown to reduce plasma total cholesterol, LDL-C, and apolipoprotein B [illegible] The agent has no consistent effect on plasma Lp(a). The effect of BAYCOL™ on cardiovascular morbidity and mortality has not been determined.

**Mechanism of Action:** Cerivastatin is a competitive inhibitor of HMG-CoA reductase, which is responsible for the conversion of 3-hydroxy-3-methyl-glutaryl-coenzyme A (HMG-CoA) to mevalonate, a precursor of sterols, including cholesterol. The inhibition of cholesterol biosynthesis by cerivastatin reduces the level of cholesterol in hepatic cells, which stimulates the synthesis of LDL receptors, thereby increasing the uptake of cellular LDL particles. The end result of these biochemical processes is a reduction of the plasma cholesterol concentration.

**Pharmacokinetics: Absorption**

BAYCOL™ (cerivastatin sodium tablets) is administered orally in the active form. The mean absolute bioavailability of cerivastatin following a 0.2-mg tablet oral dose is 60% (range 39 - 101%). In general, the coefficient of variation (based on the inter-subject variability) for both systemic exposure (area under the curve, AUC) and $C_{max}$ is in the 20% to 40% range. The bioavailability of cerivastatin sodium tablets is equivalent to that of a solution of cerivastatin sodium. No unchanged cerivastatin is excreted in feces. Cerivastatin exhibits linear kinetics over the dose range of 0.05 to 0.3 mg daily. Mean maximum concentrations ($C_{max}$) following evening cerivastatin tablet doses of 0.05, 0.1, 0.2, and 0.3 mg are 0.6, 1.3, 2.4, and 3.8 µg/L, respectively. AUC values are also dose-proportional over this dose range and the mean time to maximum concentration ($t_{max}$) is approximately 2.5 hours for all dose strengths. Following oral administration, the terminal elimination half-life ($t_{1/2}$) for cerivastatin is 2 to 3 hours. Steady-state plasma concentrations show no evidence of cerivastatin accumulation following administration of up to 0.40 mg daily.

Results from an overnight pharmacokinetic evaluation following single-dose administration of cerivastatin with the evening meal or 4 hours after the evening meal showed that administration of cerivastatin with the evening meal did not significantly alter either AUC or $C_{max}$ compared to dosing the drug 4 hours after the evening meal. In patients given 0.2 mg cerivastatin sodium once daily for 4 weeks, either at mealtime or at bedtime, there were no differences in the lipid-lowering effects of cerivastatin. Both regimens of 0.2 mg once daily were slightly more efficacious than 0.1 mg twice daily.

**Distribution:** The volume of distribution ($VD_{SS}$) is calculated to be 0.3 L/kg. More than 99% of the circulating drug is bound to plasma proteins (80% to albumin). Binding is reversible and independent of drug concentration up to 100 mg/L.

**Metabolism:** Biotransformation pathways for cerivastatin in humans include the following: demethylation of the benzylic methyl ether to form M1 and hydroxylation of the methyl group in the 6'-isopropyl moiety to form M23. The combination of both reactions leads to formation of metabolite M24. The major circulating blood components are cerivastatin and the pharmacologically active M1 and M23 metabolites. The relative potencies of metabolites M1 and M23 are approximately 50% and 80% of the parent compound, respectively. Following a 0.3-mg dose of cerivastatin to 6 healthy volunteers, mean $C_{max}$ values for cerivastatin, M1, and M23 were 3.0, 0.2, and 0.5 µg/L, respectively. Therefore, the cholesterol-lowering effect is due primarily to the parent compound, cerivastatin.

**Excretion:** Cerivastatin itself is not found in either urine or feces; M1 and M23 are the major metabolites excreted by these routes. Following an oral dose of 0.4 mg $^{14}C$-cerivastatin to healthy volunteers, excretion of radioactivity is about 24% in the urine and 70% in the feces. The parent compound, cerivastatin, accounts for less than 2% of the total radioactivity excreted. The plasma clearance for cerivastatin in humans after intravenous dosing is 12 to 13 liters per hour.

SPECIAL POPULATIONS

| | |
|---|---|
| Geriatric: | Plasma concentrations of cerivastatin are similar in healthy elderly male subjects (>65 years) and in young males (<40 years). |
| Gender: | Plasma concentrations of cerivastatin in females are slightly higher than in males (approximately 12% higher for $C_{max}$ and 16% higher for AUC). |
| Pediatric: | Cerivastatin pharmacokinetics have not been studied in pediatric patients. |
| Race: | Cerivastatin pharmacokinetics were compared across studies in Caucasian, Japanese and Black subjects. **No significant differences in AUC, $C_{max}$, $t_{max}$ and $t_{1/2}$ were found.** |
| **Renal:** | **Steady-state plasma concentrations of cerivastatin are similar in healthy volunteers ($Cl_{cr}$>90 mL/min/1.73m²) and in patients with mild renal impairment ($Cl_{cr}$ 61-90 mL/min/1.73m²). In patients with** moderate ($Cl_{cr}$ 31-60 mL/min/1.73m²) or severe ($Cl_{cr}$ ≤30 mL/min/1.73m²) renal impairment, AUC is up to 60% higher, $C_{max}$ up to 23% higher and $t_{1/2}$ up to 47% longer compared to subjects with normal renal function. |
| Hemodialysis: | While studies have not been conducted in patients with end-stage renal disease, hemodialysis is not expected to significantly enhance clearance of cerivastatin since the drug is extensively bound to plasma proteins. |
| Hepatic: | Cerivastatin has not been studied in patients with active liver disease (see CONTRAINDICATIONS). Caution should be exercised when BAYCOL™ (cerivastatin sodium tablets) is administered to patients with a history of liver disease or heavy alcohol ingestion (see WARNINGS). |

**Clinical Studies:** BAYCOL™ (cerivastatin sodium tablets) has been studied in controlled trials in North America, Europe, Israel and South Africa and has been shown to be effective in reducing plasma total cholesterol (Total-C) and LDL cholesterol (LDL-C) in heterozygous familial and non-familial forms of hypercholesterolemia and in mixed hyperlipidemia. Over 2,800 patients with Type IIa and IIb hypercholesterolemia were treated in trials of 4 to 104 weeks duration. In a 24-week, randomized, double-blind, placebo-controlled US trial in 934 patients with primary hypercholesterolemia, BAYCOL™ (cerivastatin sodium tablets) 0.05 to 0.3 mg once daily produced dose-related reductions in plasma LDL-C and Total-C. Significant reductions in mean total-C and LDL-C were evident after one week, peaked at four weeks, and were maintained for the duration of the trial. Reductions in plasma triglycerides (TG) and increases in HDL-C were also observed. The results from this study in patients treated with the marketed doses of cerivastatin are summarized in Table 1.

**Table 1**

**Response in Patients with Primary Hypercholesterolemia Mean Percent Change from Baseline after 24 Weeks**

| Dosage | n | Total-C | LDL-C | HDL-C | TG | Apo-B |
|---|---|---|---|---|---|---|
| Placebo | 137* | +1.7 | +1.8 | +3.1 | +1.1 | +3.2 |
| BAYCOL™ | | | | | | |
| 0.2 mg qd** | 143† | 17.4 | 25.3 | +10.4 | 10.7 | 18.7 |
| 0.3 mg qd** | 135‡ | 19.4 | 28.2 | +10.3 | 12.7 | 20.5 |

* 137 patients were evaluated for all parameters except LDL-C which had 136 patients.

† 143 patients were evaluated for Total-C, HDL-C and TG. For LDL-C and Apo-B there were 140 and 141 patients evaluated, respectively.

‡ 135 patients were evaluated for all parameters except LDL-C which had 134 patients.

** qd = once daily

In a separate dose-scheduling study, BAYCOL™ (cerivastatin sodium tablets) was given as either a 0.2-mg dose once daily with dinner or at bedtime or as a 0.1-mg dose twice daily (morning and evening). Mean LDL-C reduction in response to BAYCOL™ dosed once with dinner or at bedtime was about 4% greater than the mean reduction in response to twice daily (divided) dosing ($p<0.05$).

### INDICATIONS AND USAGE

Therapy with lipid-altering drugs should be a component of multiple risk factor intervention in those patients at significantly high risk for atherosclerotic vascular disease due to hypercholesterolemia. BAYCOL™ (cerivastatin sodium tablets) is indicated as an adjunct to diet for the reduction of elevated total and LDL cholesterol levels in patients with primary hypercholesterolemia and mixed dyslipidemia (Fredrickson Types IIa and IIb) when the response to dietary restriction of saturated fat and cholesterol and other non-pharmacological measures alone has been inadequate.

Before considering therapy with lipid-altering agents, secondary causes of hypercholesterolemia, e.g., poorly controlled diabetes mellitus, hypothyroidism, nephrotic syndrome, dysproteinemias, obstructive liver disease, other drug therapy, alcoholism, should be excluded and a lipid profile performed to measure Total-C, HDL-C, and triglycerides (TG). For patients with TG less than 400 mg/dL, LDL-C can be estimated using the following equation:

LDL-C = [Total-C] minus [HDL-C + TG/5]

For TG levels > 400 mg/dL, this equation is less accurate and LDL-C concentrations should be directly measured by preparative ultracentrifugation. In many hypertriglyceridemic patients, LDL-C may be low or normal despite elevated Total-C. In such cases, BAYCOL™ (cerivastatin sodium tablets) is not indicated.

Lipid determinations should be performed at intervals of no less than four weeks.

The National Cholesterol Education Program (NCEP) Treatment Guidelines are summarized in Table 2.

**Table 2**

**National Cholesterol Education Program (NCEP) Treatment Guidelines**

**LDL-Cholesterol mg/dL (mmol/L)**

| Definite Atherosclerotic Disease* | Two or More Other Risk Factors** | Initiation Level*** | Goal |
|---|---|---|---|
| NO | NO | ≥ 190 (≥ 4.9) | < 160 (<4.1) |
| NO | YES | ≥ 160 (≥ 4.1) | < 130 (<3.4) |
| YES | YES or NO | ≥ 130 (≥ 3.4) | < 100 (<2.6) |

* Coronary heart disease or peripheral vascular disease (including symptomatic carotid artery disease)

** Other risk factors for coronary heart disease (CHD) include the following: age (males: ≥ 45 years; females: ≥ 55 years or premature [illegible] pause without estrogen replacement therapy); family history of premature CHD; current cigarette smoking [illegible] HDL-C < 35 mg/dL (< 0.91 mmol/L); and diabetes mellitus. Subtract one risk factor if HDL-C is ≥ 60 mg/dL (≥ 1.6 mmol/L).

*** In CHD patients with LDL-C levels 100-129 mg/dL, the physician should exercise clinical judgement in deciding whether to initiate drug treatment.

At the time of hospitalization for an acute coronary event, consideration can be given to initiating drug therapy at discharge if the LDL-C level is ≥ 130 mg/dL (NCEP-ATP II).

Since the goal of treatment is to lower LDL-C, the NCEP recommends that LDL-C levels be used to initiate and assess treatment response. Only if LDL-C levels are not available, should the Total-C be used to monitor therapy.

Although BAYCOL™ may be useful to reduce elevated LDL-cholesterol levels in patients with combined hypercholesterolemia and hypertriglyceridemia where hypercholesterolemia is the major abnormality (Type IIb hyperlipoproteinemia), it has not been studied in conditions where the major abnormality is elevation of chylomicrons, VLDL, or IDL (i.e., hyperlipoproteinemia types I, III, IV, or V).[†]

### CONTRAINDICATIONS

Active liver disease or unexplained persistent elevations of serum transaminases (see **WARNINGS**).

Pregnancy and lactation: Atherosclerosis is a chronic process, and the discontinuation of lipid-lowering drugs during pregnancy should have little impact on the outcome of long-term therapy of primary hypercholesterolemia. Moreover, cholesterol and other products of the cholesterol biosynthesis pathway are essential components for fetal development, including synthesis of steroids and cell membranes. Since HMG-CoA reductase inhibitors decrease cholesterol synthesis and possibly the synthesis of other biologically active substances derived from cholesterol, they may cause fetal harm when administered to pregnant women. Therefore, HMG-CoA reductase inhibitors are contraindicated during pregnancy and in nursing mothers. **Cerivastatin sodium should be administered to women of child-bearing age only when such patients are highly unlikely to conceive and have been informed of the potential hazards.** If the patient becomes pregnant while taking this drug, cerivastatin sodium should be discontinued and the patient should be apprised of the potential hazard to the fetus.

Hypersensitivity to any component of this medication.

### WARNINGS

***Liver Enzymes:*** HMG-CoA reductase inhibitors have been associated with biochemical abnormalities of liver function. Persistent increases of serum transaminase (ALT, AST) values to more than 3 times the upper limit of normal (occurring on two or more not necessarily sequential occasions) have been reported in less than 1.0% of patients treated with cerivastatin sodium in the US over an average period of 11 months. Most of these abnormalities occurred within the first 6 weeks of treatment, resolved after discontinuation of the drug, and were not associated with cholestasis. In most cases, these biochemical abnormalities were asymptomatic.

**It is recommended that liver function tests be performed before the initiation of treatment, at 6 and 12 weeks after initiation of therapy or elevation in dose, and periodically thereafter, e.g., semiannually.** Patients who develop increased transaminase levels should be monitored with a second liver function evaluation to confirm the finding and be followed thereafter with frequent liver function tests until the abnormality(ies) return to normal. Should an increase in AST or ALT of three times the upper limit of normal or greater persist, withdrawal of cerivastatin sodium therapy is recommended.

Active liver disease or unexplained transaminase elevations are contraindications to the use of BAYCOL™ (cerivastatin sodium tablets) (see **CONTRAINDICATIONS**). Caution should be exercised when cerivastatin sodium is administered to patients with a history of liver disease or heavy alcohol ingestion (see **CLINICAL PHARMACOLOGY: Pharmacokinetics/Metabolism**). Such patients should be started at the low end of the recommended dosing range and closely monitored.

***Skeletal Muscle:*** **Rare cases of rhabdomyolysis with acute renal failure secondary to myoglobinuria have been reported with other HMG-CoA reductase inhibitors.** Myopathy, defined as muscle aching or muscle weakness, associated with increases in plasma creatine kinase (CK) values to greater than 10 times the upper limit of normal, was rare (<0.2%) in U.S. cerivastatin clinical trials. Myopathy should be considered in any patient with diffuse myalgias, muscle tenderness or weakness, and/or marked elevation of CK. Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever. BAYCOL™ (cerivastatin sodium tablets) therapy should be discontinued if markedly elevated CK levels occur or myopathy is diagnosed or suspected. **BAYCOL™ (cerivastatin sodium tablets) should be temporarily withheld in any patient experiencing an acute or serious condition predisposing to the development of renal failure secondary to rhabdomyolysis, e.g., sepsis; hypotension; major surgery; trauma; severe metabolic, endocrine or electrolyte disorders; or uncontrolled epilepsy.**

The risk of myopathy during treatment with other HMG-CoA reductase inhibitors is increased with concurrent administration of cyclosporine, fibric acid derivatives, erythromycin, azole antifungals or lipid-lowering doses of niacin.

Uncomplicated myalgia has been observed infrequently in patients treated with cerivastatin sodium at rates that could not be distinguished from placebo.

The use of fibrates alone occasionally may be associated with myopathy. The combined use of HMG-CoA inhibitors and fibrates generally should be avoided.

### PRECAUTIONS

**General:** Before instituting therapy with BAYCOL™ (cerivastatin sodium tablets), an attempt should be made to control hypercholesterolemia with appropriate diet, exercise, weight reduction in obese patients, and treatment of underlying medical problems (see INDICATIONS AND USAGE).

Cerivastatin sodium may elevate creatine kinase and transaminase levels (see ADVERSE REACTIONS). This should be considered in the differential diagnosis of chest pain in a patient on therapy with cerivastatin sodium.

**Homozygous Familial Hypercholesterolemia:** Cerivastatin sodium has not been evaluated in patients with rare homozygous familial hypercholesterolemia. HMG-CoA reductase inhibitors have been reported to be less effective in these patients because they lack functional LDL receptors.

**Information for Patients:** Patients should be advised to report promptly unexplained muscle pain, tenderness, or weakness, particularly if accompanied by malaise or fever.

**Drug Interactions: Immunosuppressive Drugs, Fibric Acid Derivatives, Niacin (Nicotinic Acid), Erythromycin, Azole Antifungals:** See WARNINGS: Skeletal Muscle.

**ANTACID** (Magnesium-Aluminum Hydroxide): Cerivastatin plasma concentrations were not affected by co-administration of antacid.

**CIMETIDINE:** Cerivastatin plasma concentrations were not affected by co-administration of cimetidine.

**CHOLESTYRAMINE:** The influence of the bile-acid-sequestering agent cholestyramine on the pharmacokinetics of cerivastatin

sodium was evaluated in 12 healthy males in 2 separate randomized crossover studies. In the first study, concomitant administration of 0.2 mg cerivastatin sodium and 12 g cholestyramine resulted in decreases of more than 22% for AUC and 40% for $C_{max}$ when compared to dosing cerivastatin sodium alone. However, in the second study, administration of 12 g cholestyramine 1 hour before the evening meal and 0.3 mg cerivastatin sodium approximately 4 hours after the same evening meal resulted in a decrease in the cerivastatin AUC of less than 8%, and a decrease in $C_{max}$ of about 30% when compared to dosing cerivastatin sodium alone. Therefore, it would be expected that a dosing schedule of cerivastatin sodium given at bedtime and cholestyramine given before the evening meal would not result in a significant decrease in the clinical effect of cerivastatin sodium.

**DIGOXIN:** Plasma digoxin levels and digoxin clearance at steady-state were not affected by co-administration of 0.2 mg cerivastatin sodium. Cerivastatin plasma concentrations were also not affected by co-administration of digoxin.

**WARFARIN:** Co-administration of warfarin and cerivastatin to healthy volunteers did not result in any changes in prothrombin time or clotting factor VII when compared to co-administration of warfarin and placebo. The AUC and $C_{max}$ of both the (R) and (S) isomers of warfarin were unaffected by concurrent dosing of 0.3 mg cerivastatin sodium. Co-administration of warfarin and cerivastatin did not alter the pharmacokinetics of cerivastatin sodium.

**ERYTHROMYCIN:** In hypercholesterolemic patients, steady-state cerivastatin AUC and $C_{max}$ increased approximately 50% and 24% respectively after 10 days with co-administration of erythromycin, a known inhibitor of cytochrome P450 3A4.

**OTHER CONCOMITANT THERAPY:** Although specific interaction studies were not performed, in clinical studies, cerivastatin sodium was used concomitantly with angiotensin-converting enzyme (ACE) inhibitors, beta-blockers, calcium-channel blockers, diuretics, and nonsteroidal anti-inflammatory drugs (NSAIDs) without evidence of clinically significant adverse interactions.

**Endocrine Function:** HMG-CoA reductase inhibitors interfere with cholesterol synthesis and lower cholesterol levels and, as such, might theoretically blunt adrenal or gonadal steroid hormone production.

Clinical studies have shown that cerivastatin sodium has no adverse effect on sperm production and does not reduce basal plasma cortisol concentration, impair adrenal reserve or have an adverse effect on thyroid metabolism as assessed by TSH. Results of clinical trials with drugs in this class have been inconsistent with regard to drug effect on basal and reserve steroid levels. The effects of HMG-CoA reductase inhibitors on male fertility have not been studied in adequate numbers of male patients. The effects, if any, on the pituitary-gonadal axis in pre-menopausal women are unknown.

Patients treated with cerivastatin sodium who develop clinical evidence of endocrine dysfunction should be evaluated appropriately. Caution should be exercised if an HMG-CoA reductase inhibitor or other agent used to lower cholesterol levels is administered to patients also receiving other drugs that may decrease the levels or activity of endogenous steroid hormones, e.g., ketoconazole, spironolactone, or cimetidine.

**CNS and other Toxicities:** Chronic administration of cerivastatin to rodent and non-rodent species demonstrated the principal toxicologic targets and effects observed with other HMG-CoA reductase inhibitors: Hemorrhage and edema in multiple organs and tissues including CNS (dogs); cataracts (dogs); degeneration of muscle fibers (dogs, rats, and mice); hyperkeratosis in the nonglandular stomach (rats and mice, this organ has no human equivalent); liver lesions (dogs, rats, and mice).

CNS lesions were characterized by multifocal bleeding with fibrinoid degeneration of vessel walls in the plexus chorioideus of the brain stem and in the ciliary body of the eye at 0.1 mg/kg/day in the dog. This dose resulted in plasma levels of cerivastatin ($C_{max}$), that were about 23 times higher than the mean values in humans taking 0.3 mg/day. No CNS lesions were observed after chronic treatment with cerivastatin for up to two years in the mouse ($C_{max}$ up to 7 times that of humans at 0.3 mg/day) and rat ($C_{max}$ up to 2 times that of humans).

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** A 2-year study was conducted in rats at average daily doses of cerivastatin of 0.007, 0.034, or 0.158 mg/kg. The high dosage level corresponded to plasma drug levels (AUC) of approximately 1 - 2 times the mean human plasma drug concentrations after a 0.3-mg oral dose. Tumor incidences of treated rats were comparable to controls in all treatment groups. In a 2-year carcinogenicity study in mice with average daily doses of cerivastatin of 0.4, 1.8, 9.1, or 55 mg/kg hepatocellular adenomas were significantly increased in male and female mice at ≥9.1 mg/kg and hepatocellular carcinomas were significantly increased in male mice at ≥1.8 mg/kg. These doses were in the range of human exposure (dose of 0.3 mg/day).

No evidence of genotoxicity was observed *in vitro* with or without metabolic activation in the following assays: microbial mutagen tests using mutant strains of *S. typhimurium* or *E. coli*, Chinese Hamster Ovary Forward Mutation Assay, Unscheduled DNA Synthesis in rat primary hepatocytes, chromosome aberrations in Chinese Hamster Ovary cells, and spindle inhibition in human lymphocytes. In addition, there was no evidence of genotoxicity *in vivo* in a mouse Micronucleus Test; there was equivocal evidence of mutagenicity in a mouse Dominant Lethal Test.

In a combined male and female rat fertility study, cerivastatin had no adverse effects on fertility or reproductive performance at doses up to 0.1 mg/kg/day, a dose that produced plasma drug levels ($C_{max}$) about 1 - 2 times higher than mean plasma drug levels for humans receiving 0.3 mg cerivastatin/day. At a dose of 0.3 mg/kg/day (plasma $C_{max}$ 4 - 5 times the human level), the length of gestation was marginally prolonged, stillbirths were increased, and the survival rate up to day 4 postpartum was decreased. In the fetuses (F1), a marginal reduction in fetal weight and delay in bone development was observed. In the mating of the F1 generation, there was a reduced number of female rats that littered.

In the testicles of dogs treated chronically with cerivastatin at a dose of 0.008 mg/kg/day (approximately 2 fold the human exposure at doses of 0.3 mg based on $C_{max}$), atrophy, vacuolization of the germinal epithelium, spermatidic giant cells, and focal oligospermia were observed. In another 1-year study in dogs treated with 0.1 mg/kg/day (approximately 23 fold the human exposure at doses of 0.3 mg based on $C_{max}$), ejaculate volume was small and libido was decreased. Semen analysis revealed an increased number of morphologically altered spermatozoa indicating disturbances of epididymal sperm maturation that was reversible when drug administration was discontinued.

**Pregnancy: Pregnancy Category X: (See CONTRAINDICATIONS):** Cerivastatin caused a significant increase in incomplete ossification of the lumbar center of the vertebrae in rats at an oral dose of 0.72 mg/kg. Cerivastatin did not cause any anomalies or malformations in rabbits at oral doses up to 0.75 mg/kg. These doses resulted in plasma levels ($C_{max}$) 6-7 times the human exposure for rats and 3-4 times the human exposure for rabbits (human dose 0.3 mg). Cerivastatin crossed the placenta and was found in fetal liver, gastrointestinal tract, and kidneys when pregnant rats were given a single oral dose of 2 mg/kg.

Safety in pregnant women has not been established. Cerivastatin should be administered to women of child-bearing potential only when such patients are highly unlikely to conceive and have been informed of the potential hazards. Rare reports of congenital anomalies have been received following intrauterine exposure to other HMG-CoA reductase inhibitors. In a review of approximately 100 prospectively followed pregnancies in women exposed to simvastatin or lovastatin, the incidences of congenital anomalies, spontaneous abortions and fetal deaths/stillbirths did not exceed what would be expected in the general population. The number of cases is adequate only to exclude a three- to four-fold increase in congenital anomalies over the background incidence. In 89% of the prospectively followed pregnancies, drug treatment was initiated prior to pregnancy and was discontinued at some point in the first trimester when pregnancy was identified. As safety in pregnant women has not been established and there is no apparent benefit to therapy with BAYCOL™ during pregnancy (see CONTRAINDICATIONS), treatment should be immediately discontinued as soon as pregnancy is recognized. If a women becomes pregnant while taking cerivastatin, the drug should be discontinued and the patient advised again as to potential hazards to the fetus.

**Nursing Mothers:** Based on preclinical data, cerivastatin is present in breast milk in a 1.3:1 ratio (milk:plasma). Because of the potential for serious adverse reactions in nursing infants, nursing women should not take cerivastatin (see CONTRAINDICATIONS).

**Pediatric Use:** Safety and effectiveness in pediatric patients have not been established.

**Geriatric Use:** In clinical pharmacology studies, there were no clinically relevant effects of age on the pharmacokinetics of cerivastatin sodium.

**Renal Insufficiency:** Patients with significant renal impairment ($Cl_{cr}$ < 60 mL/min/1.73m²) have increased AUC (up to 60%) and $C_{max}$ (up to 23%) and should be administered BAYCOL™ with caution.

**Hepatic Insufficiency:** Safety and effectiveness in hepatically impaired patients have not been established. Cerivastatin should be used with caution in patients who have a history of liver disease and/or consume substantial quantities of alcohol (see Contraindications and Warnings).

## ADVERSE REACTIONS

In the U.S. placebo-controlled clinical studies, discontinuations due to adverse events occurred in 3% of cerivastatin sodium treated patients and in 3% of patients treated with placebo. Adverse reactions have usually been mild and transient. Cerivastatin sodium has been evaluated for adverse events in more than 3,000 patients and is generally well-tolerated.

**Clinical Adverse Experiences:** Adverse experiences occurring with a frequency ≥2% for marketed doses of cerivastatin sodium, regardless of causality assessment, in U.S. placebo-controlled clinical studies, are shown in the Table 3 below:

**Table 3**

**Adverse Experiences Occurring In ≥2% of Patients in U.S. Placebo-Controlled Clinical Studies**

| Adverse Event | BAYCOL™ (n = 552) | Placebo (n = 247) |
|---|---|---|
| **Body as a Whole** | | |
| Headache | 11.8% | 12.6% |
| Accidental Injury | 7.1% | 6.9% |
| Flu Syndrome | 6.3% | 8.1% |
| Back Pain | 4.0% | 6.1% |
| Abdominal Pain | 3.4% | 3.6% |
| Asthenia | 3.4% | 2.8% |
| Chest Pain | 2.9% | 2.8% |
| Leg Pain | 2.0% | 1.2% |
| **Cardiovascular** | | |
| Peripheral Edema | 2.0% | 1.2% |
| **Digestive** | | |
| Dyspepsia | 5.6% | 4.9% |
| Diarrhea | 4.0% | 3.6% |
| Flatulence | 3.4% | 3.6% |
| Nausea | 2.7% | 3.2% |
| Constipation | 1.8% | 2.0% |
| Surgery | 1.4% | 3.6% |
| **Musculoskeletal** | | |
| Arthralgia | 6.7% | 4.5% |
| Myalgia | 2.7% | 1.2% |
| **Nervous** | | |
| Dizziness | 2.5% | 3.6% |
| Insomnia | 2.2% | 1.2% |
| **Respiratory** | | |
| Rhinitis | 13.2% | 12.1% |
| Pharyngitis | 12.0% | 17.0% |
| Sinusitis | 6.9% | 5.7% |
| Cough Increased | 2.7% | 2.0% |
| **Skin and Appendages** | | |
| Rash | 3.4% | 5.7% |
| **Urogenital** | | |
| Urinary Tract Infection | 1.6% | 2.4% |

The following effects have been reported with drugs in this class.

*Skeletal:* myopathy, muscle cramps, rhabdomyolysis, arthralgias, myalgia.

*Neurological:* dysfunction of certain cranial nerves (including alteration of taste, impairment of extra-ocular movement, facial paresis), tremor, dizziness, memory loss, vertigo, paresthesia, peripheral neuropathy, peripheral nerve palsy, anxiety, insomnia, depression, psychic disturbances.

*Hypersensitivity Reactions:* An apparent hypersensitivity syndrome has been reported rarely that included one or more of the following features: anaphylaxis, angioedema, lupus erythematosus-like syndrome, polymyalgia rheumatica, dermatomyositis, vasculitis, purpura, thrombocytopenia, leukopenia, hemolytic anemia, positive ANA, ESR increase, eosinophilia, arthritis, arthralgia, urticaria, asthenia, photosensitivity, fever, chills, flushing, malaise, dyspnea, toxic epidermal necrolysis, erythema multiforme, including Stevens-Johnson syndrome.

*Gastrointestinal:* pancreatitis, hepatitis, including chronic active hepatitis, cholestatic jaundice, fatty change in liver, and, rarely, cirrhosis, fulminant hepatic necrosis, and hepatoma; anorexia, vomiting.

*Skin:* alopecia, pruritus. A variety of skin changes, e.g., nodules, discoloration, dryness of skin/mucous membranes, changes to hair/nails, have been reported.

*Reproductive:* gynecomastia, loss of libido, erectile dysfunction.

*Eye:* progression of cataracts (lens opacities), ophthalmoplegia.

*Laboratory Abnormalities:* elevated transaminases, alkaline phosphatase, γ-glutamyl transpeptidase, and bilirubin; thyroid function abnormalities.

**Concomitant Therapy:** In studies where cerivastatin sodium has been administered concomitantly with cholestyramine, no adverse reactions unique to this combination or in addition to those previously reported for this class of drugs were reported. Myopathy and rhabdomyolysis (with or without acute renal failure) have been reported when another HMG-CoA reductase inhibitor was used in combination with immunosuppressive drugs, fibric acid derivatives, erythromycin, azole antifungals or lipid-lowering doses of nicotinic acid. Concomitant therapy with HMG-CoA reductase inhibitors and these agents is generally not recommended (*See* WARNINGS: *Skeletal Muscle*).

## OVERDOSAGE

The maximum single oral dose of cerivastatin sodium received by healthy volunteers and patients is 0.4 mg.

No specific recommendations concerning the treatment of an overdosage can be made. Should an overdose occur, it should be treated symptomatically and supportive measures should be undertaken as required.

Dialysis of cerivastatin sodium is not expected to significantly enhance clearance since the drug is extensively (99%) bound to plasma proteins.

## DOSAGE AND ADMINISTRATION

The patient should be placed on a standard cholesterol-lowering diet before receiving cerivastatin sodium and should continue on this diet during treatment with cerivastatin sodium. (See NCEP Treatment Guidelines for details on dietary therapy.)

The recommended dose is 0.3 mg once daily in the evening. Cerivastatin sodium may be taken with or without food. The recommended starting dose in patients with significant renal impairment (creatinine clearance ≤60 mL/min/1.73m²) is 0.2 mg once daily in the evening.

Since the maximal effect of cerivastatin sodium is seen within 4 weeks, lipid determinations should be performed at this time.

**Concomitant Therapy:** The lipid-lowering effects on LDL-C and Total-C are additive when cerivastatin sodium is combined with a bile-acid-binding resin. When co-administering cerivastatin sodium and a bile-acid-exchange resin, e.g., cholestyramine, cerivastatin sodium should be given at least 2 hours after the resin (*See also* ADVERSE REACTIONS: *Concomitant Therapy*).

**Dosage in Patients with Renal Insufficiency:** No dose adjustment is necessary for patients with mild renal dysfunction ($Cl_{cr}$ 61-90 mL/min/1.73m²). For patients with moderate or severe renal dysfunction, a starting dose of 0.2 mg is recommended (see CLINICAL PHARMACOLOGY - Special Populations - Renal).

## HOW SUPPLIED

**BAYCOL™ (cerivastatin sodium tablets)** is supplied as 0.2-mg and 0.3-mg tablets. The different tablet strengths can be identified as follows:

| Strength | Color | Markings: Front | Markings: Back |
|---|---|---|---|
| 0.2 mg | light yellow | 283 | 200 MCG |
| 0.3 mg | yellow brown | 284 | 300 MCG |

**BAYCOL™ (cerivastatin sodium tablets)** is supplied as follows:

Bottles of 100: 0.2 mg (NDC 0026-2883-51)
0.3 mg (NDC 0026-2884-51)

The tablets should be protected from moisture and stored below 77°F (25°C). Dispense in tight containers.

**References:**

[1] Classification of Hyperlipoproteinemias

| Type | Lipoproteins Elevated | Lipid Elevations: major | Lipid Elevations: minor |
|---|---|---|---|
| I (rare) | chylomicrons | TG | ↑→C |
| IIa | LDL | C | – |
| IIb | LDL,VLDL | C | TG |
| III (rare) | IDL | C/TG | – |
| IV | VLDL | TG | ↑→C |
| V (rare) | chylomicrons, VLDL | TG | ↑→C |

C=cholesterol, TG=triglycerides, LDL=low-density lipoprotein, VLDL= very-low-density lipoprotein, IDL=intermediate-density lipoprotein.

Bayer

Bayer Corporation
Pharmaceutical Division
400 Morgan Lane
West Haven, CT 06516 USA
Made in Germany

**Caution: Federal (USA) Law prohibits dispensing without a prescription.**

PZ500041 9/97 © 1997 Bayer Corporation 7575 Printed in USA

# Exhibit H

BAY w 6228 (NDA)

DEPARTMENT OF HEALTH & HUMAN SERVICES Public Health Service

Food and Drug Administration
Rockville MD 20857

NDA 20-740

JUN 26 1997

Bayer Corporation, Pharmaceutical Division
Attention: Nancy Motola, Ph.D.
Deputy Director, Regulatory Affairs
400 Morgan Lane
West Haven, CT 06516-4175

Dear Dr. Motola:

Please refer to your new drug application dated June 26, 1996, received June 26, 1996, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Baycol™ (cerivastatin sodium tablets), 0.05 mg, 0.1 mg, 0.2 mg, and 0.3 mg.

We acknowledge receipt of your submissions dated July 2, August 15, September 20(2), October 4 and 25, and December 27, 1996, and January 8, 14, and 28, February 7 and 10(2), March 6 and 7(2), April 11(2), 22, 23, and 24, May 16, 21, 22, 27, 28(2), 29(2), and 30, and June 2(2), 4, 5, 24(2), 25(2), and 26, 1997.

The User Fee goal date for this application is June 26, 1997.

This new drug application provides for use of Baycol™ as an adjunct to diet for the reduction of elevated total and LDL cholesterol levels in patients with primary hypercholesterolemia and mixed dyslipidemia (Frederickson Types IIa and IIb) when the response to dietary restriction of saturated fat and cholesterol and other non-pharmacological measures alone has been inadequate.

We have completed the review of this application as amended, and have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the draft physician labeling dated June 26, 1997, and the draft carton and container labeling dated June 26, 1996, as amended June 5, 1997, including the 0.05 mg and 0.1 mg tablets (bottles of 100) which are not listed in the draft labeling. Accordingly, the application is approved effective on the date of this letter.

The final printed labeling (FPL) must be identical to the referenced draft labeling. Marketing the product with FPL that is not identical to this draft labeling may render the product misbranded and an unapproved new drug.

Please submit 20 copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount ten of the copies on heavy-weight paper or similar material. For administrative purposes, this submission should be designated "FINAL PRINTED LABELING" for approved NDA 20-740. Approval of this submission by FDA is not required before the labeling is used.

Should additional information relating to the safety and effectiveness of the drug become available, revision of that labeling may be required

In addition, please submit three copies of the introductory promotional material that you propose to use for this product. All proposed materials should be submitted in draft or mock-up form, not final print. Please submit one copy to the Division of Metabolic and Endocrine Drug Products and two copies of both the promotional material and the package insert directly to:

Food and Drug Administration
Division of Drug Marketing, Advertising, and Communications
HFD-40
5600 Fishers Lane
Rockville, Maryland 20857

Validation of the regulatory methods has not been completed. At the present time, it is the policy of the Center not to withhold approval because the methods are being validated. Nevertheless, we expect your continued cooperation to resolve any problems that may be identified.

Please submit one market package of the drug product when it is available.

We remind you that you must comply with the requirements for an approved NDA set forth under 21 CFR 314.80 and 314.81.

If you have any questions, please contact Margaret Simoneau, R.Ph., Project Manager, at 301-443-3510.

Sincerely yours,

James Bilstad, M.D.
Director
Office of Drug Evaluation II
Center for Drug Evaluation and Research

# Exhibit I

DEPARTMENT OF HEALTH & HUMAN SERVICES Public Health Service

Food and Drug Administration
Rockville MD 20857

NDA 20-740/S-002

MAY 24 1999

Bayer Corporation
Attention: William E. Maguire
Director, Regulatory Affairs
400 Morgan Lane
West Haven, CT 06516-4175

Dear Mr. Maguire:

Please refer to your supplemental new drug application dated July 16, 1998, received July 17, 1998, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Baycol (cerivastatin sodium) tablets.

We acknowledge receipt of your submissions dated July 30, August 3, October 7, November 13, December 7, 21, 1998, January 27, February 9, March 3, 11, April 22 (2), May 6 and 14, 1999.

This supplemental new drug application provides for a new 0.4 mg dosage strength of Baycol (cerivastatin sodium) tablets.

We have completed the review of this supplemental application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the agreed upon labeling text. Accordingly, the supplemental application is approved effective on the date of this letter.

The final printed labeling (FPL) must be identical to the submitted draft labeling (package insert submitted May 14, 1999, immediate container and carton labels submitted July 16, 1998).

Please submit 20 copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount ten of the copies on heavy-weight paper or similar material. For administrative purposes, this submission should be designated "FPL for approved supplement NDA 20-740/S-002." Approval of this submission by FDA is not required before the labeling is used.

If a letter communicating important information about this drug product (i.e., a "Dear Health Care Practitioner" letter) is issued to physicians and others responsible for patient care, we request that you submit a copy of the letter to this NDA and a copy to the following address:

MEDWATCH, HF-2
FDA
5600 Fishers Lane
Rockville, MD 20857

Be advised that, as of April 1, 1999, all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred (63 *FR* 66632). We note that you have not fulfilled the requirements of 21 CFR 314.55 (or 601.27). We are deferring submission of your pediatric studies until December 2, 2000. However, in the interim, please submit your pediatric drug development plans within 120 days from the date of this letter unless you believe a waiver is appropriate.

If you believe that this drug qualifies for a waiver of the pediatric study requirement, you should submit a request for a waiver with supporting information and documentation in accordance with the provisions of 21 CFR 314.55 within 60 days from the date of this letter. We will notify you within 120 days of receipt of your response whether a waiver is granted. If a waiver is not granted, we will ask you to submit your pediatric drug development plans within 120 days from the date of denial of the waiver.

Pediatric studies conducted under the terms of section 505A of the Federal Food, Drug, and Cosmetic Act may result in additional marketing exclusivity for certain products (pediatric exclusivity). You should refer to the *Guidance for Industry on Qualifying for Pediatric Exclusivity* (available on our web site at www.fda.gov.cder/pediatric) for details. If you wish to qualify for pediatric exclusivity you should submit a "Proposed Pediatric Study Request" in addition to your plans for pediatric drug development described above. If you do not submit a Proposed Pediatric Study Request within 120 days from the date of this letter, we will presume that you are not interested in obtaining pediatric exclusivity [NOTE: You should still submit a pediatric drug development plan.] and will notify you of the pediatric studies that are required under section 21 CFR 314.55. Please note that satisfaction of the requirements in 21 CFR 314.55 alone may not qualify you for pediatric exclusivity.

We remind you that you must comply with the requirements for an approved NDA set forth under 21 CFR 314.80 and 314.81.

If you have any questions, contact Margaret Simoneau, R.Ph., Regulatory Management Officer, at (301) 827-6418.

Sincerely,

Solomon Sobel

Solomon Sobel, M.D.
Director
Division of Metabolic and Endocrine Drug Products
Office of Drug Evaluation II
Center for Drug Evaluation and Research

# Exhibit J

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| IN RE BAYCOL PRODUCTS LITIGATION | : | MDL NO. 1431 (MJD) |
| THIS DOCUMENT RELATES TO: | : | |
| JOHN HARTMAN V. BAYER A.G., ET AL. | : | CASE NO. 02-cv-00358-MJD |

DEPOSITION OF JOSEPH J. SACCOMAN, M.D.

JULY 25, 2006

4:05 P.M.

COPY

REPORTED BY: HART ERICKSON
ERICKSON COURT REPORTING
2902 KEATING CIRCLE
BURNSVILLE, MINNESOTA 55337
PHONE: 952.890.0265 * FAX: 952.426.2265

JOSEPH J. SACCOMAN, M.D.,

a witness in the above-entitled matter, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. WRIGHT:

Q. Can we have your full name for the record?

A. Joseph James Saccoman.

Q. Where are you currently living?

A. I live in Grant Township.

Q. Where is that?

A. Which is in Stillwater, Minnesota.

Q. Could we have the address?

A. It's 9104 East 68th Street, Stillwater, Minnesota.

Q. And do you plan on being there for the next year or so?

A. Yeah.

Q. Okay. Have you ever been deposed before, Dr. Saccoman?

A. One other time when I was a resident, so that would have been about 12 years ago, maybe a little bit longer than that.

Q. Were you a witness in that case?

A. I'm not sure what I was. It was a large case and I'm not sure exactly what my role was, but it was

A. Well, to -- this would have meant to discuss these abnormal lab results.
Q. And can you describe what the lab test was and what the results were for me?
A. Well, the lab tests, which were drawn on October 27, 1998, during his previous visit --
Q. Okay.
A. -- were for a lipid profile and a diabetic A1C level, which were both elevated. So he was called by myself and asked to come back to the clinic to address those issues.
Q. And what was the result of his cholesterol test from 10/27/1998?
A. Well, he had an elevation in his lipid profile, particularly the triglycerides were 449, his cholesterol was 200, and his HDL was low at 32.
Q. And did the results of his test lead you to conclude that it was necessary to get his cholesterol under control?
A. In view of his diabetes, I would have looked at this in the context of what other issues he had and how important that was to treat that.
Q. And why was his diabetes relevant to you in determining whether it was necessary to get his cholesterol under control?