**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD/SRN) |
| This Document Relates to: | : | |
| *John "Jack" Hartman v. Bayer AG, et al.* | : | Case No. 02-0358 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS BAYER AND GSK'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff John "Jack" Hartman respectfully submits this Memorandum in Opposition to Defendants Bayer Corporation and Bayer AG (Bayer") and SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") (collectively "the Defendants") Motion for Summary Judgment. There exist genuine issues of material fact, and Defendants are not entitled to judgment as a matter of law.

Specifically, the Defendants' warnings of the specific risks associated with the ingestion of Baycol were inadequate. As Defendants failed to fully disclose the known risks associated with Baycol, the learned-intermediary doctrine does not shield the Defendants from liability. Additionally, summary judgment is not appropriate because Plaintiff John "Jack" R. Hartman can sufficiently establish that his injuries were caused by the ingestion of Baycol.

## FACTUAL BACKGROUND

### I. The Development and Subsequent Recall of Baycol.

Baycol, the brand name for cerivastatin, is a statin, which is a class of drugs commonly prescribed for high blood pressure and heart disease. *In re Baycol Products Liability Litig.*, No. MDL No. 1413, Pretrial Order No. 94, at 1-2 (D. Minn. Sept. 17, 2003) (hereinafter Pretrial Order). In 1997, the United States Food and Drug Administration ("FDA") approved Defendant Bayer's Application to Market a New Drug for Human Use ("NDA") for cerivastatin. *Id.* at 2.

Baycol was withdrawn from the consumer market in August 2001. Pretrial Order at 1-2. At the time of Baycol's withdrawal, thirty-one deaths were linked to Baycol. *Id.* at 2. Baycol has also been linked to rhabdomyolysis, myalgia, myositis, and myopathy. Pretrial Order, at 2.

#### A. Plaintiff Jack Hartman.

Mr. Hartman is a 72 year-old non-smoker and non-drinker. (See Plaintiff's Fact Sheet; Hartman Depo Exh. 1). Mr. Hartman was a self-employed Truck Driver hauling gravel from the 1970's until he was force-retired unable to use a truck clutch due to "leg pain and weakness". *Id.* Prior to his retirement, Mr .Hartman unloaded his own trucks. (Hartman Depo. at. p. 54, l. 21). His educational background includes being a high-school graduate (GED) and a chef's certificate recipient from St. Paul Vocational College. *Id.*

At the time of his depostion, Mr. Hartman resided at 674 East Orange Street, St. Paul,

MN 55106 with his ex-wife, Loretta. (*See* Hartman Depo at p. 11, l. 20).[1] In the five years prior to 2002, Mr. Hartman worked out on a treadmill, rowing machine and stationary bicycle, sometimes twice a day. (Hartman Depo. at. p. 32, l. 13). Mr. Hartman also had a set of weights that he used. *Id.* Mr. Hartman did these exercises in an effort to address his legs getting weaker and weaker. (Hartman Depo. at. p. 33, l. 8).

Despite these exercises, Mr. Hartman continued to get weaker. (Hartman Depo. at. p. 33, l. 20). Mr. Hartman is approximately 6'1", and 215 pounds. (Hartman Depo. at. p. 34-5, l. 25-2). Mr. Hartman is "borderline" diabetic, but does not take insulin. (Hartman Depo. at. p. 37, l. 19). He "feels good", except for his difficulty walking. (Hartman Depo. at. p. 40, l. 7). Mr. Hartman watches his diet. (Hartman Depo. at. p. 44, l. 8).

Mr. Hartman has a history of kidney stones, which have resolved by altering his diet. (Hartman Depo. at. p. 49, l. 3). Mr. Hartman believes that this diet change has eliminated his kidney stone issues, if any. (Hartman Depo. at. p. 49, l. 9). Mr. Hartman also had a history of back pain, which resolved ("its gone") after he retired from the rigors truck driving. (Hartman Depo. at. p. 56, l. 1).

---

[1] Mr. And Ms. Hartman were divorced in approximately 1999, but Ms. Hartman moved back in approximately one month later and continued to reside with Mr. Hartman. (Hartman Depo at p. 11). The couple now lives at 1235 Lincoln, Detroit Lakes, Minnesota. (L. Hartman Depo. at. p. 4, l. 17)(due, in part, to Mr. Hartman's condition(s) and mobility issues).

**History of Baycol Use.**

Mr. Hartman began using Baycol by prescription in or about November of 1998. (Hartman Depo. at. p. 95, l. 2). Baycol was the first "statin" medication prescribed and/or used by Mr. Hartman. (Hartman Depo. at. p. 53, l. 9). In fact, Baycol was the "one and only" statin ever used by Mr. Hartman. (Hartman Depo. at. p. 53, l. 16). Mr. Hartman took Baycol from that time forward, right to the time it was withdrawn. (Hartman Depo. at. p. 96, l. 12). Within a month or so of using Baycol, Mr. Hartman began to experience "pains and things" and weakness in his legs. (Hartman Depo. at. p. 102, l. 19). Mr. Hartman complained to his doctors of these conditions. (Hartman Depo. at. p. 102, l. 24). The pain and weakness continued, and got worse. (Hartman Depo. at. p. 103, l. 11, 13). Mr. Hartman began "grab(ing) the railing to go up and down stairs." (Hartman Depo. at. p. 104, l. 4). Mr. Hartman had trouble with stairs (Hartman Depo. at. p. 104, l. 20), getting in and out of his truck (Hartman Depo. at. p. 104, l. 16) and getting in and out of seats, chairs (Hartman Depo. at. p. 104, l. 23).

The prescribing doctor(s) did not give Mr. Hartman any documents or written material regarding the use of Baycol, (Hartman Depo. at. p. 97, l. 16), and did not tell Mr. Hartman about any of the side effects of Baycol. (Hartman Depo. at. p. 98, l. 12). The Doctor did not discuss with Mr. Hartman the risks and/or benefits of statins in general. (Hartman Depo. at. p. 98, l. 18). Mr. Hartman did not see/read any Baycol labeling before using the drug (Hartman Depo. at. p.101, l. 5) or while he was using Baycol (Hartman Depo. at. p. 100, l.

10), and only learned of its adverse side-effects ‘after they pulled it off the market”. (Hartman Depo. at. p. 100, l. 11). Mr. Hartman recalls reading in a newspaper article that “when you take it, it dissolves your muscles and you urinate them into the toilet”. (Hartman Depo. at. p. 100, l. 20).

In or about December of 2000 Mr. Hartman retired as he was unable to work due to his leg weakness and pain. (Hartman Depo. at. p. 19). Dr. McCamy is his primary physician. (Hartman Depo. at. p. 45, l. 16). Mr. Hartman “had perfect legs” until he began taking Baycol. (Hartman Depo. at. p. 40, l. 13). After taking Baycol, Mr. Hartman’s legs became “weaker and weaker”. (Hartman Depo. at. p. 40, l. 14). All of the exercise machines he and his wife purchased to address the leg problems. (Hartman Depo. at. p. 40, l. 16). Unfortunately, all of the exercising did not help his leg problems. (Hartman Depo. at. p. 40, l. 19). When Mr. Hartman learned that Baycol had been removed from the market in or about August of 2001, he concluded that Baycol was the cause. (Hartman Depo. at. p. 41, l. 1). Mr. Hartman never had these problems with his legs before taking Baycol, but experienced the problems after taking Baycol. (Hartman Depo. at. p. 41, l. 6).

During this period, Mr. Hartman began to see “little squiggly things” after urination. (Hartman Depo. at. p. 59, l. 17). They were “pure white”. (Hartman Depo. at. p. 67, l. 14). Mr. Hartman’s urine would be a “deep reddish, yellowish red”. (Hartman Depo. at. p. 60, l. 5). Mr. Hartman first discovered this condition in or about January of 2000. (Hartman Depo. at. p. 60, l. 14). Since ending his use of Baycol, Mr. Hartman opined that the number

of "squiggly things" diminished to approximately 5 percent of what he had experienced while taking Baycol. (Hartman Depo. at. p. 64, l. 10). At this time, Mr Hartman's seemed to be "down to nothing" from formerly having "powerful legs". (Hartman Depo. at. p. 66, l. 4).

Mr. Hartman again consulted with Dr. McCamy about his leg weaknesses and pain, and the withdrawal of Baycol from the market. (Hartman Depo. at. p. 108, l. 11; p. 109, l. 17). When he heard about the ill effects of Baycol, Mr. Hartman literally "dumped them out into the street" and has not used it since. (Hartman Depo. at. p. 110, l. 17). At that time, Mr. Hartman would have returned to work as a truck driver "if (his) legs got better", as his truck was "sitting up there now doing nothing." (Hartman Depo. at. p. 111, l. 4).

**B. Ms. Loretta Hartman.**

As noted above, Ms. Hartman is divorced from Mr. Hartman, but lives with him in Detroit lakes, Minnesota. (Hartman Depo. at. p. 4, l. 17). She is a high-school graduate, a scholarship graduate of beauty school and a licensed beautician. (L. Hartman Depo. at. p. 17, l. 17). Ms. Hartman also has received university course work and in-house training. (L. Hartman Depo. at. p. 17, l. 23). Ms. Hartman is a retired former employee of MSI Insurance for 33 years where she worked as a senior underwriter in the casualty line. (L. Hartman Depo. at. p. 9, l. 15, 21).

During the entire marriage, Mr. Hartman was gone "maybe four days out of the week". (L. Hartman Depo. at. p. 19, l. 5, 7). At the time of their divorce in May or June of

1999, Mr. Hartman was no longer on the road for those days as "he was home then sick, getting sick, weak." (L. Hartman Depo. at. p. 19, l. 10, 15).

Before Mr. Hartman became sick, the Hartmans would "go walking around Lake Phalen, go out and have dinner, travel and many different things. (L. Hartman Depo. at. p. 26, l. 1). After the sickness, "we couldn't do anything because of weakness in his legs, which took care of walking." (L. Hartman Depo. at. p. 26, l. 5). Ms. Hartman became aware of Mr. Hartman's condition(s) when Mr. Hartman "started wearing out real early". (L. Hartman Depo. at. p. 27, l. 6). Ms. Hartman witnessed that when Mr. Hartman had urinated, she saw what she thought were "parasites" in the urine. (L. Hartman Depo. at. p. 27, l. 12). The matter looked like "[l]ittle tiny, white specs." (L. Hartman Depo. at. p. 27, l. 17). Mr Hartman was experiencing the weakness in his legs at the same time Ms. Hartman observed the flakes in his urine. (L. Hartman Depo. at. p. 41, l. 13). Mr. Hartman was walking slowly, could no longer drive his truck and could no longer mow grass. (L. Hartman Depo. at. p. 42, l. 21). Ms. Hartman encouraged Mr. Hartman to see a physician about the condition. (L. Hartman Depo. at. p. 38, l. 9). Mr. Hartman went to the doctor within weeks of her suggestion. (L. Hartman Depo. at. p. 55, l. 10).

Mr. Hartman related to Loretta Hartman that the physician stated Mr. Hartman's muscles were "deteriorating". (L. Hartman Depo. at. p. 51, l. 19). Ms. Hartman "watched him go after he started taking Baycol . . . I watched him go from a strong, healthy person to a weak person that could no longer drive his truck and could no longer (sic) could do

anything." (L. Hartman Depo. at. p. 52, l. 11). It began with Mr. Hartman not being able to get in and out of his pickup truck. (L. Hartman Depo. at. p. 56, l. 7, 16). The weakness in Mr. Hartman's legs did not go away, or improve. (L. Hartman Depo. at. p. 58, l. 1, 4). Ms. Hartman would be responsible for filling Mr. Hartman's Baycol prescription, on a monthly basis. (L. Hartman Depo. at. p. 101, l. 20). Ms. Hartman does not recall Mr. Hartman having any problems with leg weakness prior to taking Baycol. (L. Hartman Depo. at. p. 104, l. 3). Ms. Hartman ended up sleeping in a different bedroom than Mr. Hartman due to Mr. Hartman's aching legs and restlessness causing him to "move around" in bed and interfering with her sleep. (L. Hartman Depo. at. p. 112-13, l. 24-14).

According to Ms. Hartman, Mr. Hartman is "very good about controlling his diet" (L. Hartman Depo. at. p. 118, l. 7), and takes a multiple vitamin as she does. (L. Hartman Depo. at. p. 118, l. 18). However, Ms. Hartman never witnessed Mr. Hartman taking any food supplements or drinking grapefruit juice while he was taking Baycol. (L. Hartman Depo. at. p. 119, l. 14-25).

Ms. Hartman confirmed the exercise equipment, using it with Mr. Hartman, and that the use of the exercise equipment continues. (L. Hartman Depo. at. p. 105-06, l. 10-9).

Lastly, Ms. Hartman noted, in response to Defendants' questioning, that none of her family members, or Mr. Hartman's family members, are involved in any other lawsuits against pharmaceutical companies (L. Hartman Depo. at. p. 91, l. 14), and that Ms. Hartman drove down from Detroit Lakes with Mr. Hartman, who did none of the driving. (L. Hartman

Depo. at. p. 94, l. 18, 20).

**C. Dr. McCamy.**

Dr. McCamy practices at the Maryland Clinic, on 911 Maryland Avenue in St. Paul, Minnesota. (Dr. McCamy Depo. at p. 7, l. 23). He is a graduate of the Minnesota School of Medicine, and is a licensed physician in the State of Minnesota. (Dr. McCamy Depo. at p. 9, l. 10; p. 106, l. 12-16 ). Dr. McCamy is a Family Practice Specialist (Dr. McCamy Depo. at p. 8, l. 8), and has been practicing medicine at the Maryland Clinic for approximately 27 years. (Dr. McCamy Depo. at p. 8, l. 19). Dr. McCamy has hospital privileges at a number of hospital locations including St. Joseph's Hospital, St. John's Hospital (primary Hospital), the HealthEast Hospital System, United Hospital and Woodwinds. (Dr. McCamy Depo. at p. 9, l. 5-9). Dr. McCamy has been Mr. Hartman's family physician as long ago as September of 1981. (Dr. McCamy Depo. at p. 9, l. 24). Dr. McCamy considered himself to be Mr. Hartman's primary physician. (Dr. McCamy Depo. at p. 13, 14, l. 20, 7-10).

In or about June of 2004, Dr. McCamy provided an opinion and answers as to Mr. Hartman's condition in relation to Mr. Hartman's Baycol use. (See Exhibit C-1; Case Specific Expert Report Pursuant to PTO 114). Dr. McCamy provided the opinions noted therein and "filled in" the form "without coaching". (Dr. McCamy Depo. at p. 18, l. 17). Dr. McCamy confirms the handwriting on the Report as his. (Dr. McCamy Depo. at p. 18, l. 26).

Dr. McCamy prescribed Baycol for Mr. Hartman. (Dr. McCamy Depo. at p. 25, l. 5). These included refills on the dates July 12, 1999, October 18, 1999 and May 22, 2000. (Dr. McCamy Depo. at p. 25, 26, l. 15-16, 24). Dr. McCamy would look at a patient's chart to a point the Dr. felt appropriate to make sure that the refill is appropriate. (Dr. McCamy Depo. at p. 25, l. 2-10). If while reviewing the chart the Doctor became concerned about Mr. Hartman's continued use of Baycol, the Dr. may not have approved the refill. (Dr. McCamy Depo. at p. 25, l. 11-14). Refills were also approved by other physicians in Dr. McCamy's Clinic, for example, on June 27, 2000 by Dr. Neff and on September 7, 2000 by another Clinic physician. (Dr. McCamy Depo. at p. 29, 30, l. 16-19, 5). All in all, Mr. Hartman receive "one year of refills." (Dr. McCamy Depo. at p. 31, l. 10). Mr. Hartman received a dose of .3 milligrams, a level characterized by Dr. McCamy as a "middle range" dosage. (Dr. McCamy Depo. at p. 31-32, l. 25-6).

When Dr. McCamy approved the refills, Dr. McCamy "probably never" went back and reviewed any package inserts or label for Baycol. (Dr. McCamy Depo. at p. 32, l. 8-15). Dr. McCamy further testified that he suspected he did not ever read, in complete detail, any Baycol package insert. (Dr. McCamy Depo. at p. 32, l. 16-25). Dr. McCamy further testified that this did not concern him as statins were a calls drug, and "our speakers and consultants probably didn't raise any red flags to us." (Dr. McCamy Depo. at p. 33, l. 5-7). Before prescribing a new drug that the doctor has not used before, Dr. McCamy first experience was "them introducing the drug from the viewpoint of their company and the FDA. And the old

phrase that still holds true is that we often wait until our local specialists and the people that set the standard of care using it, often in a hospital setting when we get a chance to see it and start to use it ourselves. Generally, people in primary care aren't the first people to prescribe something new." (Dr. McCamy Depo. at p. 33, l. 10-22). Dr. McCamy, instead of becoming familiar with a new drug by any labels, inserts or PDR, learns of the drug in part through observing its use. (Dr. McCamy Depo. at p. 34, l. 2-4). As far as drug representatives are concerned, According to Dr. McCamy, you should rely on what company drug representatives tell you about a drug "with a grain of salt." (Dr. McCamy Depo. at p. 36, l. 14-16). "In other words, everybody is promoting their own drug and can show us studies about how good their drug is. We're always looking for the dirt, too. And most reputable reps will give you the negatives, within reason. So we're looking. Yeah, we trust them to a certain degree, but you also come to learn which reps you can trust and which might be a little more, you know, just trying to sell you something. (Dr. McCamy Depo. at p. 36, l. 14-24). Dr. McCamy does not recall speaking with a Baycol representative (Dr. McCamy Depo. at p. 36-37, l. 25-8), and has no specific recollection of seeing a drug representative that was detailing pharmaceuticals made by Bayer. (Dr. McCamy Depo. at p. 37, l. 15-20). In fact, Dr. McCamy was unable to think of any pharmaceuticals that are made by Bayer. (Dr. McCamy Depo. at p. 37, l. 21-23). However, Dr. McCamy easily recalled other representatives for statin drugs, including representatives for Zocor, Lipitor, Crestor and Mevacor. (Dr. McCamy Depo. at p. 38, l. 10-17). Dr. McCamy does not recall receiving any

"Dear Doctor" letters relating to Baycol. (Dr. McCamy Depo. at p. 44, l. 23-25).

Dr. McCamy prescribes statins in his practice, including Zocor and Lipitor being his "top two" with Crestor 'climbing". (Dr. McCamy Depo. at p. 38, l. 20-24). He also prescribes Pravachol in his practice. (Dr. McCamy Depo. at p. 39, l. 1-3). Dr. McCamy notes that "[w]e are checking liver functions and checking for weakness or muscle pain on everybody who is on a statin nowadays." (Dr. McCamy Depo. at p. 39, l. 10-12). Since 2000, Dr. McCamy has learned more about drug interaction, but might not have understood it in 2000. (Dr. McCamy Depo. at p. 39, l. 13-16). According to Dr. McCamy, Mr. Hartman was not taking gemfibrozil at the same time he was taking Baycol, so drug interaction was not any issue. (Dr. McCamy Depo. at p. 43-44, l. 25-8).

Since 2000, Dr. McCamy attended 12 to 15 evening sessions sponsored by the pharmaceutical companies in which a "national thought leader" would speak. (Dr. McCamy Depo. at p. 39-40, l. 17-14). The speakers talk about the risk of statins. (Dr. McCamy Depo. at p. 40, l. 15-17). Other than these conferences, Dr. McCamy attends Monday morning educational conferences at St. John's Hospital, reads cardiology updates by St. Paul Heart Clinic and other facilities. (Dr. McCamy Depo. at p. 40-41, l. 23-6). Dr. McCamy's knowledge of statins includes textbooks, (Dr. McCamy Depo. at p. 41, l. 7-11). Dr. McCamy visited the library to learn more about rhabdomyolysis, but did not have a lot of success "as far as the issue of Baycol" was concerned. (Dr. McCamy Depo. at p. 41, l. 11-13). However, Dr. McCamy approved refills of Baycol for Mr. Hartman based upon his understanding of

Baycol and its risks and benefits. (Dr. McCamy Depo. at p. 47, l. 6-12).

According to Dr. McCamy, the symptoms of one having rhabdomyolysis are: "[p]robable muscle pain, soreness, probable weakness, probably dark urine, possibly blood in the urine, and in severe cases, decreased urine output, kidney failure." (Dr. McCamy Depo. at p. 50, l. 5-10).

On June 3, 2004, subsequent to any and all doctor visits, consultations and/or examinations by Dr. McCamy or any of the physicians at the Maryland Clinic, Dr. McCamy answered the Case Specific Expert Report Pursuant to PTO 114, and noted, in relevant part:

> 4. My opinion is based on my examination of the patient, I have also been extensively involved in Mr. Hartman's hospital care;
>
> 5. It is my opinion that this patient has suffered injuries or damages related to this patient's ingestion of Baycol. These injuries include the following: Baycol associated myopathy, primarily involving the proximal musculature of his legs;
>
> 6. The grounds for my opinion are as follows:
>
>    a. There is a claim of injury as described above in the patient's medical records;
>    b. The claim of injury in the medical records is reasonably contemporaneous with the patient's ingestion of Baycol;
>    c. There is no other explanation for this injury apparent in the medical records I have reviewed;
>    d. The injury described is of new onset with the taking of Baycol;
>    e. The described injury did not grow worse after Baycol was removed.

(*See* Exhibit C-1, Dr. McCamy Report 6-3-04). Dr. McCamy adds in his report: "Dr. Neff left our practice several years ago and now resides in California. Since I have cared for Mr. Hartman extensively since then, as well as periodically before then, I am also well aware of

his issues and symptoms concerning Baycol. My opinions are based on our evolving understanding of Baycol (or other "statin" drug), and Mr. Hartmans' well documented (comments cut off on copy). *Id.*

Dr. McCamy confirmed the continuing vitality and accuracy of these opinions in his deposition. (*See, e.g.,* Dr. McCamy Depo. at p. 105-106, l. 24-11).

Mr. Hartman accordingly commenced this action alleging that his injuries are attributable to his Baycol use. The Complaint set forth four counts: negligence, products liability, breach of implied and express warranties, and fraud.

## DISCUSSION

**Summary Judgment Standard.**

As this Court is well-aware, the standard to be applied to a motion for summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure and provides for the entry of summary judgment on a claim if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also, Carroll v. Pfeffer*, 262 F.3d 847 (8th Cir. 2001); *Barge v. Anheuser-Busch, Inc.*, 87 F3d 256 (8th Cir. 1996). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1996). Accordingly, all evidence must be viewed in the light "most favorable to the non-moving

party", resolving all doubts and inferences against the moving party. *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997); *see also Bailey v. United States Postal Service*, 208 F.3d 652, 654 (8th Cir. 2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[B]ecause we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).

It is well-established that credibility determinations are jury questions and not for the court to decide. *Heidrick v. Smith*, 169 S.W.180, 186-187 (Mo. App. S.D. 2005); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.105 (2000). Thus, when the court is faced with a credibility determination on an issue material to the cause of action, summary judgment is not appropriate. *Powel v. Chaminade College Preparatory, Inc.*, 197 S.W.3d 576, 578 (Mo. Banc 2006).

The standard is whether the evidence is sufficient to raise a fact issue, not whether the evidence is sufficient to compel a conclusion. *Danner v. MBNA America Bank, N.A.*, 369 Ark. 435, _ S.W.3d _ (2007). A fact issue exists, even if the facts are not in dispute, if the facts may result in differing conclusions as to whether the moving party is entitled to judgment as a matter of law. *Id.* In such an instance, summary judgment is inappropriate. *Id.* A genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of

the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to show "that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. V. Catrett*, 477 U.S. 317, 325 (1986).

**Standard of Causation.**

"A 'direct cause' is a cause that had a substantial part in bringing about" the accident, harm or injury. 4 Minnesota Practice, CIVJIG 27.10 (2006). Minnesota law uses the terms "direct cause", "proximate cause", and "substantial factor" interchangeably. *Id., cmt. See Lestico v. Kuehner, 204 Minn. 125, 133, 283 N.W. 122, 127 (1938)* (equating "proximate cause" with "substantial factor" in assessing negligence when plaintiff was injured in a car accident).

Expert review must set forth "an outline of the chain of causation that allegedly resulted in damage to the plaintiff. *Sorenson v. St. Paul Ramsey Medical Center*, 457 N.W.2d 188, 193 (Minn. 1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992).

**Standard of Duty.**

As a general rule, the manufacturer of a product has a duty to warn of the dangers inherent in that product under the theories of strict liability, negligence, and breach of warranty. *Hill v. Searle Laboratories, Div. of Searle Pharmaceuticals, Inc.*, 884 F.2d 1064, 1070 (8th Cir. 1989). A prescription drug or medical device is not reasonably safe due to

inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to: (1) prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings; or (2) the patient when the manufacturer knows or has reason to know that health-care provider will not me in a position to reduce the risks of harm in accordance with the instructions or warnings. Sections 1 and 2 of the Restatement (Third) of Torts: Products Liability, for product defect cases involving manufacturing defects, design defects, and defects based upon inadequate instructions or warnings. *See Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002).

**Learned Intermediate Doctrine.**

In general, Minnesota has adopted the learned intermediary doctrine, there is no conflict of law, and Minnesota substantive law must be applied. *See Mulder v. Parke Davis & Co.*, 288 Minn. 332, 335, 181 N.W.2d 882, 885 (1970) (recognizing the learned intermediary doctrine in Minnesota).

## II. MR. HARTMAN'S CLAIMS ARE ACTIONABLE BECAUSE BAYCOL FAILED TO ADEQUATELY WARN MR. HARTMAN OR HIS PRESCRIBING PHYSICIAN OF THE DANGERS OF INGESTING BAYCOL

Mr. Hartman's claims should not be summarily dismissed because the Defendants failed to adequately warn Plaintiff of the risks associated with Baycol. Because Mr. Hartman's prescribing physician was not with provided adequate warnings, he was not aware of the relevant risks associated with Baycol, and therefore, the learned intermediary doctrine

is inapplicable to this case.

**A. Defendants cannot shield themselves behind the learned intermediate doctrine because they failed to adequately warn physicians of the potential side effects associated with Baycol.**

The Defendants are not shielded by the learned intermediary doctrine when the physician who prescribed Baycol was not adequately informed of the specific side effects of Baycol, even though he may have been aware of the general side effects associated with a class of drugs. Under Minnesota law, the Defendants have a duty to warn physicians about the dangers associated with the use of Baycol about which the Defendants knew or should have known. *See Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124, 1129 (D. Minn. 1998); *Gray v. Badger Mining Corp.*, 676 N.W.2d 268, 274 (Minn. 2004). A legally adequate warning: (1) attracts the attention of those that the product could harm; (2) explains the mechanism and mode of injury; and (3) provides instructions on ways to safely use the product o avoid injury. *Gray*, 676 N.W.2d at 274. With regard to medical issues, the manufacturer does not have a duty to warn the lay public, but it has a duty to warn the medical professional who will be using the medical product or device of its inherent dangers. *Mozes*, 14 F. Supp. 2d at 1130; *Mulder*, 288 Minn. at 335, 181 N.W.2d at 885. Thus, the issue here is whether Mr. Hartman's prescribing physician was adequately warned by the Defendants.

During the time that Baycol was on the market, the Defendants had a legal duty to adequately warn physicians of the risk associated with Baycol's use. Although the

Defendants issued certain warnings with regard to Baycol, genuine issues of fact remain as to whether the Defendants provided adequate warning regarding the negative side effects associated with Baycol directly to Dr. McCamy. Whether the manufacturer provided an adequate warning is a factual issue to be determined by the jury. *See Balder v. Haley*, 399 N.W.2d 77, 81 (Minn. 1987).

Under the facts of this case, a jury could reasonably conclude that the Defendants' various warnings were inadequate due to the dearth of negative information concerning Baycol which was withheld from or misrepresented to prescribing physicians, the public at large, and the FDA. The Defendants' warnings were not adequate in large part because of what the warnings did not reveal. At the very least, a variety of documents produced by the Defendants create a factual issue as to whether the Defendants adequately warned physicians about the negative effects of Baycol use. The serious side effects suffered by Mr. Hartman, all without any knowledge of what was happening to him, demonstrate that Defendants withheld and misrepresented significant information concerning Baycol's efficacy, potential risks, adverse reports, and various side effects. There is evidence that the warnings given to prescribing physicians were inadequate because the marketing information given to physicians may have been incomplete or misleading.

Under the facts of this case and testimony of Dr. McCamy noted above, a jury could reasonably conclude that the Defendants did not adequately warn prescribing physicians about the dangers of Baycol because the Defendants withheld or misrepresented to

prescribing physicians significant information concerning Baycol's efficacy, potential risks, adverse reports, and various side effects.

### B. An Adequate Warning Concerning the Dangers of Baycol Would Have Prevented Mr. Hartman's Injuries.

Where an adequate warning could not have prevented a plaintiff's injuries, causation does not exist as a matter of law. *Balder v. Haley*, 399 N.W.2d at 81; *see also Bruzer v. Danek Med., Inc.*, No. Civ. 3-95-971/RHKJMM, 1999 WL 613329, at *6 (D. Minn. Mar. 8, 1999) (noting that summary judgment will be granted if the plaintiff fails to introduce any evidence that any conduct on the part of the defendants would have affected the manner in which the plaintiff's doctor treated him). Mr. Hartman trusted his doctors and relied on Dr. McCamy and his medical advice in prescribing Baycol. Unfortunately, the prescribing doctor, upon whom Mr. Hartman relied, was never given complete disclosure by the Defendants of Baycol's side effects. Had Mr. Hartman's physician received complete disclosure from the Defendants, Mr. Hartman's injuries would not have occurred.

Dr. McCamy prescribed Baycol to Mr. Hartman in or about November 1998. In prescribing Baycol, Dr. McCamy relied on the information available to him at the time. However, as Dr. McCamy's deposition testimony reflects, the Defendants made certain, through their inadequate warnings, that Dr. McCamy was not an informed intermediary when it came to prescribing Baycol to Mr. Hartman. Based on the facts presented, a reasonable jury could conclude that had Dr. McCamy had the complete facts regarding the efficacy and safety of Baycol, he would not have prescribed it to Mr. Hartman. Therefore, summary

judgment is not appropriate under the learned intermediary doctrine.

## III. MR. HARTMAN CAN ESTABLISH MEDICAL CAUSATION.

Under Minnesota law, expert testimony is required to prove causation in cases involving complex medical issues with which a jury is unlikely to have experience. *Willert v. Ortho Pharm. Corp.,* 995 F. Supp. 979, 983 (D. Minn. 1998) (citing *Stahlberg v. Moe,* 166 N.W.2d 340, 345 (Minn. 1969)). "Minnesota law requires a plaintiff to establish a link between the alleged defect and the injury sufficient to allow a jury to conclude that the defect caused the injury. Such a requirement does not necessarily require the plaintiff to exclude all possible other causes." *Johnson v. Zimmer, Inc.*, No. Civ. 02-1328 JTNFLN, 2004 WL 742038, *7 (D. Minn. Mar. 31, 2004) (internal citations omitted); *see also Lillebo v. Zimmer, Inc.*, No. 03-2919 (JRT/FLN), 2005 WL 388598, at *9 (D. Minn. Feb. 16, 2005) (citing *Johnson v. Zimmer, Inc.* for the proposition that when establishing causation "a plaintiff is not required to exclude all possible other causes of his injury").

Contrary to the Defendants' assertion, Mr. Hartman has provided sufficient evidence to, at the very least, establish a genuine issue of material fact with regard to whether Baycol injured Mr. Hartman's legs and related musculature. Mr. Hartman has offered Dr. McCamy as a case-specific-expert in this case, and Dr. McCamy 's conclusions provide evidence of a connection between Mr. Hartman's ingestion of Baycol and his injuries. Also, because Dr. McCamy did reasonably rule out other possible causes for Mr. Hartman's injuries besides Baycol in his Case Specific Expert report Pursuant to PTO 114, Dr. McCamy's testimony is

proper and admissible in this case. Dr. McCamy based his opinion on his examination of Mr. Hartman, and his extensive history of treatment of Mr. Hartman.

Additionally, Mr. Hartman and Loretta Hartman have both provided extensive and corroborative evidence that Mr. Hartman's pain, weakness and loss of leg function is attributable to the use of Baycol through their own observations. Although Dr. McCamy recognized that other common age ailments may have contributed to Mr. Hartman's conditions, Dr. McCamy was clear in his Case Specific Report that Baycol was the culprit. Dr. McCamy's inability to rule out every possible cause of Mr. Hartman's injuries goes to the weight of his testimony, not its admissibility. *See Kudabeck v. Kroger Co.*, 338 F.3d 856, 861 (8th Cir. 2003) (noting that nothing in Rule 702, *Daubert* or *Daubert's* progeny require an expert to "'resolve an ultimate issue of fact to a scientific absolute in order to be admissible'') (quoting *Bonner v ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)); *Lauzon v. Senco Prod. Inc.*, 270 F.3d 681, 694 (8th Cir. 2001) (concluding that attacks regarding the completeness of the expert's methodology go to the weight and not the admissibility of the testimony); *see also In re Ephedra Products Liability Litig.,* 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005) ("[G]aps or inconsistencies in the reasoning leading to [the] opinion . . . go to the weight of the evidence, not to its admissibility").

The Defendants point to a series of cases, including *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202 (8th Cir. 2000), as justification for their argument that Dr. Clarke's testimony should be excluded. Def. Mem. in Supp. of Mot. Summ. J. at 12-13. But the

testimony offered by Dr. McCamy is distinguishable from the situation in *Turner*. In *Turner*, the court excluded the causation expert's opinion because the expert's opinion was made "more as an afterthought, in an ad hoc manner, only after being informed that (the expert) had misidentified (one of the possible toxic ingredients)," and without examination of any literature. 229 F.3d at 1208-09. In comparison, Dr. McCamy's diagnosis of Mr. Hartman has remained constant, he has demonstrated that he examined Mr. Hartman's medical record carefully, and he considered other possible causes of Mr. Hartman's injuries. *See Kudabeck*, 338 F.3d at 861 (distinguishing the situation from the one presented in *Turner* when the expert's opinion did not change over time and the defendants failed to point out any fact that the expert overlooked and noting that "[s]imply because (the expert) did not conduct his examination and treatment of (the plaintiff) in the manner (the defendant) preferred does not render (the expert's) testimony unreliable"). The other cases cited by the Defendants are also equally distinguishable from the facts presented in this case. *Compare Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (excluding expert testimony on causation where the expert made a causation decision without inquiring about other toxic exposures or excluding confounding factors) *and Medalen v. Tiger Drylac USA, Inc.*, 269 F. Supp. 2d 1118, 1137-39 (D. Minn. 2003) (excluding the proffered expert testimony where the expert had only engaged in a cursory causation analysis and made no showing of an attempt to rule out other potential causes of the injury) *with* McCamy Dep., *Supra.* Given the evidence presented, "[e]ven a specious interpretation of (the expert's) testimony, which

would enable other possible theories of the event to exist . . . does not preclude (the expert's) testimony." *Lauzon*, 270 F.3d at 694 (noting that the defendant may attack explanations of causation on cross examination). Therefore, Dr. McCamy's testimony is admissible.

Finally, the Defendants argue that the "Baycol package insert warned of the exact risk that Plaintiff allegedly experienced – myopathy". *See* Def. Mem. in Supp. of Mot. Summ. J. at 17. As noted above, Dr. McCamy was not aware of the possibility of this type of muscle injury. The Defendants did not fully apprise Dr. McCamy (or at all) of the potential side effects associated with Baycol usage. Because Dr. McCamy and his Clinic colleagues were not fully aware of the risks associated with Baycol, the Defendants' warnings were not as a matter of law adequate and the learned intermediary doctrine does not apply. Therefore, because a reasonable jury, if presented with the evidence described above, could conclude that Baycol caused Mr. Hartman's leg injuries, summary judgment is not appropriate.

## IV. MR. HARTMAN'S CLAIM OF FRAUD IS ACTIONABLE.

Mr. Hartman asserts premised on traditional state tort law. Because Mr. Hartman's claim is based upon state law claims of fraud, his fraud claims are actionable. *See In re St. Jude Med. Inc. Silzone Heart Valves Products Liability Litig.*, No. MDL 01-1396 JRTFLN, 2004 WL 45503, at *13 (D. Minn. Jan. 5, 2004) (noting that *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-53 (2001) applies only to claims that depend entirely upon the regulatory relationship between the federal government and the FDA).

Moreover, Mr. Hartman has presented sufficient evidence to establish a genuine issue

of material fact with regard to his fraud claim. Under Minnesota law, fraud is established by showing: (1) a false representation of a material past or present fact susceptible of knowledge; (2) the defendant either knew it to be false or asserted it as his own knowledge without knowing whether it is true or false; (3) the defendant intended the plaintiff to act on his representation; (4) the plaintiff was induced to act in reliance on the representation; and (5) the plaintiff suffered damages which were the proximate cause of the representation. *Rognlien v. Carter,* 443 N.W.2d 217, 220 (Minn. Ct. App. 1989). Based on the facts presented above, a genuine issue of material fact exists as to Mr. Hartman's fraud claim. Therefore, summary judgment is inappropriate.

## V. **MR. HARTMAN'S CLAIM OF UNJUST ENRICHMENT CLAIM IS ACTIONABLE**

In brief, Mr. Hartman may prevail upon this claim if the Defendants "knowingly received something of value to which it was not entitled, and that it would be unjust for the Defendants to retain such benefits without compensation Mr. Hartman therefore. *See Southtown plumbing, inc. v. Har Ned Lumber Company,* 493 N.W.2d 137 (Minn. Ct. App. 1992).

Defendants admit that the Defendants received value from Mr. Hartman: "the only value Bayer potentially received from Mr. Hartman is the amount, if any, Mr. Hartman contributed to the cost of his baycol prescriptions." Def. Mem. in Supp. of Mot. Summ. J. at 19. While this is not the only benefit the Defendants received from Mr. Hartman's use of Baycol, the Defendants' admission in this regard is surely sufficient to survive summary

judgment. The Defendants did indeed acquire a benefit from the sale of Baycol, and its use by Mr. Hartman. Mr. Hartman need only then assert that Baycol's retention of this benefit was wrongful. Such a determination has been sufficiently supported by the foregoing facts and analysis, and need not be repeated. Such is a jury question.

## CONCLUSION

For all of the foregoing reasons, Plaintiff John "Jack" Hartman respectfully requests that this Court enter an order denying Defendants' motion for summary judgment.

DATED: January 31, 2008

Respectfully submitted,

**GIEBEL, GILBERT, WILLIAMS & KOHL, P.L.L.P.**

/s/ Kevin E. Giebel
Kevin E. Giebel, # 164112
2277 West Highway 36, Suite 220
Roseville West Building
Roseville, MN 55113
Tel: (651) 633-9000
Fax: (651) 639-1551

*Attorneys for Plaintiff John "Jack" Hartman*