# EXHIBIT C

**Deposition of Dr. Allan E. McCamy, M.D.**

**July 7, 2006; 9:05 a.m.**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

IN RE BAYCOL PRODUCTS LITIGATION : MDL NO. 1431
: (MJD)
THIS DOCUMENT RELATES TO: :
JOHN HARTMAN V. BAYER A.G., ET AL. : CASE NO.
: 02-cv-00358-MJD

DEPOSITION OF ALLAN E. McCAMY, M.D.

JULY 7, 2006

9:05 A.M.

REPORTED BY: HART ERICKSON
ERICKSON COURT REPORTING
2902 KEATING CIRCLE
BURNSVILLE, MINNESOTA 55337
PHONE: 952.890.0265 * FAX: 952.426.2265



THE DEPOSITION OF ALLAN E. McCAMY,

M.D., taken on the 7th day of July 2006, commencing at approximately 9:05 a.m. at 911 Maryland Avenue East, St. Paul, Minnesota, before Hartman L. Erickson, Court Reporter and Notary Public.

A P P E A R A N C E S

COUNSEL ON BEHALF OF JOHN HARTMAN:

MARK E. GILBERT, ESQ.
GIEBEL GILBERT WILLIAMS & KOHL
Broadway Place West
1300 Godward Street NE, Suite 6200
Minneapolis, Minnesota 55413

COUNSEL ON BEHALF OF BAYER A.G.:

ELIZABETH WRIGHT, ESQ.
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402-1498

COUNSEL ON BEHALF OF SMITHKLINE BEECHAM D/B/A GLAXOSMITHKLINE:

FRANK J. EISENHART, ESQ.
DECHERT LLP
17751 I Street, N.W.
Washington, D.C. 20006-2401

I N D E X

EXAMINATION BY: PAGE

MS. WRIGHT 4, 107
MR. GILBERT 104

DEPOSITION EXHIBITS MARKED:

1. 6/1/04 letter to Neff from Giebel,
with enclosure 104

ALLAN E. McCAMY, M.D.,

a witness in the above-entitled matter, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. WRIGHT:

Q. Could we have your full name for the record, please?

A. Allan Edward McCamy.

Q. And you are an M.D., correct?

A. Correct.

Q. Okay. Dr. McCamy, I'm Elizabeth Wright. We just met. I am an attorney from Dorsey & Whitney, and we represent Bayer in the Baycol litigation.

Do you understand that you're here to give a deposition today in connection with a lawsuit that one of your patients brought against Bayer in connection with Baycol?

A. Yes, I do.

Q. There are a number of other lawyers in this room, and do any of them represent you today?

A. No.

Q. Have you ever been deposed before?
A. Yes.
Q. How many times have you been deposed?



A. One time with one of the diet medication class action lawsuits; another time with a current interest case, a bilirubin toxicity case in a newborn.
Q. Did you testify as an expert witness there, or had you been a treating physician in those cases?
A. Treating physician in one case, and something similar to this where we were involved in the care of the patient.
Q. Were you a party in either one of those litigations where you gave deposition testimony?
A. The second one.
Q. The bilirubin toxicity case?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. I take it you've never given a deposition before that involved statins or hyperlipidemia then?

A. I never have.
Q. Okay. And if I understand the deposition testimony you gave in the diet drug case, was that Phen-fen?
A. I believe it could have been Redux.
Q. Redux?



A. Yeah.
Q. Okay. Do you know what the generic name for Redux is, by any chance?
A. Not right now. It's not a drug we use very often.
Q. Is it something you had prescribed?
A. Possibly not. The issue was whether the patient had a murmur or had anybody ever heard a murmur on that patient.
Q. And how was the case involving bilirubin toxicity resolved?
A. A settlement.
Q. Have you had a chance to ever talk to Mr. Hartman's lawyers?
A. Only just in introduction this morning.
Q. You've never talked to a Mr. Giebel?
A. I don't recall it. I haven't seen Mr. Hartman for

several years, so no, I don't recall.
Q. When was the last time you talked to Mr. Hartman?
A. I could probably tell you on the chart here. The last visit I had with John was 2/4/04.
Q. And what was the purpose of that visit, can you tell me?
A. A diabetic evaluation.
Q. I asked you if you met with any lawyers that represented Mr. Hartman. Did you meet with any



people or talk to anybody from his lawyer's office at any point?
A. I certainly don't recall it.
Q. And you've never talked to any lawyers representing Bayer or GSK, I take it?
A. No.
Q. Other than lawyers, have you discussed Mr. Hartman's case and the fact that you'll be deposed today with anybody?
A. Only Carolyn, who gave us the information on the depositions and what not.
Q. And Carolyn is your office manager?
A. Yes. The fact that it's going to happen, yeah.

Q. You haven't talked to any of your colleagues about Mr. Hartman and his use of Baycol?
A. Back in the early 2001/2002 time, it wouldn't surprise me a bit if we didn't discuss it, because when some of these things come out and we talk to other doctors, we often will trade thoughts or ask consultants, things like that.
Q. And just so I'm clear, because I have a feeling I made do it frequently, when I refer to your colleagues, you are part of the Maryland Clinic; is that correct?
A. That's correct.



Q. And when I'm talking about your colleagues in this deposition, I'm referring to your colleagues here at the Maryland Clinic; and if I'm talking about other physicians, I'll try and be a little more particular.
A. Sure.
Q. What kind of a doctor are you?
A. Family practice specialist.
Q. How long have you been doing that?
A. 27 years.

Q. So about 1979?
A. Correct.
Q. And how long have you been with the Maryland Clinic?
A. 27 years.
Q. Were you one of the founders of the Maryland Clinic?
A. No.
Q. And have you been at 911 Maryland Avenue, the address we're at today, the entire 27 years?
A. Yes.
Q. Do you have any other clinic offices?
A. No.
Q. So day-to-day when you come to work, you come to work here?



A. Yes.
Q. And do you have hospital privileges?
A. Yes.
Q. Where?
A. St. Joseph's -- St. John's is our primary Hospital, the HealthEast Hospital System. We use St. Joseph's somewhat. We have used United in the

past, we used to use Woodwinds, but St. Joseph's is our secondary and St. John's is our primary.
Q. Where did you go to med school?
A. University of Minnesota.
Q. And where did you do your residency?
A. Ramsey Hospital.
Q. Are you from St. Paul originally?
A. No.
Q. Did you do any kind of specialty training or fellowship?
A. No. Just family practice specialty development.
Q. Okay. Do you recall when you first started treating Mr. Hartman?
A. I believe 1981. Well, no. Can I amend that?
Q. Sure.
A. Mr. Hartman had a hospitalization that I saw him for in 9 of '81, and then the next time in the office, a phone call was '83, I guess. So I saw



him first time in the hospital in 1981.
Q. Why was he in the hospital in '81?
A. That's not really clear. I'd have to go back and find the discharge summary.

Q. Okay. Don't worry about it. You don't recall in any event.
And does it say there what the phone call was that you handled in 9 of '83?
A. The patient was seen in the Holy Spirit Hospital Emergency Room concerning a left renal stone, and then was requesting follow-up on that.
Q. Was he calling you, or was it the hospital --
A. Apparently so.
Q. -- that was calling you? Okay.
Do you have a practice here at the Maryland Clinic for documenting telephone calls from patients?
A. (Nods head.)
Q. Is that a yes?
A. Yes.
Q. And I apologize. I may do that throughout because the court reporter is taking down what you say, and it's hard to remember because we don't communicate that way usually, but he can't take down nods and shakes of the head.

A. I'll remember.
Q. So I may prompt you to give me an oral response.
What is the practice here regarding?
A. During clinic hours, currently now we of course have an electronic medical record so we can make up a virtual visit, basically, and in the past we used to just write on the chart.
Q. Is there a policy regarding what needs to be written?
A. Generally, just the gist of what's going on, our recommendations, any prescriptions, you know, follow-up.
Q. And do you attempt to record in the note information that's given to you by the patient in terms of the complaints or symptoms during the telephone call?
A. Yes.
Q. Is the goal to record all important information that the patient gives you over the telephone?
A. Everything that we would feel important for us or for a colleague for future care.
Q. Is that your practice with regard to your office

notes as well --
A. Yes.
Q. -- notes of office visits, things that are



important to you to know or to some other colleague to know or some other physician, will be documented in the record?
A. Yes.
Q. And that includes symptoms or complaints that the patient reports to you?
A. Yes.
Q. In your experience, 27 years here at Maryland Clinic, is that policy followed pretty rigorously?
A. Yes.
Q. Do you personally follow it pretty rigorously?
A. As best I can, yes.
Q. Okay. After the phone call in 9 of '83, was there a period where you were regularly seeing Mr. Hartman?
A. Actually, from that time for a number of years, he saw several of my colleagues, and not necessarily the same partner, for some episodic care of his kidney stones and stomach pain, things like that.

But my next visit with him, if you were asking --
Q. Yes.
A. -- would have been -- sometimes several of us had writing that was similar, so I have to make sure I know whose note this is. January of 2000 as far as in the office here.



Q. You're saying you may have seen him in a hospital visit or something?
A. Potentially in a hospital setting, yeah.
Q. Do you have any recollection of seeing him in a hospital between 9 of '83 and January of 2000?
A. I don't have that recollection.
Q. Okay.
A. And it doesn't appear, looking at these notes, that there were any hospital -- well, there was one here in 1994, post hospital check, okay, but that was one of my partners again, so I can't be sure I saw him at that time.
Q. Okay. Why did you see him in January of 2000?
A. A diabetic follow-up.
Q. Do you know why you started seeing him again in January of 2000?

A. He had come in for some basic laboratory follow-up and then was told at that time he had to come in. And one of my partners previously had seen him and somehow recognized me as his primary, or perhaps he recognized me as his primary and said, I'm going to draw some labs and have him come back and see Dr. McCamy.
Q. So it was more that somebody had mistakenly thought you had been his primary physician over



the years?
A. Not necessarily mistakenly. Many people regard me as their doctor but they see other people because I'm booked up or something, so I may not see them for some time but I'm still, in their mind, their primary doc.
Q. And would you consider yourself his primary physician from January of 2000 until the last visit on February 4 of 2004?
A. Certainly, I saw him many times, and I would say yes, although he did see Dr. Neff a number of times as well. So I would say we handed him off quite a bit, but I was intensely involved with his

care in- and outpatient.

Q. After January of 2000?

A. Correct.

Q. Okay. How would you describe the nature of your practice between January of 2000 and February of 2004?

A. General family practice. As my practice was aging, I was certainly doing a lot more geriatric work, more diabetic work, more intense diabetic work, more heart disease, hypertension, metabolic syndrome type work, and probably less pediatrics since I was not delivering as many babies during

15

that time frame as I used to.

Q. What are the most common conditions that you were seeing and treating in that four-year time frame, between January of 2000 and February of 2004?

A. Aside from things like back aches and respiratory infections and ear infections, we see a lot of diabetes, a lot of hypertension, a lot of heart disease follow-up, things that sort of go together under what we now call the metabolic syndrome. We also see a lot of musculoskeletal things.

Q. When a patient comes to see you, is there a typical routine that you go through with each patient visit?
A. The typical history, physical exam, appropriate lab type thing, yes, and then depending on what they come in with. If they are a diabetic, we have protocols nowadays which we may not have had in 2000 where everybody gets certain testing on a certain type of schedule within loose parameters, various lab tests, ophthalmology follow-ups, laboratory monitoring, things like that.
Q. Does someone, either a nurse or a physician's assistant, usually see the patient before you do when they come for a clinic visit?
A. Yes.



Q. Who sees them?
A. Usually our nurse.
Q. And what is the nurse's function when she initially sees the patient?
A. To get some vital signs, like blood pressure; at least once a year, a weight. Also, to get perhaps the chief complaint for the visit, get a little

background information.
Q. Is the nurse expected to document the information that she obtains during this initial meeting with the patient?
A. Yes.
Q. And she documents it on the same clinic note that you will subsequently --
A. Write on.
Q. Okay. So essentially, the nurse starts the note for you. Is that accurate?
A. That's accurate.
Q. And then does the nurse leave the room and you come in at that point?
A. Yes.
Q. And I take it initially you have a discussion of why they're there and what symptoms they've been having. Is that accurate?
A. Yes.



Q. What else, in general, would you do initially when you see the patient?
A. Many times I certainly unearth more things than the patient admits they came in with. Sometimes

they're only willing to talk to the nurse about certain things and sometimes their issues are others, but that might come up late in the visit, too. And, you know, we're always using our powers of observation, looking at patients, looking at their personality, their concentration, their skin. So, yeah.

Q. And when you make the chart note of a particular visit, do you do it right there while the patient is there, or is that something you do at the end of the day or what?

A. Typically, with a paper chart, we would take notes, sometimes shorthand but notes there, and then late in the day sometimes you'll flesh out the rest of them, or even sometimes the next day, depending on what your schedule is like and what not. So I can't say that my notes have always been written concordantly right when the patient is there.

Q. If you write it the next day, do you put a separate date on that note?



A. Not necessarily, unless it's an addition or an

addendum.
Q. And I think you said you went to an electronic chart at this point?
A. Yes.
Q. When did you do that?
A. August of last year, 2005.
Q. So the entire time that you were seeing Mr. Hartman there should be just paper records?
A. Correct. Except through the hospital --
Q. Yes.
A. -- there will be some electronic stuff back then.
Q. Have you had a chance since you learned of this deposition to look over the chart at all for Mr. Hartman?
A. I was going to do some of it last night, but I was in the hospital all night with a delivery type problem, and so this morning I spent about 15 minutes reviewing back to his first visit. I did not have a chance to review all of his previous labs and hospital discharges, although I certainly remember some of them.
Q. Okay. I take it, then, the last time that you would have looked at his chart was when you saw

him in February of 2004?



A. Yes, unless there had been a letter or an opinion that I had to provide at some point after the last time he was here. Then I'm sure I would have referred to his chart.

Q. Do you recall preparing any kind of letter or opinion concerning Mr. Hartman?

A. Only this (indicating).

Q. And can I see what you're holding up?

A. (Complied.)

Q. You showed me a document that's captioned United States District Court, District of Minnesota, it's a two-page document, and it looks like it has a title, Case Specific Expert Report, and it's dated June 3rd, 2004.

A. Okay.

Q. Is that -- did I get the date right?

A. Yes.

Q. Okay. And this is a document that you prepared?

A. Yes. I can't be -- okay. It is about the Baycol Product Litigation. Okay. That must have been an introductory.

Q. What do you mean, "an introductory"?
A. Early on in the whole course of him pursuing the case. I'm not sure.
Q. Did he ever talk to you about bringing a lawsuit



against Bayer or anyone related to Baycol?
A. I think he was aware that there had been issues. I can't honestly recall whether he ever said, "I'm going to sue Bayer," but I think he was aware of a lawsuit. He was certainly aware at some point that statins can have issues with physical symptoms, too.
Q. Was it Mr. Hartman -- it looks like a form, the document we were just talking about.
A. I cannot recall discussing this with him (indicating).
Q. Okay.
A. Although, he might have asked me, would you do this, although, I cannot remember that discussion either.
Q. So you filled out that form, correct?
A. Yes, without coaching.
Q. And I assume you did it in approximately June of

2004 since it's dated then, or what?
A. Yes.
Q. And do you know how you came to -- did you generate that form?
A. I didn't generate the form. I generated the answers to it.
Q. The handwriting on it?



A. Yes.
Q. And all the handwriting on that is yours?
A. Yes.
Q. Okay. And so you don't know how you came into possession of the form?
A. No, I don't. Something like this I would think he would not have dropped off. I can't say that for sure, but --
Q. Okay. Is it possible you got it from his lawyers?
A. I'd say it would be possible.
Q. Is this something that you would note somewhere in the chart if you had received this form from lawyers, or would you keep correspondence if there was a cover letter with this in the chart?
A. Sometimes certain correspondence will be kept in

our business office in like a business file, yes, many times we would, just like if we dictate a letter for someone.
Q. Do you have any correspondence in your chart there that concerns this particular form?
A. I was just going to look at that and see. Not right here, at least in the office notes.
Q. What about in -- do you have any correspondence in that folder there (indicating)?
A. So far, from what I'm seeing, are routine



correspondence with his consultants and things like that, but I can continue to look. So far, all of these are just professional consultation letters/summaries. I've got several things right here (indicating).
Q. Are they addressed to you?
A. This is one letter, June 1st of 2004, addressed to Dr. Neff concerning the Baycol lawsuit.
Q. May I look at it?
A. Yup. And at that time she had left our practice.
Q. Okay. And attached to it, it appears to be the original of your --

A. Possibly. I'm sure what happened is that since she had left the practice for California and we probably weren't even aware of her whereabouts at the time, I was probably asked if I would do a summary since I had also cared for him.

Q. Could I have a photocopy of this? Could your office manager do that for us?

A. I don't know that I have a problem with that.

Q. Okay. And then we'll mark it. May I see this one (indicating)?

A. Sure.

THE WITNESS: Should I give it to her right now?



MS. WRIGHT: Yeah. That would be great.

(Discussion off the record.)

MS. WRIGHT: I'll let you finish looking.

THE WITNESS: This is a request for medical records. MCS, I'm not sure what that's all about. This is a District Court --

MS. WRIGHT: I suspect that's just a

request for medical records from one of the parties in this litigation.

THE WITNESS: Did you need that?

MS. WRIGHT: No. That's okay.

THE WITNESS: Here is another one, an original signed medical authorization. I don't know if you need that.

MS. WRIGHT: Just simply requesting medical records.

THE WITNESS: Okay. And here is something, June 1st, again, of '04 from Dr. Neff.

MS. WRIGHT: And again, it's a letter from Giebel, Gilbert, Williams & Kohl, at least on their letterhead.

BY MS. WRIGHT:

Q. This appears to be a photocopy of the June 1, 2004



letter that we were just talking about, and it has some of the chart notes stapled to the back of it.

And I'm just wondering, was this letter originally sent on to Dr. Neff for her review, do you recall?

A. My gut reaction would be no. I remember vaguely

being introduced to this with the situation that
this was meant for Dr. Neff since she was sort of
the physician of record around that time; but
being gone, I'm not sure how this came about, but
it was probably asked that someone else who had
been caring for him perhaps equally as much would
handle that in her absence, I guess.
Q. Is that something, providing opinions in
connection with lawsuits, is that something that
you're regularly called upon to do as a physician?
A. No.
Q. Is this the first time you've done that?
A. I know in the case with, for example, the diet
medications, I don't think I was asked to provide
any particular opinions except physical exam
opinions. So no, we don't do that often, and this
potentially could be the first time I've ever been
asked, what are your thoughts.
Q. Okay. Before I talk about this letter and the



document you completed, I just want to talk to you
about some other things.
Did you ever personally prescribe Baycol for

Mr. Hartman?
A. I remember okaying refills for it.
Q. Are you able to tell from your chart when you okayed refills for him?
A. Yes. Did you need any date detail?
Q. If you're able to give them from your chart, that would be helpful.
A. Okay. The first record on the chart of Baycol -- do you want dates?
Q. Right now I'm just asking the dates that you okayed refills for him.
A. Okay. The first date that I see was 7/12/99 and another on 10/18/99. Would you like me to continue?
Q. And was that you okaying the refills?
A. Yes.
Q. Now, you hadn't started seeing him again, my understanding, until January of 2000. How was it that you came to be the physician that okayed the refills?
A. If someone is on vacation, for example, then one of the partners will look at the chart and

continue it, yeah.
Q. Why would somebody look at the chart before okaying it?
A. To make sure the patient is being seen appropriately, make sure that nothing else has changed with their care. Just to make sure it's appropriate.
Q. And would you have done that, then, reviewed Mr. Hartman's chart before okaying the refill?
A. To a point that I thought appropriate, yes.
Q. And if you had seen anything that gave you concern about his further use of Baycol, you would not have approved the refill, I take it?
A. Correct.
Q. So at that point, there was no indication he was having any problems with Baycol as of 7/12/99?
A. That's correct.
Q. And still as of 10/18/99, there was no indication that he was having any problems with Baycol, correct?
A. That's correct.
Q. Okay. When did you next approve a refill of his

Baycol?
A. 5/22/00.
Q. And again, you reviewed the chart before you



approved a refill of Baycol for him?
A. As appropriate, yes.
Q. And by this time, you were more involved with his care on a regular basis; is that correct?
A. More involved than in the past.
Q. And so you had a better knowledge at this point firsthand of how he had been doing on Baycol?
A. Yes.
Q. And so as of 5/22/2000, there was no indication in the chart or any of your interaction with him that it would be inappropriate to continue Baycol?
A. That's correct.
Q. Because there wasn't any information at that time that suggested he was having any problems with Baycol; is that correct?
A. That's correct.
Q. There weren't any reports of muscle aches, for example, that you attributed to Baycol by that time?

A. Correct.
Q. Are you able to tell from the chart how long he had been on Baycol by May 22 of 2000?
A. Yes. His first prescription ever recorded at our clinic was 11/6 of '98.
Q. Are you able to tell who actually prescribed it



for him?
A. Dr. Saccoman.
Q. Is he with your practice anymore?
A. No.
Q. Is he retired?
A. No.
Q. Has he moved to another practice, do you know?
A. Yes.
Q. Okay. Can you tell where he's at?
A. North St. Paul Medical Center. And that's part of the umbrella organization, also.
Q. HealthEast, is that it?
A. We are the East Metro Family Practice, merged with MNHealth, so our big organization now is Family Health Services of Minnesota.
Q. And his clinic over in North St. Paul is under

that umbrella?
A. Like us, yes.
Q. Okay. What type of practice does Dr. Saccoman have?
A. Family practice.
Q. Do you know how long he's been practicing?
A. I'll just estimate 17 years, yeah.
Q. Are you able to tell from the chart, just continuing on, when you next approved a refill of



Baycol for Mr. Hartman?
A. I gave you already 5 of '00; is that right?
Q. That's correct.
A. 8/31/00. No. I'm sorry. That was a different drug. That's the last time that I have a documented refill.
Q. That you did it?
A. That I did.
Q. And did you see in the chart as you were leafing through it where any of your colleagues approved a refill?
A. Yes.
Q. After 5/22 of '00?

A. I believe the answer is yes to that.
Q. Okay. When did you see instances where your colleagues approved it after May 22nd of 2000?
A. 6/27/00.
Q. And who approved that?
A. Dr. Neff.
Q. Do you know, did Dr. Neff have the same practice in approving refills that you did, to review the chart to make sure that prescribing a refill was still appropriate before approving a refill?
A. Yes.
Q. And do you have any reason to believe that she



didn't do that on June 27 of 2000?
A. No reason to think that she wouldn't.
Q. Okay. When was the next refill that one of your colleagues approved?
A. 9/7/00.
Q. And who was that?
A. It was either TLL, but I can't read it. It's either TON, that's Dr. Nichols, or it could have been TLL, Dr. Lundsten.
Q. And do they also have the same practice, to your

knowledge, of reviewing the chart and making sure
that a refill is appropriate?
A. Yes.
Q. And do you have any reason to believe they would
not have done that on September 7 of 2000?
A. No.
Q. What was the next one?
A. 8/20 of '01, a comment for Dr. Neff, "was on
Baycol, needs new meds."
Q. So there is no indication in your medical records
that there was any kind of refill authorized
between September 7 of 2000 and August 20 of 2001?
A. Correct.
Q. Okay. Would we find that somewhere else if it was
done?



A. I would think not.
Q. Are you able to tell how many months of refills
were authorized?
A. In general, we would always try to indicate number
of fills and number of refills, so let me take a
look and see.
Q. I'm specifically talking about the one that was

authorized on September 7 of 2000.
A. Okay. This would have been, I think, Dr. Nichols, but number 34, one year of refills.
Q. Okay. Now, being a physician in this practice and using this chart, when you looked at the fact that Dr. Nichols had authorized a year of refills, would it have been your conclusion from that that as of September 7 of 2000, he was not having any problems that anyone attributed to Baycol?
A. I think that's a fair assumption.
Q. And is it your recollection that if that was the case, you don't recall him reporting any problems by September 7 of 2000 that you would have attributed to Baycol?
A. Correct. You said September of 2000?
Q. Yes, I did.
A. Correct.
Q. Can you tell what dose he was on? It was my

32

understanding that he was on .3 milligrams the entire time. Is that your --
A. That is correct.
Q. And do you know, is that one of the lower doses of

Baycol or one of the higher doses?
A. Middle range, to my knowledge. Again, I didn't use the drug much.
Q. Okay. When you approved the refills, did you review the package insert for Baycol?
A. At the time of the --
Q. At the time you approved the refill, would you go back and review the current package insert or label for Baycol?
A. Probably never, unless there was a question in my mind about the drug or something I didn't know.
Q. Do you know, have you ever seen a Baycol package insert?
A. Perhaps when the drug first came out and the reps came by, they might have given us the spiel and what not.
Q. Do you recall ever reading the Baycol package insert?
A. In complete detail?
Q. Yes.
A. I would suspect I did not.

Q. Okay. Is that because you didn't prescribe the drug much?
A. And because, again, being a statin, sort of a class effect, we probably didn't find any reason to go into any more detail, and probably our speakers and consultants probably didn't raise any red flags to us.
Q. Well, let me try it another way, because you say speakers and consultants.
Before prescribing a drug, a new drug that you haven't used before, what do you do to familiarize yourself with that drug?
A. You understand the terminology of the drug rep. Oftentimes, our first experience, then, will be them introducing the drug from the viewpoint of their company and the FDA. And the old phrase that still holds true is that we often wait until our local specialists and the people that set the standard of care are using it, often in a hospital setting when we get a chance to see it and start to use it ourselves. Generally, people in primary care aren't the first people to prescribe

something new.

Q. Okay. I understand it may not have happened with Baycol, but would you generally read the package



insert for a drug that you had not prescribed before?

A. Yes.

Q. And would you read it in detail?

A. I would say looking in the PDR, for example, not every word.

Q. Okay.

A. Not every word.

Q. Okay. And this is not meant to insult you because I find the PDR to be quite difficult to read, but I'm just wondering, are there parts of it that you just look at it and you're like I don't know what this means? For example, if they're talking about drug metabolism or something like that.

A. Well, you can talk about certain phrases like all the various cytochrome system interactions. Many people don't understand it but you understand the concept of drug interactions and what not. Many of us will tend to look under warnings,

contraindications, oftentimes issues like breast feeding, children, that type of thing.
Q. Is that what you tend to focus on is going to the warnings and caution section of the label?
A. If it's a new drug, I kind of like to see what the mechanism is, sometimes what the molecule is like,



like is it intimitazole, is it sulfa, things like that, too.
Q. So the Physicians' Desk Reference is something that you can understand in pretty good detail, I take it?
A. Correct.
Q. And is that something that you consult regularly before you prescribe a new drug?
A. If it's a new drug and we've been introduced to it in an adequate way, I probably wouldn't necessarily have to refer to that. If it's a new drug that I'm asked to refill or something and I haven't used it before, like some people use the palm pilot or something, I tend to like the PDR.
Q. And when you say "the palm pilot," you're talking about basically the PDR that's in electronic form?

A. Exactly.
Q. And when you say you like to use the PDR, you actually like to go to the hard copy book?
A. Yes.
Q. And does this office get the annual PDR?
A. Yes.
Q. And the spring supplement?
A. Yes.
Q. So you don't get it on your palm, though?



A. I do not.
Q. So if I understand, then, how do you get familiar from a drug if it's not the label or the PDR?
A. Its use; seeing our patients come back from a cardiology office on it; evening educational sessions where local or national type, you can call them thought leaders, I guess, would be discussing the subject and the drug. Sometimes the drug is related to a subject.
So generally, before we in primary care will use it, we're somewhat comfortable with it even through the actions of our colleagues in their own specialties.

Q. Do you rely on what the company drug representatives tell you about a drug?
A. With a grain of salt. In other words, everybody is promoting their own drug and can show us studies about how good their drug is. We're always looking for the dirt, too. And most reputable reps will give you the negatives, within reason. So we're looking. Yeah, we trust them to a certain degree, but you also come to learn which reps you can trust and which might be a little more, you know, just trying to sell you something.
Q. Did you ever talk to any drug representatives



about Baycol that you recall?
A. At this point I could not say that. I'm not saying I didn't.
Q. Would you have made a note or something, or is there something that you would have that could refresh your recollection whether you ever talked to a drug representative about Baycol?
A. No.
Q. Do you know, have you ever been visited by a drug representative that represents Bayer

pharmaceutical products?
A. I would say almost certainly.
Q. Do you recall who it would have been?
A. No.
Q. Do you recall the last time that you would have seen a drug representative that was detailing pharmaceuticals made by Bayer?
A. My guess would be within the last year.
Q. But you don't have a specific recollection of it?
A. No.
Q. Okay. Can you think right now of any pharmaceuticals that are made by Bayer?
A. No.
Q. So I take it if there had been a Bayer pharmaceutical representative here, you may not

38

have even realized they were with Bayer or selling a Bayer product?
A. If they're here, they'll make it known that they're Bayer, yes.
Q. But you don't have any recollection in the past year of any visits with anybody from Bayer?
A. No. I mean, if you told me what their products

were, I could definitely tell you that, but
otherwise, no, I can't.
Q. What about any other statin? Do you recall any
visits in the past, even going back to 2000,
visits with drug reps concerning statins?
A. Yes.
Q. What different statins did drug reps come in and
talk to you about?
A. The last few years, Zocor, Lipitor, Crestor came
out. Mevacor has probably not pushed itself very
much the last few years. Lescol has dropped out
of sight.
Q. Do you prescribe statins in your practice?
A. Yes.
Q. Which ones do you prescribe?
A. Zocor and Lipitor are my top two. Crestor is
climbing. And HMOs might require some of the
others, otherwise, they normally would not be my



first choice. Pravachol is also used quite a lot.
Q. By you?
A. By me.
Q. Okay. Is it your understanding that all statins

are basically the same in terms of their function?
A. Basically the same in terms of their function and potentially side effects.
Q. What do you mean by that, that they're potentially the same in terms of their side effects?
A. We all are checking liver functions and checking for weakness or muscle pain on everybody who is on a statin nowadays.
Q. Did you understand that they had different risks in terms of drug interaction?
A. Yes. We might not have understood it in 2000, but we've learned more now.
Q. Okay. How have you come to learn more about statins since 2000?
A. My best education would be the evening sessions with the pharmaceutical companies sponsoring a talk by a national thought leader.
Q. And how many of those have you attended since 2000?
A. On lipids, for example?
Q. Yeah.

A. Okay. I would guess 12 to 15, at least a number per year, because, number 1, they're good dinners, and number 2, they're good speakers. Some of our best education, actually.
Q. Okay. And do you understand that the thought leader is usually there to tell you about a specific statin, or do they usually come in and talk about statins in general?
A. They're asked to talk about statins in general and the subject, for example, lipid disease, metabolic syndromes. And they're obviously being paid by a company who makes one of those and sometimes they'll put something in on that, but they try to maintain neutrality as much as they can.
Q. Do they come in and talk about the risks of statins?
A. Absolutely.
Q. When did you first start going to conferences where thought leaders were talking about statins?
A. Oh, I would say -- I forget when Lovastatin or Mevacor, for example, came out, but I would guess probably either the late '80s, early '90s.

Q. Other than going to conferences presented by the thought leaders, are there other sources of information that you've had available to you to



learn more about statins in general?
A. Yes. Monday morning educational conferences at St. John's Hospital, for example. And there is cardiology updates by St. Paul Heart Clinic and other places that might be an eight-hour, one-day course or something, too.
Q. What about textbooks, do you refer to any textbooks in your practice?
A. Yeah, in the hospital. Just like in the middle of the night last night, I was waiting on a baby, so I went into the library and was looking up rhabdomyolysis, and not having a lot of success as far as the issue of Baycol and all of that kind of stuff. But yeah, textbooks are good. Sometimes they're a bit outdated, but we use them. We also use the hospital librarian to do literature searches for various subjects, things like that.
Q. Have you had any literature searches for statins done for you?

A. Yes. In fact, probably within the last month.
Q. What was the purpose of that literature search?
A. Statin myopathy or Baycol myopathy type thing.
Q. And did you, in fact, get some literature on that?
A. Some short summary type things.
Q. What was the purpose of getting that research?



A. Just to find out what's been out there. Actually, it's an update for me right now, too.
Q. Why were you looking for literature on Baycol myopathy since it's off the market?
A. To refresh myself, even for something like this.
Q. For this deposition?
A. Sure.
Q. And did you read articles on Baycol myopathy?
A. Summaries of articles are pretty much what came to me.
Q. You're talking about the computer generated kind of synopsis of an article?
A. The synopsis of an article or a list of various articles that have been written.
Q. Okay. Did you actually go to the article that was referenced on this list of articles?

A. My librarian provided some that were three, four, five paragraph type things, just summaries.
Q. So that's all you've had a chance to look at?
A. Correct.
Q. Did that kind of help refresh your recollection for purposes of this deposition?
A. Not particularly, because they all talk about the issue that they don't understand the mechanism, that certain drugs can interact with others. So



it pretty much told us what we've learned the last few years.
Q. Is that what you were looking for, was an explanation of the mechanism of interaction with another drug?
A. Yeah, curiosity.
Q. Now, Mr. Hartman was never on -- the interaction you're talking about is with gemfibrozil; is that correct?
A. Well, the way we look at it nowadays, you can have interactions with perhaps just about any of them. So, yeah, we kind of fear these things when you have two or three drugs being used together.

Q. Did these summarize that you looked at regarding
Baycol talk about interactions with drugs other
than gemfibrozil?
A. The erythromycins, the ketoconazoles, antifungals,
cyposporums, some of those, many of which we
sometimes never use but we still like to stay off
them.
Q. And do you know, was the interaction with those
drugs that you just listed in the PDR for Baycol?
A. I'm not sure if it would have been back then or
not. I don't recall that.
Q. Okay. To your recollection, Mr. Hartman was never



taking gemfibrozil at the same time he was taking
Baycol; is that correct?
A. To my recall, he was switched to that as a result
of going off Baycol. It wouldn't be an unusual
thing back then to use them together.
Q. But that didn't happen in his case is what I'm
talking about.
A. Not to my knowledge.
Q. Okay. What about Dear Doctor letters? Do you get
Dear Doctor letters in your practice from

pharmaceutical companies?
A. Yes.
Q. Do you rely on those when you receive them?
A. Yes, we do, because usually they're significant warnings, black box labeling, things like that.
Q. If one physician in a practice gets a Dear Doctor letter, is there a practice for disseminating that to the rest of the physicians in your practice?
A. I'm not sure there is any written policy except word of mouth. Since we all use these drugs, if there is something out there, we like to point it out to everybody.
Q. Do you recall ever seeing Dear Doctor letters relating to Baycol?
A. I cannot recall the specific instances.



Q. Do you regularly read any peer review journals, medical journals?
A. American Medical Association, some of those kind of things, Patient Care, Journal of Family Practice.
Q. Do you subscribe or review any regularly that deal specifically with hypercholesterolemia?

A. No, I don't.
Q. What about journals that regularly publish articles concerning statins?
A. We occasionally get these kind of articles, but they're often given to us by a drug rep.
Q. And do you rely on articles that drug reps pass on to you, or is that also information that you take with a grain of salt?
A. You take it with a grain of salt, but some of them are well done and some of them are quite neutral.
Q. And do you feel comfortable being able to evaluate whether an article is neutral and well done as opposed to something that might be more of a marketing piece?
A. I think you can tell the difference in the scope of the article, how it comes across, but I'm certainly not an expert.
Q. Okay. Does this practice keep a file for Dear

46

Doctor letters?
A. I don't know that. My guess is no.
Q. And you don't have a personal file where you retain them?

A. No.

Q. Do you receive FDA med watch notices?

A. I can't say that I recognize the term med watch. But if the FDA sends them out to physicians, we get them, but I don't recall that term.

Q. Do you get electronic notices from the FDA concerning drugs on your computer? And by "notices," I mean e-mail notices.

A. I'm not aware of that, at least since we've gone on our EMR here.

Q. Okay. Based on everything that you've learned about drugs over the years from the various sources, would you agree that all drugs have risks?

A. Yes.

Q. And sometimes drugs that are approved by the FDA have serious risks, correct?

A. Can I qualify?

Q. Sure, absolutely.

A. They may have serious risks, but the risk versus benefit, if they get approval, usually is on the

favor of the benefit.
Q. And that's something you consider in prescribing a drug, is whether the benefit for your particular patient outweighs the risks of those drugs?
A. Yes.
Q. And in approving renewals of Baycol for Mr. Hartman, I assume that you also, based on your review of the chart and your treatment of him, concluded that the benefits to him of continuing on Baycol outweighed any risk?
A. Yes. According to our understanding at the time, yes.
Q. And when you say "our understanding at the time," are you suggesting that information was withheld from you concerning Baycol?
A. No.
Q. Okay. You're saying that science has evolved concerning statins, in general, and Baycol, in particular, over time?
A. As it has with other drugs, too.
Q. Okay. Do you also understand that drugs can have risks that aren't known before the FDA approves

them for marketing?
A. Yes.
Q. And that's because some risks are just so -- occur



so infrequently that it would be impossible to fully test for them before the FDA approves the drug?
A. Yes.
Q. What was the first statin you ever prescribed, do you remember?
A. Mevacor.
Q. And did you read the package insert before prescribing that?
A. Yes, since it was the first in the class.
Q. By that time had the risk of myopathy been discovered for statins?
A. I cannot say yes to that. I can't say it was pointed out to us.
Q. But at some point you're aware that cases of myopathy were reported with Mevacor?
A. Yes.
Q. And I think that you've also prescribed Zocor; is that correct?

A. Yes.
Q. And when you prescribed that, did you read the package insert before you prescribed it, or was it a situation where maybe you relied on the opinion leaders?
A. Both.

49

Q. And did you understand before you prescribed it, that myopathy was a risk with Zocor?
A. I would think I would, but I would have assumed it was a very low risk, again, because of the thought leaders.
Q. And when you say "very low," what do you mean?
A. When you're talking about one out of several hundred people may get a symptom versus something serious like rhabdomyolysis, for example.
Q. So what you're saying is if it's less than 1 in 100 that would get a symptom, you'd consider that to be a low risk of side effects?
A. Not necessarily. By our standards nowadays, we tell people that 1 or 2 percent may have some low-grade liver irritation, 1/2 to 2 percent, depending on the study, might have some myopathy,

but many fewer have rhabdomyolysis. So we kind of get an idea of that and we're always kind of cautious, but then we listen to our thought leaders. And if they are saying these are really unusual, here is how you approach them and watch for them, we'll still use the drug.
Q. Mr. Hartman never had rhabdomyolysis, correct?
A. In my opinion, correct.
Q. Do you know anybody that's formed the opinion that



he did have it?
A. The only one I saw was a note from Dr. Neff indicating, I think, he had rhabdo, but I shouldn't opine any further than that.
Q. What's your definition of rhabdomyolysis? What symptoms do you have to have to have it?
A. Probable muscle pain, soreness, probable weakness, probably dark urine, possibly blood in the urine, and in severe cases, decreased urine output, kidney failure.
Q. What about CPK levels, is that something that's --
A. Well, CPK level is a challenge for all of us. They used to talk in terms of 10 times the upper

limits of normal, which very few of us ever see, but that's because we're not seeing rhabdo. We see far more myopathy, which means muscle soreness or weakness, where we may have a level that's one or two times normal.
Q. Did Mr. Hartman ever have CPKs that were even one or two times the upper limit of normal?
A. I don't recall that. My thinking is he had normal CPKs.
Q. Did you ever request that CPK testing be done while he was on the drug?
A. While he was on it? I don't recall my ever doing



that.
Q. Is it your practice that if a patient is on a statin and comes in complaining of myopathy, that you would get a CPK level taken?
A. Yes.
Q. And if there is no indication in the records that you ordered CPK levels for Mr. Hartman while he was on Baycol, would it be your conclusion that he had not been complaining of symptoms that you categorize as myopathy?

A. That's correct.
Q. Can you find in your chart anywhere where you requested a CPK test be done? I believe you requested one be done in November of 2001, but I'm talking about before that.
A. Okay. So before that. Because in November of 2001 he might have been on Lopid or something.
Q. And just for the record, Lopid is the same as gemfibrozil?
A. Correct.
Looking at the chart, I do not see me ever ordering a CPK before that time.
Q. And from that you conclude that until that time, you were not aware of any complaints from him that would lead you to believe that he was potentially



having any symptoms that could be attributable to a statin such as Baycol?
A. Correct.
Q. I think you said you didn't use Baycol much. Was there a reason for that?
A. Many times in certain drug classes, if you're the new kid on the block, you have to demonstrate some

pretty clear superiority before we'll adapt that one. There was also probably whispering when it first came out that it's so much more potent than the other drugs, that there was some fear that maybe there could be problems, but I cannot tell you when those whisperings were in the whole time frame.

Q. Doesn't potency just mean that you need a smaller dose?

A. Correct. Although, from the standpoint of side effects, some of our thought leaders were worried that the potency might indicate a risk for drug side effects, too.

Q. Have you seen any medical literature that suggests that the increased potency of Baycol led to increased side effects?

A. I don't recall seeing anything to that effect.

Q. And just to go back to your reason for not using



Baycol, if I understand, and I'm going to try and summarize what I understood you said and correct me if I'm wrong, basically, at the time that you were prescribing the statin and treating

Mr. Hartman, Baycol was a fairly new statin, correct?
A. Correct.
Q. And that you had been using statins that you were comfortable with and so you didn't see any reason to take on one that was untested, and plus, there may have been at that time rumblings about the increased potency leading to increased side effects?
A. That's correct.
Q. Any other reason why you didn't use Baycol much?
A. HMO coverage is always a reason. If you're a new kid on the block, many times you wouldn't have coverage no matter how good the drug is sometimes.
Q. When you did prescribe Baycol then, why would you prescribe it?
A. For example, if a patient had tried several others and didn't get a good response, you might try the new person because you've heard they have good data as well; sometimes poor response to another drug; a side effect from another drug; an HMO that

might dictate it, although I don't remember that
that was ever the case.
Q. So is it fair to say that even though there are
many drugs in the class, that's something that's
valuable to a physician because one drug in a
class may not have the same side effects that
another drug has or one drug in a class may work
for a patient whereas another hasn't? Is that the
case?
A. Correct.
Q. And that was true of Baycol as well?
A. Yes.
Q. Okay. In the cases where the other statins had
not been effective for your clients, do you recall
whether the Baycol was effective for them?
A. I can't recall any circumstances because, again, I
can't recall any particular patients that I gave
it to.
Q. Is it possible that other than Mr. Hartman, you
never approved the use of Baycol for any of your
patients?
A. It is possible, especially if the HMOs around that

time really weren't covering it, and HMOs were a large part of our practice at that time.
Q. Did you ever have any sense about how Baycol



compared to the other statins in terms of cost?
A. Not particularly.
Q. Is that something that you consider when prescribing a drug in a class for your patient?
A. Yes, especially within the realm of the HMOs and co-pays and whether it's covered. For many people that is very important.
Q. Okay. Are you even able to comment on your experience with prescribing Baycol since you don't necessarily recall doing so?
A. No, I can't recall any specific instances, but I can honestly say that aside from Mr. Hartman's circumstances, I do not recall another patient having a similar complaint.
Q. Okay. Have you had patients that have come in that you've concluded have a statin-induced myopathy?
A. Not rhabdo, but you're asking myopathy?
Q. Yes.

A. Many.
Q. How do you define myopathy for purposes of your practice?
A. The current thinking would say muscle pain, muscle weakness, muscle soreness, sometimes including joint symptoms associated with the muscle



symptoms. Currently, I think myopathy would include that without a CPK elevation.
Q. And that's what you use in your practice to determine if a patient has a myopathy, correct?
A. To the point where I would want to get them off the drug or cut their dose in half, recheck the blood work.
Q. And that's what I wanted to ask you. When a patient comes in with what you conclude is a statin-induced myopathy, what's your normal practice?
A. Since I have other choices, I stop the drug, see their numbers normalize again, and then --
Q. When you say "their numbers," are you talking about CPK?
A. CPK. Or if their CPK is normal, then I expect

their symptoms to normalize.
Q. Okay. And does that typically happen when you take them off the statin, that their symptoms normalize and their CPK comes back to normal?
A. Yes.
Q. How long does it usually take after you stop a drug before their symptoms improve?
A. Several weeks to several months.
Q. So with a typical statin-induced myopathy, in your



experience, the muscle weakness/muscle pain would improve within several weeks to several months?
A. Yes.
Q. Have you ever seen it take longer?
A. We have one case with Lipitor of my partner who I saw whose CPK went up to over 5,000 and did not come down significantly over three months, and we wound up sending him to rheumatology and then Mayo Clinic, and they wound up saying he had a primary myositis disorder that perhaps Lipitor just aggravated. So I have seen cases where they didn't obey the rules.
Q. When you say "they didn't obey the rules," what do

you mean? The symptoms didn't?
A. The symptom course huddled everybody up.
Q. And in the case where it didn't obey the rules, it was because there was something else going on in addition to a simple statin-induced myopathy?
A. Yes.
Q. Okay. Can you just help me understand the benefits of statin therapy? It's used to treat hypercholesterolemia; is that correct?
A. Yes.
Q. What is that?
A. When you look at some of the various lipids or



forms of body fat in our bloodstream, hypercholesterolemia would indicate abnormal levels of them, some of which can be abnormally low, some of which can be abnormally high. The statin drugs tend to improve the bad cholesterol profile and sometimes the good cholesterol profile, and to some degree, the triglyceride levels. And in so doing, they improve the total cholesterol, but that's not a very important number anymore.

Q. Total cholesterol is not?
A. (Nods head.)
Q. And the bad cholesterol is LDL cholesterol --
A. LDL.
Q. -- and the good is HDL?
A. HDL cholesterol.
Q. And what was the other --
A. Triglycerides.
Q. And that's another kind of fat?
A. Yes, another subfraction.
Q. And are high triglycerides bad?
A. Yes, to a significant degree.
Q. And high LDL cholesterol is bad?
A. It's the number 1 target right now.
Q. And why is high LDL cholesterol a bad thing for



humans?
A. It tends to, in simple terms, clog arteries, like you can clog pipes. And when you clog arteries, the walls become unstable, and they call this plaque, and if the plaque ruptures, it brings blood clots into an area quickly and can suddenly occlude or block arteries.

Q. And so the result of that is either a stroke in
your brain, I take it, or a heart attack?
A. Yes.
Q. Anything else from these blood clots?
A. You can get chronic kidney disease from that. You
can get -- the mechanism of some of the other
things, like the eye problem, isn't always quite
as clear, or the peripheral neuropathy with the
legs.
Q. But peripheral neuropathy can be a result of too
much LDL cholesterol?
A. Probably indirectly in the metabolic patient
syndrome. They all kind of meld in together
because neuropathy can also be from statins and
from diabetes, so there are many causes.
Q. What is neuropathy?
A. Neuropathy is a symptom of discomfort, numbness,
pain, burning in a nerve that has many causes;

60

vitamin B-12 deficiency, diabetic sugar changes on
nerves, shingles, for example, or herpes zoster.
There are many causes.
Could I add one more thing, too, because you

were asking about what statins do?
Q. Of course.
A. Statins we like to look at nowadays as excellent blood vessel stabilizers. We all have some plaque in our arteries, but the people who are on statins tend to be protected considerably from those plaques rupturing or becoming unstable. So we tell people, your numbers are going to get better, but you can also have faith that your whole blood vessel tree is healthier too.
Q. And so that means less risk of stroke and heart attack and things like that?
A. Yes, even regardless of what their numbers do, the fact that they're on these drugs.
Q. Because you're saying it stabilizes the plaque?
A. It stabilizes plaque.
Q. Do all statins do that?
A. Yes, to some degree. It's a class effect. You know, you'll have some cardiologists say that some are better than others or more popular than others.

Q. Okay. And what about lowering triglycerides? I think you said some statins do that, or do they all do that?
A. They all do that, but that's not their major function.
Q. Okay.
A. Other drugs do it better.
Q. And that's the reason for gemfibrozil, or Lopid, is to lower triglycerides?
A. Yeah. Gemfibrozil will lower triglycerides better and raise HDLs better.
Q. And HDL is the good cholesterol?
A. Correct.
Q. Okay. So what statins are doing is, if I understand, preventing some potentially fatal conditions --
A. Correct.
Q. -- or problems, stroke and heart attack?
A. They're putting the patients in a lower risk category for those fatal conditions.
Q. Okay. And we were talking about neuropathy, peripheral neuropathy. What does that mean? That

means it's in your hands and feet?
A. Hands and feet, more distally from the truck of your body.



Q. And distally means further away from your body?
A. Further away.
Q. Does it include forearms and calves and things like that, too, peripheral neuropathy?
A. Yes.
Q. Could it include thighs as well, the term peripheral neuropathy?
A. As it gets more advanced, it could.
Q. And you said that one of the causes of peripheral neuropathy is a B-12 deficiency?
A. Yes.
Q. Mr. Hartman, I thought I saw, was getting B-12 shots; is that right?
A. Yes.
Q. Did he have peripheral neuropathy?
A. That's one of the conditions in the differential diagnosis for his symptoms.
Q. Okay. And what symptoms are you referring to?
A. Complaints of numbness, sometimes discomfort in

extremities.
Q. And by extremities in Mr. Hartman, you're talking about his leg?
A. Certainly.
Q. Did he have it anywhere else? In his arms or --
A. My recollection is most of his complaints involved



his legs. Most of his complaints involved weakness, but I think pain was included at times as well.
Q. So he was receiving B-12 shots in an attempt to treat the pain and weakness in his legs?
A. You know, I'm not sure if I can comment on that.
Q. Okay.
A. That would be a logical thing. If my patient has a B-12 deficiency and they have tingling and burning, yes, that's my intention; but I'm not sure that whatever doctor started that, that their intention was that they were treating weakness. I'm not sure about that.
Q. What would B-12 shots be used to treat besides --
A. B-12 deficiency?
Q. Yeah.

A. There is probably no other valid thing. Doctors used to use that for people who just weren't well nourished or they were achy and tired, but that was sort of an off-label type prescription years ago.
Q. And does B-12 deficiency lead to symptoms other than kind of muscle achiness, maybe tiredness or weakness?
A. Tingling, then potentially weakness, too, because,



of course, your muscles require innervation from nerves to function.
Q. Okay. So peripheral neuropathy was something that you and your colleagues considered in terms of the explanation for Mr. Hartman's complaints of leg pain and weakness?
A. Yes, especially in a diabetic, also. Not just B-12 deficiency, but diabetes can also account for that type of thing.
Q. And he had a long-standing history of diabetes, is my understanding.
A. Yes. Although, I cannot comment now on when he was diagnosed because he had some other issues he

was seeing us for when we weren't dealing with his diabetes.

Q. Were you called in primarily to deal with his diabetes? Was that why you started seeing him?

A. No. I think that he identified with me perhaps through a hospitalization. People will sometimes just find someone that they meet mind to mind with.

Q. Okay. My understanding, and correct me if I'm wrong, from reading the records is that his diabetes was not well controlled.

A. Correct.



Q. And that was largely because he refused a lot of your suggestions in terms of lifestyle changes or treatment.

A. Correct.

Q. And some of the things that you had suggested that he should monitor is glucose at home, for example, and he refused to do that?

A. Yes.

Q. And that was because he had to stick his finger and he didn't want to do that?

A. That might be one of the causes. Cost could be a cause. His lifestyle, his trucking job. There are many reasons why people will not get into a regimented system.
Q. And if I understand correctly, it was also recommended that he take insulin and he refused that.
A. Yes.
Q. And do you know why he refused insulin?
A. Truck drivers, if they are on insulin, I think even back then, cannot be truck drivers. Other people do it for other reasons, like discomfort or just the number of pin pricks they have to do, too.
Q. Did he ever explain to you why he was refusing

66

insulin?
A. I would probably have to go back and look in the note.
Q. Okay. What are the results of uncontrolled diabetes? Or poorly controlled, I guess I should say.
A. Well, most diabetics will die from heart disease

or cerebral vascular disease, like strokes. Those
are the two main causes of morbidity/mortality
with diabetics. They can become blind; they can
have chronic kidney failure which requires
dialysis; they can have peripheral neuropathy;
they can have poor circulation in their
extremities, especially in their feet, which
ultimately can lead to the loss of extremities and
amputations, too.
Q. Anything else, as if that isn't enough?
A. I mean, that might be pretty much what I summarize
with my patients. I'll tell them, too, that
diabetics tend to have somewhat impaired immune
systems for reasons that aren't always totally
clear, so their risk of infections are not doing
well if infections go up.
Q. As a result of his poorly controlled diabetes,
were you starting to see evidence of heart disease



with Mr. Hartman?
A. Yes.
Q. In fact, I guess he had triple bypass at some
point.

A. Yes.
Q. Did you attribute that to the diabetes?
A. At least a comorbidity.
Q. What do you mean by comorbidity?
A. Heart disease has many causes, and hypertension might be the biggest one, smoking is a big one, diabetes is a big one. Those are probably the big three. High cholesterol levels is another contributing factor, as is genetics.
Q. Does diabetes lead to high cholesterol?
A. It's part of the metabolic syndrome of which diabetes and high cholesterol are in common.
Q. Is it a chicken and egg thing, you don't know which leads to which?
A. Correct.
Q. Okay. Did he have any evidence of cerebral vascular disease when you were treating him?
A. I almost recall in a note if he ever made a comment about some memory issues or something. I cannot say that I was aware that he ever had a stroke.

Q. Okay. And what about blindness, is that something that's progressive, or is that sudden when you have blindness because of diabetes?
A. It can be either. Diabetics can get cataracts more frequently, which would be a more gradual thing. Diabetics can get abnormal blood vessels which can bleed suddenly and cause loss of vision very quickly as well.
Q. Now, he never had blindness, correct?
A. Not to my knowledge.
Q. Did he ever develop cataracts?
A. I'd have to go back to my exam and see that. I don't recall it.
Q. And what about kidney failure? I saw in his notes that there was some evidence of kidney failure but I wasn't clear what the cause of that was.
A. Again, there are multiple causes. Diabetes is one of them. And what we do with that is we look for microalbumin leakage into the urine, which is often an early sign of diabetic kidney stress.
Q. Did he have that?
A. I'd have to look.

Q. Go ahead and look.
A. Okay. Also, rising creatinine levels in the blood
is a sign of kidney stress of whatever cause.



Q. Okay.
A. And John had a creatinine in 2 of '04 of 1.4,
which is at the upper limits of normal, so
strictly speaking, he was still okay from the
creatinine standpoint.
Q. Meaning his kidneys were functioning fairly well?
A. Quite well.
Q. Okay. Can kidney function, once it starts to
decline, can it improve?
A. Yes.
Q. Okay. Even in a diabetic? So if they maybe start
to control their diabetes better, you can see
improved kidney function?
A. If you control all the factors, the diabetes, the
lipids, the blood pressure is critical, starting
people on what they call ARBs.
Q. What are those?
A. Those are angiotensin receptor blockers. They're
well known as blood pressure medications, but

they're kidney strengtheners in diabetics, or protectors, you could say. And also, they strengthen the heart muscle.
Q. Okay. And while you're looking, can you see if you note any evidence of kidney problems in the 2000 to 2001 time frame as well?



A. Okay. At least so far here, John hasn't had a creatinine over 1.4. He had one here in 2001 that was 1.5, so that's at the upper limits of normal for an adult.
This is sort of an aside, but April of 2000, we had a creatinine level in John of 7.2 at one point.
Q. So that's significantly elevated?
A. That was seriously elevated.
Q. When did you say that was, April of 2000?
A. It must have been when he was in the hospital.
Q. And is that, in fact, when he had one of his kidney stones?
A. Let's see what the date was on that. My comment says, "noted in the hospital at that time." Let's see what the date was. April 25 of 2000.

Q. Do you recall admitting him to the hospital in that time frame because he had a problem with kidney stones at that point?
A. I can go back to the --
Q. Go ahead. Let's stick with that. Right now I'm asking if you remember it.
A. I don't recall admitting him, but I have a feeling I would have. A 7.2 is serious.
Q. He had a history of kidney stones, correct?



A. Correct.
MS. WRIGHT: Our court reporter needs to take care of his equipment, so let's go off the record.
(Discussion off the record.)
MS. WRIGHT: Back on.
BY MS. WRIGHT:
Q. Before our brief break, we were just talking about whether there was any evidence of kidney problem in the 2000/2001 time frame for Mr. Hartman, and I think one of the things that you said while we were off the record was in January of 2000, you saw that there was no evidence of protein in his

urine.
A. Yes.
Q. What's the significance of that?
A. Protein in the urine would indicate some cause. We usually associate protein in the urine with some kind of kidney dysfunction, and at least a lack of it is an optimistic finding.
Q. So basically, based on your review of the records, and I understand that it might be a little bit short, is that there was no evidence of any kind of kidney failure or significant kidney problems in the 2000/2001 time frame.

72

A. That's not true.
Q. Except for the April time when it was significantly high and --
A. Related to a ureteral obstruction by a stone, yes.
Q. And once a kidney stone is removed so the obstruction is gone, does the kidney function typically return to normal?
A. If it hadn't been there too long.
Q. What's too long?
A. Sometimes weeks or months.

Q. And I know you said he had a history of kidney stones. What are the typical symptoms that people have when they have a kidney stone?
A. Probably in the population of people with stones, the most common symptom is no symptom. If a stone moves and causes obstruction of the ureter, then pain and blood in the urine are the two most common symptoms.
Q. And blood in the urine, is that also known as hematuria?
A. Correct.
Q. So if I saw that in the record, that's what it meant. It meant blood in the urine.
A. Correct.
Q. Okay. And where is the pain usually?

73

A. The pain can vary, because kidneys are up in the upper flanks (indicating), and the pain can be there or it can --
Q. Basically, that's kind of the low back to the sides where you're pointing?
A. Low to mid back. Because the nerve supply goes all the way down to the penis or the vaginal area,

pain from a kidney stone can be up by the kidneys
or all the way down to the flanks to the groin.
Q. It doesn't go lower than that into the legs,
typically?
A. Typically not.
Q. Does it cause weakness of any sort, that kind of
pain that you could get from a kidney stone?
A. Only in that you might be so sick and so painful
that you're weak, but otherwise no, it doesn't
cause a muscular weakness.
Q. Okay. Was hematuria something that Mr. Hartman
would get with his kidney stones?
A. He has commented in at lease one note about blood
in the urine.
Q. And was that on April 25 of 2000, or are you
looking at a different note?
A. April 25 of 2000, hematuria was mentioned. Also,
6/13/00.



Q. Is it your understanding he was having problems
with kidney stones that entire time, from April of
2000 to June 13 of 2000?
A. My understanding would be he had kidney stones,

sometimes inactive, sometimes symptomatic during that time frame.

Q. Okay. What kind of problems can kidney stones cause besides the pain and the hematuria? You said kidney failure. Is that pretty much it?

A. Kidney failure with ultimately shrinkage of the kidney and scarring. Infections are more common in the presence of stones as well.

Q. I thought I saw that one of the radiologists did note that his left kidney had shrunk during an episode of kidney stones. Is that something that then permanently decreases the kidney function, or can that resolve as well?

A. Shrinkage is usually a late stage phenomenon that usually doesn't totally reverse. Dilatation acutely from a stone in the first few weeks often will go back to completely normal once the stone or the blockage is corrected.

Q. Do you know, did he have any long-term problems as a result of any of his episodes of kidney stones?

A. My thinking is no, only because his creatinine

level pretty much normalized.
Q. I think he was treating for something called cellulitis as well in I believe January of 2000, about the time that you started seeing him. What is cellulitis?
A. Cellulitis, in simple terms, could be looked at as a red, hot infection of the skin and soft tissue.
Q. And he had this in the foot, I believe. Do you recall that?
A. Yes.
Q. Was it in both of his feet?
A. I could look in the notes. I don't recall that. Typically, it will be a unilateral or one-sided phenomenon.
Q. And is it something that causes pain, or is it just red and warm?
A. Pain, warmth, swelling, and sometimes ulceration, to the extreme of amputation.
Q. Is this something, this cellulitis, that's caused by having diabetes or is it independent?
A. Diabetics are more prone because of the impaired immune system, as well as the impaired circulation

to the feet.
Q. Did you attribute his cellulitis in his foot or his feet to his diabetes?



A. As a contributing or part of the factor. Sometimes it can be a bug bite or a sliver.
Q. So it's the result of an infection?
A. Yes.
Q. What's the typical treatment, then, for cellulitis?
A. For an early one caught early, oral antibiotics will often work. For something more advanced, intravenous antibiotics in the hospital.
Q. He was not hospitalized for his, was he?
A. I don't recall him being hospitalized.
Q. Okay. Is it the kind of pain that would have interfered with his ability to walk? Is that what he would have been experiencing?
A. It could be, unless he had severe neuropathy. Some diabetics have no feeling in their feet, so they don't even know they have cellulitis.
Q. Did he have episodes of cellulitis after January of 2000, to your recollection?

A. I don't recall that.
Q. Okay. Now, I had also seen that Mr. Hartman had some problems with degenerative disc disease, I believe. Do you recall that?
A. Vaguely.
Q. I might be able to help you out a little bit here.



I'll show you a note. And we can mark it or you can -- in 3/24 of 1991 -- or excuse me -- 3/25 of 1991, he's talking about right flank pain, and I don't know if you can read that note. Can you read it?
A. Quite well.
Q. Okay. Could you read it for me, that note, 3/25 of '91?
A. "Right flank pain, Friday night, 3/22; right hip pain, Saturday, 3/23, legs feel very unsteady."
Q. Unsteady or unstable?
A. Unstable looks like it might be a better interpretation. "56 years old. Blood pressure 142 over 86." And let me just look over here. There is something here about seeing Dr. Antelac, IVP, hystos. Okay.

Q. Is that referencing --
A. Urologic workup.
Q. So they're thinking that the pain may be due to a kidney stone again?
A. I think what he's saying is that he is seeing Dr. Antelac, and that was his way of sort of reminding him that he's seeing a urologist for something. He didn't put stones down at the time, and he mentioned a profile was sent after blood



work. Then the little diagram there is indicating reflexes in the knees and in the ankles.
Q. And is it indicating that they're all normal or --
A. The one on his right knee is plus/minus. The one on the left knee was two pluses, which means a bit more brisk.
Q. Is plus/minus normal?
A. It can be. Or we generally like to see symmetry. We generally like to see both legs the same unless there has been a previous injury to a disc or something.
Q. And so there is a difference. The right you're saying is --

A. A little down from here to his left.
Q. Okay.
A. Then the right quadriceps, marked weakness, and then he mentions something. Ears, negative; throat, negative; chest, negative. Those little zeros are negative behind those things.
Q. Okay.
A. Heart, regular sinus rhythm. The circle around the little M is no murmur. Abdomen, negative; no liver, kidney or spleen. What he means is they're not enlarged or palpable.
Q. Okay.



A. Then the lumbar spine, L5-S1, this is on an office x-ray, was narrowed, and he commented scoliosis, which would be a lateral curvature of the spine. He didn't necessarily indicate where, but this was done of the lower back.
Q. And I may have the -- is this the x-ray report that he may be referring to (indicating)?
A. That would be -- this is the same date, so this would be the report, yes.
Q. And what does this report indicate? First of all,

if you could just read it for us.
A. Sure. "There is lumbar scoliosis present, convectity to the left with secondary hypertrophic degenerative spurring." The scoliosis is the curvature of the spine. Instead of being very straight up, many of us will have curvature side to side. By itself, it isn't necessarily a cause of pain or disability unless it's extensive.
Q. Okay.
A. Secondary hypertrophic degenerative changes indicate someone who has likely been very active, and in the bones that keep your spine upright, there are bone spurs and thickening of the calcium, which you can actually see as hypertrophic or enlargement.



Q. Can that lead to pain?
A. Yes.
Q. Okay.
A. "The most significant degenerative changes are at the L5-S1 level" -- which is the bottom level of your spine. The disc is between the L5 and S1 -- "where there is joint space narrowing.

"Eburnation" -- are like bone spurs -- "and
marginal osteophyte formations." Marginal
osteophytes would be lateral bone spurs again.
Q. Okay.
A. Okay. "There is also straightening of the lumbar
spine noted on the lateral view." That's a
nonspecific finding often associated with spasms,
but it can also be a chronic problem from
degenerative changes.
Q. Okay. Now, the degenerative changes that he's
noting at L5-S1, can those lead to pain?
A. Yes.
Q. Where would you expect the pain to be in a patient
that has degenerative changes at L5-S1?
A. Deep in the low back. It could be more on one
side than the other.
Q. Could it be referred into the legs?
A. Yes.

81

Q. Any particular part of the leg or just the legs
generally?
A. If it's a referred pain, it generally will be at
or above the knee level.

Q. Okay. Are you able to tell whether somebody has
referred pain from an L5-S1 degenerative change?
A. I mean, a report like this could support a
diagnosis or supposition. If we hear that the
pain goes below the knee where part of the foot is
involved might give us an indication of which disc
level might be hitting that sciatic nerve.
Q. But you wouldn't from an L5-S1 degenerative
change, you would not expect it to be going below
the knee?
A. If it's from a disc hitting a nerve, yes, you
would. But referred pain from arthritis could
give you leg symptoms but without sciatic nerve
damage. Referred pain is like heart disease. You
can get referred pain down your arm but your arm
is perfect, but the nerve supply goes there so
you'll feel pain there.
Q. And where does the nerve supply from L5-S1 go to?
A. L5-S1 would tend to go to your web space between
the grate and second toe and the top of the foot,
and then it will go up the back of the leg

eventually.
Q. Okay. So can you tell from this note that you were reading to us earlier dated 3/25/91, whether there was any conclusion as to whether his pain was due to these changes that were seen on the x-ray? I guess I should say the findings that were seen on the x-ray.
A. I mean, I know how my partner thought and how he processed things in the footnotes. Knowing how my partner recorded --
Q. Who made this note? I should ask that.
A. Dr. Ron Nelson.
Q. Is he still with your practice?
A. No. Retired.
Q. Okay.
A. But his emphasis here was strongly on the musculoskeletal component of the spine, the degenerative disc disease, and to me, this is where his focus was.
Q. And do you agree with the conclusion that the degenerative disc disease was likely causing the pain and the weakness that he had been complaining

about?

A. I would say his right hip pain that he mentioned certainly -- when I say "hip pain," I usually am



not referring to a kidney stone type thing. Hip pain can be from degenerative arthritis to the hip, which they are not talking about, or from your lower back, because the referred pain or true sciatic nerve pain will go through your hip on down the legs.

Q. What about the instability in his legs, are you able to determine what was causing that from looking at these notes?

A. Not from his x-ray. CT scans or MRI scans may give you more information that would support the hypothosis.

Q. Does this note contain the results of a CT scan that was done, the 3/25/91 note?

A. Yes, it does.

Q. What does that say?

A. "CT scan, prominent degenerative disc." Then he mentions "to the left," and then "left foramen increased bony spurring." In other words, the

nerve opening at that level where the nerve goes
out to the side before it goes down your leg was
narrowed by bone spurs.
Q. And that can cause nerve irritation which can lead
to pain?
A. Yeah, and conceivably weakness.



Q. Okay.
A. Then he mentions the L4-5 right-sided disc
fragment. That doesn't mean a lot, only because
many of us have bulging discs that may or may not
give symptoms. So you have to correlate these
findings with a patient's symptoms with their
right side, that type of thing.
Q. Okay.
A. "Lateral recess." He tended to write little
shorthand notes. But when he mentions the lateral
recess, when I see that, I'm often thinking about
something, a fragment perhaps out in an opening
where the nerve should be irritating it.
Q. So do the changes in his back explain the pain, in
your opinion, having seen the results of the CT
scan that are recorded here?

A. It would explain potentially his hip pain. And I don't see any other symptoms he was mentioning, but I wouldn't necessarily be satisfied with that explaining flank pain.
Q. What about legs feeling unstable?
A. Yes, it could do that.
Q. It could explain that?
A. Yes. He mentions marked weakness.
Q. In the right quadriceps. Can that be explained by



the changes in his back, too?
A. Yes, it could.
Q. Do you have any reason to believe that the complaints he had in terms of right quadricep weakness and leg instability would cause anything other than back problems?
A. Certainly at that time I wouldn't have.
Q. What about now? Based on what you know about his health now, does it lead you to think that there may have been something else going on?
A. Unilateral symptoms like that, we will usually look for a structural cause, like disc or bone spurs. And if you want me to generalize, I could

say that if I'm looking at myopathy, I'm generally looking at more than just one muscle group. Myopathy will usually be proximal muscles, bilateral, upper body and lower body. So if I have a patient that says I'm just sore in my one calf, I won't think of a rhabdomyolysis or a myopathy from a statin.
Q. Because you would expect it to be on both sides?
A. More generalized, systemic.
Q. Okay. Now, of course, he wasn't on a statin in March of 1991, was he?
A. Correct.



Q. So it couldn't have been from that anyway?
A. Correct.
Q. And Baycol wasn't even on the market so it definitely couldn't have been from Baycol?
A. Correct.
Q. So is that something when he -- he, at some point after Baycol was withdrawn from the market, did start complaining to you about muscle pain and weakness in his legs; is that correct?
A. Yes.

Q. And the first complaints that you heard from him were after he had learned that it had been withdrawn from the market.
A. I would have to go back to the notes.
Q. Go ahead.
A. Sure.
Q. And if I could clarify my question for you, his first complaints of muscle pain and weakness that you did not attribute to some cause unrelated to a statin or potentially related to a statin. That wasn't very clear, was it.
Of course there were complaints of muscle pain and weakness here that we talked about in 1991 that were unrelated to or couldn't be related to a statin, and we've also talked about muscle

87

pain, things like that, that were related to kidney stones. I'm looking for reports of muscle pain and weakness that you did not attribute to things like kidney stones or back problems.
A. It's sometimes difficult looking back. Did you want dates?
Q. Yeah, if you've go it.

A. January 25 of 2000, there was a complaint in the
arch of his foot since four or five days before,
"hard to keep his balance when walking. Toes were
numb on his left foot."
Q. Wasn't that when he had the cellulitis that you
treated him for?
A. And plantar fascitis.
Q. Okay.
A. And again, circumstances where one side will have
pain and the other won't, I then, and probably
now, wouldn't think much about.
Q. And so you wouldn't attribute that particular
complaint in January 2000 to a statin-induced
myopathy?
A. I wouldn't have then and I probably wouldn't now.
Q. Okay.
A. So basically, you'd like to know when the first
comment was to any of us doctors?

88

Q. Yeah.
A. Okay. Fatigue was mentioned in that April 25, '00
visit.
Q. And that, again, is when he had the significant

kidney stone, correct?
A. Yes.
Q. And fatigue is something that would be a common symptom to go along with a kidney stone, wouldn't it?
A. Not the kidney stone but the creatinine level being elevated.
Q. Okay. So again, the complaint of fatigue you would not attribute to Baycol?
A. It would be very nonspecific.
Q. Okay.
A. You asked would I attribute it to Baycol? By our knowledge now, potentially you could. Weakness without pain or soreness could be at least a myopathy but probably never a rhabdomyolysis.
Q. But he wasn't complaining of any muscle pain at that point --
A. Correct.
Q. -- other than the flank pain from the kidney stone?
A. Correct. So again, you would like me to point out

on the chart when the first muscular pain type comments came out, right?
Q. Yeah.
A. A flank pain was mentioned 3/5/01, bilateral flank pain and lower abdominal pain, which I believe was ultimately "possibly kidney stone related" from Dr. Neff.
Q. Given that it was flank pain and abdominal pain, would you have any reason to disagree with Dr. Neff?
A. No, not particularly.
Q. Any reason to think that that type of pain would be Baycol induced?
A. It wouldn't have rung that bell at that time, nor now.
3/27/01, a comment from Dr. Neff, "gets weak off and on, tired legs give out, weak."
Q. Did she indicate any potential cause for it?
A. No. She made a comment, "was using Glucophage twice a day, now only once a day and feels fine." I don't know if she was sort of implying that maybe changing the dose may have had an effect on

that.
Q. Are you able to say that this is as a result of the Baycol?

90

A. No.
Q. Okay. And when I say "this," I was talking about the complaint of pain and weakness.
A. Looking at it from a different lens nowadays with what we now know?
Q. Yeah, even today.
A. Today I would being looking at med lists of what people are on to find out, and if I couldn't find another cause for it, I might discontinue a drug based on those symptoms.
Q. Are those symptoms that could also be consistent with a peripheral neuropathy?
A. Weak legs giving out, yes.
Q. Okay.
A. Then the next reference was 8/30/01.
Q. By this time, Baycol had been withdrawn from the market, correct?
A. Yes. The nurse wrote on here, "medication check, Baycol discontinued," and then there is a quote,

"Baycol knocked my legs out, had to quit driving truck, started in 11 of '98."

Q. And that's a note of a telephone call from him; is that correct? Is that what you're looking at?

A. I don't think it's a telephone call. I think that's the nurse taking a history there.

91

Q. Oh, okay. So he came in telling you that he was now having problems due to Baycol?

A. This was to Dr. Neff.

Q. Telling Dr. Neff, reporting to Dr. Neff, that he was having problems due to Baycol?

A. Correct.

Q. And he said it knocked his legs out, correct?

A. Yes. "He says he is weak in his thighs. He feels that the Baycol was taking the muscles out of his thighs, and when he raises out of a chair, he needs to use his arms for strength."

Q. And is this a note where he also refers to seeing strands in his urine?

A. Yes.

Q. Is that something that would be consistent with rhabdomyolysis or statin-induced myopathy?

A. Myopathy, no. Rhabdomyolysis could give something in the urine that's not normal.

Q. But not strands. Chunks?

A. Casts, which are little chunks of clots or protein and other debris, theoretically could form into strands the longer they sit in your bladder, but I wouldn't rule that out.

Q. Okay.

A. It wouldn't have struck me real high, but -- and



from there on out, I believe there is more comments. 11/1 of '01, "I saw John, legs weak, thinks related to Baycol." And then I made a comment here, "Muscles are non-tender, quads are slightly weak with his gait and his transfers," and I mentioned, "he had decreased sensation of his feet, pulses were good."

Q. Did you form a differential diagnosis of his complaints at that time on 11/1 of '01?

A. On that date, "leg weakness, questioned diabetic neuropathy and myopathy, rule out lumbar disc," and we identified that he has diabetic peripheral neuropathy.

Q. You diagnosed him definitely with that?
A. My feeling was he had that.
Q. Okay.
A. And then I put a note here, too, on that visit, "no new meds, may need a fibrate-like gemfibrozil depending on his lipid pattern. At this point, no evidence for Baycol-associated rhabdomyolysis." In other words, the severe condition.
Q. Okay. And you got a CPK test at that time, correct?
A. Yes.
Q. And that CPK test came back normal?



A. I believe so, but I should probably look that up to say that for sure.
Q. Okay.
A. Normal.
Q. Okay. What was your plan on 11/1/01 to kind of assess what was the cause of his complaints, his muscle complaints and decreased sensation?
A. Well, at that point, we decided to look for some of the other issues that could do this. We ordered an EMG, an electromyelogram, of his legs;

we asked for a neurologic consultation about these symptoms of leg weakness; and I also ordered an MRI scan to evaluate his low lumbar spine because of the leg weakness.

Q. And did you get the results of the MRI?

A. The answer would have to be yes, although, they are not right in this note or my next note. I made reference to the neurology consultation. I have a neurologic letter if you want me to refer to it.

Q. May I look at it first? Or I'll let you read it, and if I could look at it, that would be great.

A. (Complied.)

Q. Thank you. Okay.

A. And I have the MRI of the lumbar spine as well.

94

Q. Okay. May I see that?

A. (Complied.)

Q. If I could ask you about that. Do you mind taking a look at that so I can ask you a few quick questions?

A. Uh-huh.

Q. Have you had enough time to look at the MRI

report?
A. Yes.
Q. Is that MRI report consistent with the one that we looked at from the results that we looked at from 1991 of that x-ray report and the MRI that were listed in Dr. Nelson's --
A. No. This is in more detail and pretty much goes beyond those findings and includes them.
Q. And does it show progression of those findings?
A. In the sense that there is moderate or, in some cases, marked disc space narrowing, disc protrusions, they talk about spinal canal stenosis, that has a potential for being a progression.
Q. And could that, then, still explain his complaints of leg weakness and pain?
A. Yes, it could.
Q. And when you received those, is that one of the



conclusions you drew, is that perhaps his complaints of leg weakness and pain are due to degenerative disc problems?
A. And probably more so with the spinal stenosis or

foraminal stenosis.
Q. And that was something that had progressed since 1991?
A. I guess I would say possibly because I don't have that report with me, and they are hard to compare sometimes, the CT with the MRI.
Q. Okay. What other testing did you order on November 1 of 2001 in order to evaluate these complaints of weakness and muscle pain?
A. The CPK, and we did a urinalysis, but that was probably because of his kidney issues, and then I did a lipid profile only wanting to see where we were at in case I had to choose another drug for him.
Q. Okay. And then you referred him for an EMG of the legs. What's an EMG?
A. It's an electromyelogram. It's a test of nerve function to muscle.
Q. Okay. And is that something that tests for peripheral neuropathy or what?
A. You can test for peripheral neuropathy, for



myopathy, which is muscle dysfunction, yeah.

Q. Did you get the results of the EMG or was one done?
A. Yes.
Q. Okay. When was that done?
A. This was done on 11/15/01 by Dr. Nadeen Iqbal, I-Q-B-A-L.
Q. And he sent you a letter?
A. Yes, consultation letter.
Q. From Neurological Associates of St. Paul; is that correct?
A. Yes.
Q. And did he tell you what the results of the EMG study were?
A. Yes.
Q. What did he say about the results of those?
A. "These observations were confirmed with a nerve conduction and EMG study today that showed myopathic changes proximally and neuropathic changes were seen in additional muscle groups."
Q. Now, is that something that's consistent with having a peripheral neuropathy from diabetes?
A. Yes, it could be.
Q. Now, I believe in here that Dr. Iqbal says that it

could be a statin-induced myopathy as well?



A. Yes.
Q. But that's also because it's his understanding that at that time he was currently taking a statin, is that correct --
MR. GILBERT: Objection, foundation.
BY MS. WRIGHT:
Q. -- or some other lipid-lowering agent?
A. He was aware of at least some other lipid-lowering agents.
Q. And do you know whether he was actually on another one at that point?
A. My note a week or two before then indicated, "do not start another agent at that point."
Q. And what was the date on that?
A. My note, 11/1/01.
Q. Okay. And doesn't Dr. Iqbal also say under the Impression section of his letter to you that -- excuse me. Go ahead.
A. Should I?
Q. Yeah.
A. I went back to my labs from 11/1/01 and I was

looking at his lipid numbers, and at that point, "Lopid would be a good choice for this lipid pattern," and a prescription of Lopid was sent in.
Q. On 11/1?



A. Yes.
Q. So he may have been on it by that point?
A. May have been on it.
Q. Okay. Now, one thing that Dr. Iqbal says is, "Baycol has a well known side effect of myopathy that usually improves after stopping the medicine." Do you agree that Baycol-induced myopathy usually improves after stopping the medicine?
A. Yes.
Q. And do you have any understanding that the time frame for improvement is any different for other statins, and I believe you said earlier it was a few weeks to a few months usually?
A. Yes.
Q. So if Mr. Hartman were still complaining of leg weakness and leg pain today, would you attribute that to his past use of Baycol?

A. Typically not.

Q. Okay. If he's still complaining of it today, would that cause you to think that his leg weakness and leg pain is due to something else?

MR. GILBERT: Objection to the form of the question.

MS. WRIGHT: You can answer.



BY MS. WRIGHT:

Q. Based on what you know of his medical condition and care, if a patient continues to complain of muscle -- let me start all over.

MR. GILBERT: Same objections. Where are you going with the line of questioning?

BY MS. WRIGHT:

Q. Have you seen any literature that suggests that statin-induced myopathy ever does persist past a few weeks to a few months in the absence of some secondary cause?

A. I have never seen that happen by itself.

Q. And you haven't seen any literature that reports that either?

A. No, I have not.

Q. So after receiving the letter from Dr. Iqbal,
which is dated November 15, 2001, were you able to
draw any further conclusions as to what the cause
of his muscle pain and weakness were?
A. The diabetes alone is a contributing factor with
peripheral neuropathy and potentially a myopathy,
both of which were documented.
Q. So you're still considering diabetes as a cause of
his complaints?
A. You have to.



Q. Okay.
A. The second would be his spine disease. Both of
those could give those symptoms and certainly in
combination.
Q. Were you considering that the gemfibrozil at that
point was contributing to the problem?
A. No, because he would have just been on it a very
brief period of time.
Q. Do you know with statin-induced myopathy, is that
something that typically you have onset fairly
close to the time that the statin is first
initiated?

A. Typically, it will be in the first three months.
Q. And so in Mr. Hartman's case where he didn't
report symptoms to you, even assuming the March
27, 2001 symptoms could be attributable to a
statin, for about two and a half years after he
started the statin; is that correct?
A. As far as the reports?
Q. Yes.
A. That is correct.
Q. And would that be a factor that was important to
you in determining whether to attribute his
complaints of leg weakness and pain to the statin
itself?

101

A. It would bring out the other potential in the
differential diagnosis making them more likely on
your list.
Q. So you're saying that the diabetic neuropathy
would be more likely given the fact that the onset
of the pain and weakness was so long after he
started the Baycol?
A. Yes. His would have been a less common scenario,
yes.

Q. And it would have also made the lumbar disc
disease and the narrowing of the spinal stenosis
would have also been a more likely cause than
Baycol-induced myopathy at that point?
A. To say more likely is hard to say, but equally
likely, and the whole scenario was problematic
because we had at least three potential causes,
and you may doubt it because of the lateness of
the onset of the symptoms.
Q. Was that your personal conclusion, is that because
of the lateness it likely was not Baycol-induced
myopathy?
A. Yes. I struggled with that thought.
Q. Okay. Is that still your belief today, is because
of the unusual presentation in terms of the late
onset, the fact that it didn't resolve promptly



upon discontinuing Baycol, that that made it
problematic in terms of concluding that it was a
Baycol-induced myopathy?
A. At that time it made it problematic for me, but at
this time, since we learned that, again, the
laboratory tests can be normal, the symptoms can

be merely weakness without the impressive pain or the kidney damage, I've come to learn now that it still would be Baycol as one of the culprits.
Q. But does the timing of the onset of the symptoms and the fact that they didn't resolve within the usual period after the Baycol was stopped, does that cause you to question --
A. It raises doubt, yes. It's less typical.
Q. And do you still consider diabetic neuropathy as a potential cause of his complaints?
A. Yes.
Q. And also the lumbar disc problems and the spinal stenosis?
A. Yes.
Q. Okay. Are you able to say which of those factors it could be, in any of them?
A. My thinking is all three. I mean, we have documented that he has myopathy/neuropathy. I think all three played a role.

103

Q. Okay. Are you able to say, to the extent he still complains of leg pain and weakness today, whether you believe that the Baycol is still playing a

role?
A. I would say there is a possibility of that in, again, the not typical scenario, but I'm also looking at the other two causes that are undeniably there, so it's multi-factorial.
MS. WRIGHT: Can we take a brief break and maybe I can finish this a little more efficiently?
MR. GILBERT: Sure. I'm fine.
MR. EISENHART: Uh-huh.
(Recess taken.)
BY MS. WRIGHT:
Q. Dr. McCamy, do you expect to be offering expert opinions at the trail of Mr. Hartman's lawsuit?
A. Expert opinions? I guess I don't regard myself as an expert, so I would say no.
Q. You recognize that these people that you call opinion leaders have more expertise in statin-induced myopathy than you?
A. Yes.
Q. And would you defer to their opinions with respect to Mr. Hartman's condition and the cause of his

myopathy?

MR. GILBERT: Objection to the form of the question, foundation.

A. I guess I would respect other people's opinions. Would I defer to them? Not necessarily.

MS. WRIGHT: Okay. I don't think I have anything further.

MR. EISENHART: Dr. McCamy, you will be pleased to know I have no questions at all.

MR. GILBERT: You know, I wanted to mark this because we were talking about it.

(McCamy Deposition Exhibit Number 1 marked for identification.)

EXAMINATION

BY MR. GILBERT:

Q. Doctor, my name is Mark Gilbert, and you and I met for the first time just this morning, correct?

A. Yes.

Q. We never talked on the phone or met on any previous occasion?

A. Correct.

Q. I want to show you what's now been marked
Deposition Exhibit 1, which you were referring to
in your -- in response to questioning by counsel.



Do you see that?
A. Yes.
Q. It's a three-page document. It looks like there
is a cover letter on it, June 1st, 2004. Do you
agree with that?
A. Yes.
Q. Okay. And have you had a chance to review pages 2
and 3 of Exhibit 1?
A. Yes.
Q. And is that a form that contains your handwriting?
A. Yes.
Q. And is all the handwritten material on Exhibit 1
your handwriting?
A. Yes.
Q. And is that your signature at the bottom of the
third page of Exhibit 1?
A. Yes.
Q. And Doctor, you were asked generally in Exhibit 1
what your opinion was with regard to a diagnosis

for Mr. Hartman. Is that true?
A. Yes.
MS. WRIGHT: Object to the form.
BY MR. GILBERT:
Q. And in particular, do you see number 5, which is on page 2 of Exhibit 1, which says, "It is my



opinion that this patient has suffered injuries or damages related to this patient's ingestion of Baycol"? Do you see that?
A. Yes.
Q. And then could you just read what your handwritten material is following that statement on number 5?
A. Yeah. Under 5.a., "Baycol associated myopathy, primarily involving the proximal musculature of his legs."
Q. Thank you. And is that still your opinion today?
A. Yes.
Q. Okay. And Doctor, just one other question. You were asked very generally about your qualifications, and I think you indicated that you were a licensed physician in the State of Minnesota. Is that true?

A. Yes.
Q. Okay. And you have been licensed, I believe you indicated, and practicing in the area of family practice for some 27 years now?
A. Yes.
Q. And you have treated patients before with the type of symptoms and diagnosis that you have talked about with Mr. Hartman in this case?
A. Yes.



Q. You indicated, I think rather loosely before, that you weren't an expert. And when you say that, I take it you mean you're not an expert on Baycol? Or tell us what you mean by that.
A. I'm not a neurologist, I'm not a rheumatologist or an orthopedist, so that I don't try to come across as I can take a case and give you a definite answer like some people might be authorized to do. I can work a case up, I can give good opinions, but I look at myself as a good family doctor and probably not a neurologist, a pharmaceutical type specialist, or anything else.
MR. GILBERT: Fair enough. That's all

I have.

MS. WRIGHT: I'd like to ask you about Exhibit 1.

EXAMINATION (CONT.)

BY MS. WRIGHT:

Q. In terms of the indication in paragraph 5 of Baycol-assisted myopathy, are you willing to put a time frame on when his Baycol-assisted myopathy was present?

A. Only what his continued statements to the various doctors was, that he related back to 1998 after

108

the time he started Baycol.

Q. So you would have to rely on what Mr. Hartman says in terms of when the symptoms started, correct?

A. Yes.

Q. Because certainly, your medical records don't show that there were any symptoms that you attribute to Baycol until after Baycol was withdrawn, correct?

A. Correct.

Q. And in terms of whether he has suffered injury from Baycol, you can't say to what degree his

complaints of muscle pain and weakness are due to Baycol as opposed to diabetic neuropathy, spinal stenosis, degenerative disc disease, or some other cause; is that correct?
A. I couldn't apportion them out, correct.
Q. Okay. Have you ever testified as an expert on statin-induced myopathy?
A. No.
Q. Have you written any journal articles on statin-induced myopathy?
A. No.
Q. And, in particular, you haven't written any articles on Baycol-induced myopathy?
A. No.
Q. Have you ever lectured on statin-induced myopathy?

109

A. No.
Q. Have you had any special training focusing on statin-induced myopathy?
A. Special training, no.
Q. Have you had any courses that specifically focused on statin-induced myopathy?
A. No.

Q. Can you identify any journal articles that you've read that deal with statin-induced myopathy?
A. Some on my desk.
Q. You have some on your desk, did you say?
A. Yes.
Q. Do you know what they are?
A. No, I couldn't tell you.
Q. Okay. And they are on your desk because they are articles that you obtained recently; is that correct?
A. Yes. Within the last month from my hospital librarian, yes.
Q. Other than those articles that you obtained in the last month, can you identify any article that you previously read concerning statin-induced myopathy?
A. I would think that several years ago in some of the general medical journals there has probably



been something, but nothing about Baycol alone or anything like that.
MS. WRIGHT: Okay. I don't have anything further. Thank you.

MR. GILBERT: That's all I have.

(Discussion off the record.)

MS. WRIGHT: Doctor, I'm not your lawyer, but as a witness that gives a deposition, you have a right to review the transcript and to determine what you said today has been accurately transcribed. You can waive that right and we will all just assume that it's accurate, or you can read it and then sign it. I believe you usually get 30 days after you get the transcript.

THE WITNESS: To return it or something?

MS. WRIGHT: Yes, to the court reporter.

THE WITNESS: Would you normally suggest I do?

MS. WRIGHT: I'm not your lawyer so I can't advise you. I just have to tell you that you have this right, and if --

THE WITNESS: Why don't I go ahead and read it and sign it.

MS. WRIGHT: Okay. Thank you.

(Deposition concluded at 11:35 a.m.)

DEPOSITION CORRECTION SHEET
FOR THE DEPOSITION OF ALLAN E. McCAMY, M.D.
TAKEN ON JULY 7, 2006

RE: JOHN HARTMAN V. BAYER A.G., ET AL.

I, ALLAN E. McCAMY, do hereby certify that I have read the foregoing transcript of my testimony and believe the same to be true and correct, except as follows:

PAGE LINE CORRECTION AND REASON FOR CHANGE

Deponent's Signature Date

STATE OF MINNESOTA )
) ss.
COUNTY OF DAKOTA )

Be it known that I took the foregoing deposition of ALLAN E. McCAMY, M.D.;

That I was then and there a notary public in and for the County of Dakota, State of Minnesota, and by virtue thereof I was duly authorized to administer an oath;

That the witness was by me first duly sworn to testify to the whole truth concerning the matter in controversy aforesaid;

That the foregoing transcript is a true and correct transcript of my stenographic notes in said matter;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That the witness reserved the right to read and sign the foregoing testimony;

That I am not related to nor employed by any of the parties hereto, nor a relative nor employee of any attorney or counsel employed by the parties hereto, nor interested in the outcome of the action.

IN EVIDENCE HEREOF, WITNESS MY HAND AND SEAL this 12th day of July 2006.

Hartman L. Erickson, Notary Public

Dakota County, Minnesota
My Commission Expires January 31, 2010