LORETTA F. HARTMAN



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE: BAYCOL PRODUCTS LITIGATION

MDL NO. 1431
(MJD)

THIS DOCUMENT RELATES TO: CASE NO. 0:02-CV-03858-MJD

BARTYLLA, ET AL VS. BAYER CORP., ET AL.,

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

LORETTA F. HARTMAN

MAY 25, 2006

1:00 P.M.

DEPOSITION OF LORETTA F. HARTMAN, taken at the Law Offices of Giebel, Gilbert, Williams & Kohl, Suite 6200, 1300 Godward Street Northeast, Minneapolis, Minnesota 55402, commencing at 1:00 p.m., on the 25th day of May 2006, before James M. Trapskin, a Notary Public and Registered Merit Reporter.

* * * * *

A P P E A R A N C E S

FOR THE PLAINTIFF:

GIEBEL, GILBERT, WILLIAMS & KOHL
Suite 6200
1300 Godward Street Northeast
Minneapolis, Minnesota 55413
(612) 633-9000

BY: MR. KEVIN E. GIEBEL

FOR THE DEFENDANT BAYER CORPORATION:

DORSEY & WHITNEY LLP
Suite 1500
50 South Sixth Street
Minneapolis, Minnesota 55402
(612) 340-2600

BY: MS. ELIZABETH S. WRIGHT
MS. HEATHER C. TOFT

FOR THE DEFENDANT SMITHKLINE BEECHAM CORPORATION:

DECHERT, LLP
4000 Bell Atlantic Towers
1717 Arch Street
Philadelphia, PA 190103-2793
(215) 994-4000

BY: MR. ELLIOT GARDNER

LORETTA F. HARTMAN

3

L. HARTMAN EXHIBIT INDEX


| EXHIBIT NO. | PAGE MARKED |
|---|---|
| 1 Hand-drawn sketch of flakes in J. Hartman's Urine | 29 |


* * * * *

LORETTA F. HARTMAN,

having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. WRIGHT:

Q. Could we have your full name, please.

A. Loretta Faye Hartman.

Q. Okay. I apologize for asking but how old are you?

A. Sixty-one.

Q. Okay.

A. Too old.

Q. Well, I wouldn't have guessed that.

Where were you born?

A. In Pelican Rapids, Minnesota.

Q. Where are you living now?

A. In Detroit Lakes, Minnesota.

Q. What's your address?

A. 1235 Lincoln.

Q. Do you plan to stay there for the next year or so?

A. Yes.

MS. TOFT: Elizabeth, I'm sorry to interrupt. We just lost Elliot Gardner.

(A recess was taken.)

BY MS. WRIGHT:



Q. When did you move to the Detroit Lakes address?

A. A couple years ago. We're going on the third year, I believe, now.

Q. So 2004?

A. Yeah.

Q. Why did you move up there?

A. Well, I decided that with Jack with being so sick and getting so sick, and he could no longer mow grass and things like that, that I moved to Detroit Lakes where I have more family than I have in the Twin Cities area.

Q. Okay.

A. And more help.

Q. So this was your decision to move?

A. It was both of ours because his driving abilities and things in the city kind of hindered, you know, with

all the people. And I thought, well, to have a
little better life, go where there's less --
MRT. GARDNER: Anyone there?
MR. GIEBEL: Yes.
THE WITNESS: -- and less people.
(A discussion was held off the record.)
MR. GARDNER: This is Elliot Gardner representing Smithkline Beecham Corporation, d.b.a.



Glaxosmithkline only.
BY MS. WRIGHT:
Q. And we've been introduced off the record, but I'm Elizabeth Wright. I'm with Dorsey Whitney, and I'm representing Bayer in this matter.
Where were you living before you moved to Detroit Lakes?
A. We were living at -- on Orange Avenue in St. Paul.
Q. And how long had you lived there?
A. Twenty-five years, 30.
Q. Okay. Do you have any children?
A. No.

Q. Okay. Now, I understand that -- are you currently married to Mr. Hartman?
A. Right at this moment, no.
Q. Okay. You have been married --
A. Yes.
Q. -- in the past.
A. And we are. It's sort of on paper right now. We're not married; we're going to remarry again.
Q. Okay.
A. But, no, not right now.
Q. When did you divorce?
A. Beats me. I don't have any of the records. I haven't even looked at them.





Q. I believe at least on the 1999 tax return that he indicated that he was filing single. And then prior years --
A. It could have been around there.
Q. Does 1999 sound about right to you?
A. '98 or '99.
Q. Okay.
A. I would say '99 maybe.

MR. GIEBEL: Make sure you wait until she's done with her question.

THE WITNESS: Okay.

BY MS. WRIGHT:

Q. It could have been in '98 because he still would have filed jointly if it was for at least part of the year?

MR. GIEBEL: I'll object to the form of the question.

THE WITNESS: I believe it -- '99.

BY MS. WRIGHT:

Q. That's your best recollection?

A. That's my best.

Q. Do you recall what month in '99?

A. May, June.

Q. Okay. Mr. Hartman testified at his prior deposition that he thought you moved out for about a month.



Does that sound right? Or what's your recollection? Did you move out at some point?

MR. GIEBEL: I'll object to the form of the question.

You can answer.

THE WITNESS: Yeah.

BY MS. WRIGHT:

Q. When did you move out?

A. I don't remember all these dates.

Q. Okay. Was it before the divorce was final?

A. Yeah.

Q. Did you move back in before the divorce was final?

A. Yeah.

Q. What was the reason for the divorce?

A. Oh, let me think.

MR. GIEBEL: Is this important?

THE WITNESS: Yeah, is it?

MR. GIEBEL: Wait, you go ahead and answer.

THE WITNESS: How important is that?

MR. GIEBEL: Just go ahead and answer to the best of your recollection.

THE WITNESS: Irreconcilabilities.

BY MS. WRIGHT:

Q. It didn't have to do with government benefits or eligibility for government benefits?

A. Somewhat.
Q. Okay.
A. Uh-huh.
Q. How did it relate to eligibility for government benefits?
A. I believe at that time, if I'm remembering correctly, I was, I was taking money out of my company at that time, because they were being taken over by another company, and I wanted to get some of my benefits out of there. So it probably had something to do with that.
Q. Okay. You owned a company?
A. No, I worked for a company --
Q. Okay.
A. -- for 33 years.
Q. Who did you work for?
A. MSI Insurance.
Q. Okay.
A. And they are now called Country Companies.
Q. What did you do for them?
A. I was a senior underwriter in the casualty line.

Q. And you were planning on retiring?
A. I did retire, early retirement.
Q. What year?
A. I'm not good on dates. I believe it was July of '99.



Q. And how did being divorced improve your eligibility or amount of benefit? I'm not quite clear on that.
MR. GIEBEL: I'm going to object to the form of the question; lack of foundation.
But you can go ahead and answer to the degree you know.
THE WITNESS: I believe it helped me as far as putting money in my husband's name to share it with him.
BY MS. WRIGHT:
Q. Oh, by being divorced?
A. Yes.
Q. Okay.
A. Yeah.
Q. Were you having any marital strife at that time or was it really more about maximizing benefit?
A. More about the benefits.

Q. Now, do you have plans to -- a specific date set for
remarriage?
A. Any day.
Q. Oh, really?
A. When I get it done.
Q. Okay. Will it be a civil ceremony, is that what
you're planning?
A. Sure.



Q. Is there any reason why you haven't done it before
now?
A. I've been too focused on Jack's health and keeping
him alive, and doctors' reports and doctors'
appointments and everything like that. I just
haven't focused on anything else but.
Q. And is the plan to remarry for estate planning
purposes?
A. Because it's the right thing to do.
Q. Okay. Does your husband -- and do you refer to him
as your husband currently?
A. Yes.
Q. I will refer to him as your husband throughout the

deposition, if that's okay with you.
A. That's fine.
Q. Does your husband have any siblings that have knowledge of his -- and by "knowledge," I mean more than kind of passing knowledge -- knowledge of his health condition?
A. "Siblings," do you mean children?
Q. Brothers or sisters.
A. One sister in California --
Q. Okay.
A. -- Jack has that may have some knowledge.
Q. Okay.



A. But she's in a nursing home, so she knows very little.
Q. How old is she?
A. I believe like 80, 81.
Q. What's her name?
A. Dolly -- oh, Donna, Ruppenthal, I believe.
MR. GIEBEL: Can you take a stab at spelling that?
THE WITNESS: Or it could be -- I think she

was married twice, so let me think. Donna Coates, C-O-A-T-E-S. She could go under that name too, I'm not sure.

BY MS. WRIGHT:

Q. Do you happen to know the name of the nursing home she's in?

A. No.

Q. And is she --

A. I have it at home.

Q. Has your husband been out to visit her in the past five years?

A. No.

Q. Okay. Has she been here to visit him in the past five years?

A. No.

Q. Okay.





A. Maybe in the last 20 years she's been here.

Q. Do they talk on the telephone regularly?

A. Every week.

Q. Oh, they do.

A. Uh-huh. Every week she calls.

Q. So any knowledge of his health condition would be based on whatever he's told her?

MR. GIEBEL: I'll object to lack of foundation and to the form of the question.

You can answer if you know.

THE WITNESS: We don't tell her a lot because we don't want to upset her.

BY MS. WRIGHT:

Q. Okay.

A. Because she really has no one but herself out there. And I -- I'll let her know if things are going really bad.

Q. You haven't authorized any of your husband's -- or your husband hasn't authorized any of his doctors to talk to her, has he?

A. No.

MR. GIEBEL: I'll object, lack of foundation and the form of the question.

BY MS. WRIGHT:

Q. Have you ever been present at a visit, at one of your



husband's doctor's visits where his sister has either

been physically present or present by virtue of being on the phone?
A. Absolutely not.
Q. Do you know whether she's ever been provided with any of his medical records?
A. Absolutely not.
Q. Does she have any kind of medical training?
A. No.
Q. Do you have any medical training?
A. None.
Q. Did you have to get any kind of -- to be an underwriter, any kind of medical knowledge or anything like that?
A. No. I didn't work with the life department. I worked strictly with automobile insurance, so we worked with the bylaws for the State of Minnesota regarding liability for clients.
Q. Did your husband ever have any other siblings other than this sister, Donna Coates?
A. Yes, he had a brother -- two brothers.
Q. When did they pass away?
MR. GIEBEL: They did pass away, didn't they?

THE WITNESS: Yes, they did. I'm not good



on dates. It's, it's -- I'm not good on dates. I didn't -- you know, I haven't thought about that.

BY MS. WRIGHT:

Q. More than a decade ago?

A. Oh, it's not that long ago.

Q. Okay.

A. Maybe -- I'm going to say five to 10 years.

Q. Both of them?

A. Uh-huh.

Q. Do you know what they died of?

A. Actually, I really can't tell you I do, other than complications from something or --

MR. GIEBEL: If you don't know, don't guess.

THE WITNESS: Yeah.

BY MS. WRIGHT:

Q. Okay.

A. I wasn't that close or --

Q. Does your husband have any children?

A. One daughter, I believe.

Q. Does he have any contact with her?
A. (Shakes head.)
Q. No?
MR. GIEBEL: You need to answer audibly.
THE WITNESS: Oh, no.



BY MS. WRIGHT:
Q. That's okay. Has he ever had any contact with her?
A. I don't know.
Q. Have you met her?
A. No.
Q. Do you know how old she'd be?
A. No.
Q. Do you know her name?
A. No. You might ask him.
Q. Was he married previously before you?
A. Before me?
Q. Yes.
A. Not --
Q. And before your divorce.
A. -- not to my knowledge.
Q. Okay. Just for some background, do you have any

problems with high cholesterol?
A. Me?
Q. Yes.
A. No.
Q. You haven't ever taken a statin?
A. Never.
MR. GIEBEL: Do you understand what a statin is?
THE WITNESS: Uh-huh.





BY MS. WRIGHT:
Q. Is that yes?
A. Yes, sorry.
Q. No, it's okay. I apologize if I correct you, we're just trying to make sure we get a clean record.
Do you have any family members that are health care professionals, and by that I mean nurses or doctors?
A. No.
Q. Do you have any members of your family that work for law firms?
A. No.

Q. Could you tell me a little bit about your education?
A. Uh-huh.
MR. GIEBEL: Better to answer yes, remember?
THE WITNESS: That's right. I graduated from high school.
I had a scholarship for beauty school, so I went there and got my license.
And later on, I went to an insurance company and I loved them, so I stayed there for 33 1/2 years.
And they educated me as far as sending me to the university for courses and also in-house training and that's about it.





BY MS. WRIGHT:
Q. Okay.
A. I started out low and ended up high.
Q. What kind of university courses did you have?
A. Well, they were insurance related.
Q. Was this at the University of Minnesota?
A. They were -- I believe they were in our company.
Q. Okay.

A. People would come into our company, and I believe they were from the -- or they were university level.
Q. I understand.
A. And this is about 20 years ago, so I can't remember. But we had ongoing training yearly for our jobs.
Q. You got your license.
Did you ever actually work as a -- you know, I don't even know what it would be.
A. As a beautician?
Q. Beautician, thank you.
A. For about a year.
Q. Okay.
A. And I didn't care for working on weekends, so I decided to change my profession.
Q. Okay.
A. I went to beauty college in Fergus Falls, Minnesota.
Q. I understand that your husband was an over-the-road





trucker?
A. Yes, he was.
Q. Was that for your entire marriage?
A. Yes.

Q. How often would you see him on a weekly basis, then?
A. He'd be gone maybe four days out of a week.
Q. How long did that last? Was that during your entire marriage up until May or June of '99?
A. Yes, it was.
Q. Did that continue after your divorce was final in May or June of '99?
MR. GIEBEL: I'll object to the form of the question.
You can go ahead.
THE WITNESS: Actually, no, because he was home then sick, getting sick, weak.
BY MS. WRIGHT:
Q. Did he ever drive a truck again after May or June of '99?
A. Probably not that I can recall.
Q. I believe he testified at his deposition that he learned about the Baycol recall in August of 2001 when he was up in Fargo, when he saw the Fargo paper. And he was up there because he was driving his truck.
Is that consistent with your recollection? Not

in terms of how he learned about the recall, but that
he was driving his truck in August of 2001.

MR. GIEBEL: I object to the form of the question.

You can answer.

THE WITNESS: Oh, goodness, 2001, August? As far as I can remember right now, yes.

BY MS. WRIGHT:

Q. As late as August --

A. Uh-huh.

Q. -- 2001 he was still driving?

MR. GIEBEL: Object to the form of the question. I'll add mischaracterization.

You can answer if you wish, if you can.

THE WITNESS: I really can't remember.

BY MS. WRIGHT:

Q. Okay.

A. I'm sure I probably know, but I can't remember right now.

Q. Do you have any kind of condition that affects your memory?

A. No.

Q. Are you on any medications that --

A. Absolutely nothing.

Q. Okay.



MR. GIEBEL: Make sure you wait so you don't interrupt.

MS. WRIGHT: Yes.

MR. GIEBEL: Make sure she's done with her question.

THE WITNESS: Okay.

BY MS. WRIGHT:

Q. I am going to reask that question.

Are you on any kind of medications that affect your memory?

A. No.

Q. Do you make notes of things to help you remember things?

A. No.

Q. Do you keep diaries?

A. No.

Q. I know that you attended at least some of your

husband's medical appointments.

Would you make notes when you would attend those?

A. Absolutely not.

Q. Okay.

A. And I attended very few.

Q. In one of your notes -- in one of the medical records, it indicates that your husband at -- it's a



note from 2005 and he's going in to see a podiatrist. And he tells the podiatrist that he's been having problems walking lately. This is after you moved up north.

Excuse me, is Detroit Lakes up north?

A. Uh-huh, it is.

Q. And he indicates that 18 months before this 2005 visit that he had been into the emergency room because he had had a fall and hurt his ankle or his foot.

Do you recall that, a fall where he hurt his ankle or his foot after he moved up north?

MR. GIEBEL: I'm going to object to lack of

foundation; also to the form of the question. I'd add it's confusing too.

But you can answer to the degree you know anything about the medical records.

BY MS. WRIGHT:

Q. I'm not asking about the medical records. I'm asking if you recall your husband having a fall and injuring his ankle or his foot sometime after you moved to Detroit Lakes.

MR. GIEBEL: Okay, that's different. I'll object to the form of the question.

And you go ahead and answer.





THE WITNESS: It wasn't when we moved to Detroit Lakes that I can remember, it was before.

BY MS. WRIGHT:

Q. You remember it happened before.

A. I remember one time. It could have been another time.

Q. Okay.

A. But I remember before we moved.

Q. When did you recall it happening before you moved?

A. Probably a year before we moved.
Q. So approximately 2003?
A. It could have -- yeah, or '2.
Q. Do you recall your husband, as a result of that ankle or foot injury, was unable to drive his truck?
MR. GIEBEL: Object to the form of the question.
You can answer if you know.
THE WITNESS: I don't know.
BY MS. WRIGHT:
Q. Does he still own -- he owned a truck at one point, is that correct?
A. Yes, he did.
Q. I'm not talking like a pickup truck. I'm talking about a truck --
A. Semi?





Q. -- that you use for over-the-road.
Yes. Does he still own it?
A. No.
Q. When did he sell it?
A. I, I don't know.

Q. Was it before or after you moved to Detroit Lakes?
A. After.
Q. How did he get the truck up to Detroit Lakes?
A. It was up here.
Q. You mean it was stored up there?
A. At, at his -- at a trucking company, a friend of his.
Q. Was that typically where the truck was kept, was in the Detroit Lakes area?
A. No, it wasn't. But when he was hauling gravel, yes, it was kept there. And when he was hauling other produce, it was kept at home.
Q. Who did he haul gravel for?
A. When?
Q. No, who, do you know?
A. I don't know. There were many different ones. I know some of them, but I don't know all of them.
Q. Which ones do you remember?
A. Central Specialties. Mark's Sand and Gravel, but there were several.
Q. Did you do any of the bookkeeping for your husband's

business?
A. None.
Q. He was self-employed, correct?
A. Yes.
Q. And did you help him out with his business at all in any way?
A. No.
MR. GIEBEL: I'll object to the form of that question.
We answered it already.
BY MS. WRIGHT:
Q. During the three days a week that your husband was in town, and I'm talking in the time frame up until May or June of '99 and just the five years before, that range is what my question pertains to, what kind of activities did your husband and you typically engage in?
MR. GIEBEL: I'll object to the form of the question.
Go ahead and answer.

THE WITNESS: Before he got sick, is that
what you're asking me?
BY MS. WRIGHT:
Q. When did he get sick?
A. Oh, that's a hard one, because I can't remember dates



that well. I go strictly by -- we used to go walking
around Lake Phalen.
We used to go out and have dinner.
We used to go travel, many different things we
used to do. And then we couldn't do anything because
of weakness in his legs, which took care of walking.
But one of the best activities we did was walk
around the lake because we were close to Lake Phalen.
Q. Did he have problems walking before or after your
divorce?
A. After.
Q. How much after?
A. Oh, goodness.
MR. GIEBEL: I'll object as asked and
answered and to the form of the question.
You can answer.

By the way, Mr. Reporter, you're getting those objections?

THE COURT REPORTER: Yes.

MR. GIEBEL: Thank you.

THE WITNESS: I, I really don't remember dates.

BY MS. WRIGHT:

Q. I'm not asking you for a date.

Do you recall approximately whether it was



months or years after the divorce?

A. Months.

Q. And can you tell me about these -- how did this weakness, how did that come to your attention?

A. It come to my attention when he would come home. And maybe he was going to mow the grass, and he started wearing out real early after a couple of hours, which I didn't think too much of.

But there were a couple of times -- and I don't know a nice way of saying this -- when he urinated that it was brought to my attention there was something in his urine, and I wasn't sure. I thought

it was parasites.
Q. Did you see it?
A. Yes.
Q. Okay. What did it look like?
A. Like little tiny, tiny white specs.
Q. If I give you this piece of paper which we'll -- maybe I'll have her draw and we'll mark it then.
A. I saw it a couple --
Q. Could you --
MR. GIEBEL: Why don't we mark it first and then we can refer to it as an exhibit.
BY MS. WRIGHT:
Q. Actually, we'll do it this way. Could you on the





piece of paper I've placed in front of you, could you try to draw the specks as close to the size that you observed them and --
A. Even smaller.
Q. Draw it as small as you can and as accurately as you can.
A. Like little, like maybe little flakes.
MR. GIEBEL: Do the best you can.

BY MS. WRIGHT:
Q. Yes, go ahead.
A. But different sizes -- you know, not different sizes, different shapes.
Q. Okay. So they were different shapes. Are these sizes about accurate?
A. Even maybe just a teeny bit smaller, but they're pretty accurate.
Q. And can you tell me how many you would see in the urine?
A. Oh, maybe like six.
Q. Six --
A. To me it was like six.
Q. Six, okay.
A. Because I would look quick.
Q. What color was the urine?
A. More like lemonade color.

LORETTA F. HARTMAN

29

MS. WRIGHT: Could we, please, mark this as Exhibit 1.

(L. Hartman Deposition Exhibit 1 was marked for identification.)

MR. GIEBEL: I'll note for the record it's not to scale.

MS. WRIGHT: Okay. We'll note for the record that her testimony was what it was.

BY MS. WRIGHT:

Q. How often did you see these -- what did you call them, pieces?

A. Yeah, I'm not sure what you call them.

Q. What do you call it?

A. I only saw them twice.

Q. Okay.

A. I called them little flakes.

Q. Okay. And --

A. Because someone had told me that you can have parasites. And that's what I thought, maybe --

MR. GIEBEL: You've answered the question.

BY MS. WRIGHT:

Q. You thought they were parasites?

A. I didn't know.

Q. You thought they might be parasites?

MR. GIEBEL: Object as asked and answered.

You can answer one more time. Did you think
they were parasites?
MS. WRIGHT: You know, it's a different
question --
MR. GIEBEL: She's already --
MS. WRIGHT: -- and the objection is
objection to form and that's it.
MR. GIEBEL: My objection stands, and
you've asked that a number of times.
Now, I'm permitting her to answer again if you
want her to answer it. If you don't, move on. Those
are your choices.
We can argue objections later but they're on the
record.
MS. WRIGHT: We're not going to argue
objections. You start following the Rules of
Procedure and the PTOs or we call Davis, that's it.
MR. GIEBEL: You want to call Davis, we'll
call him right now.
MS. WRIGHT: I don't have any problem doing
it.

MR. GIEBEL: Call Judge Davis.
MS. WRIGHT: Start objecting right and --
MR. GIEBEL: Call Judge Davis.
MS. WRIGHT: I don't need to at the





moment --
MR. GIEBEL: Then don't threaten me.
MS. WRIGHT: -- but if you continue with these forms of objections, I will. The PTOs are clear.
MR. GIEBEL: Are you done? You're threatening to call Judge Davis, we'll call Judge Davis. If you don't want to call Judge Davis, don't raise the issue. Or I --
MS. WRIGHT: I'm telling you, if you continue --
MR. GIEBEL: Pardon me, may I finish my objection?
MS. WRIGHT: This is off the record.
MR. GIEBEL: No, we're staying on the record.
MS. WRIGHT: Okay.

MR. GIEBEL: I'm not --

MS. WRIGHT: You know what? You've been angry and obstructive ever since we started to arrange this deposition. You're continuing throughout this deposition, and now you're continuing to make objections that don't follow the Federal Rules or the PTOs. I have a problem with your anger and the way you express it in this deposition.



MR. GIEBEL: Are you done?

MS. WRIGHT: I am now done.

MR. GIEBEL: Will you permit me to finish my objection?

MS. WRIGHT: The objection is to form. If you have anything else, no.

MR. GIEBEL: You've already said that, ma'am. May I finish my objection?

MS. WRIGHT: No.

MR. GIEBEL: All right. Now, I would ask you, please, professionally, not to interrupt me again, all right?

And I'm not being angry --

MS. WRIGHT: I will --

MR. GIEBEL: You are showing -- you're all red in the face and you're raising your voice. So we're going to end that behavior right now. Okay?

MS. WRIGHT: I will conduct this deposition as I need to.

MR. GIEBEL: If you're going to begin -- if you're going to be that unprofessional --

MS. WRIGHT: And if your way of conducting --

MR. GIEBEL: May I finish?

MS. WRIGHT: No. If your way of conducting





a deposition is to get angry and trying to intimidate me, then I will respond as necessary, and that's all I'm doing.

MR. GIEBEL: May I finish what I was saying?

MS. WRIGHT: You may finish what you were saying --

MR. GIEBEL: All right.

MS. WRIGHT: -- not your objection.

MR. GIEBEL: My objections are on the record.

This is not the time to argue this. We don't have the time for this. If you're going to raise your voice and you're going to disrupt my office and get all red in face and be unprofessional, we'll talk to Judge Davis.

MS. WRIGHT: Okay.

MR. GIEBEL: Okay. Now, we're on the record for that.

Please move on with your deposition and let's finish this out.

MS. WRIGHT: Okay. And if you --

MR. GIEBEL: If you'd be more professional --

MS. WRIGHT: I haven't disrupted your





office, and I haven't been unprofessional --

MR. GIEBEL: Be more --

MS. WRIGHT: -- and the record will reflect that.

MR. GIEBEL: Yes, the record will reflect that.

MS. WRIGHT: So --

MR. GIEBEL: And be more professional.

MS. WRIGHT: You know what? You --

MR. GIEBEL: Stop there. Just stop --

MS. WRIGHT: You were the one --

MR. GIEBEL: -- there. Move on with your deposition.

MS. WRIGHT: -- that's being unprofessional.

MR. GIEBEL: Move on with your deposition.

MS. WRIGHT: Don't push me around. That's the bottom line.

And now I will move on --

MR. GIEBEL: Move on with your deposition, ma'am.

Do you have any more questions? I notice there was a long pause there. Do you have more questions? It was a simple question.

MS. WRIGHT: It's a hostile question. It

was asked in a hostile tone of voice.

I am simply gathering my thoughts. If you're going to interrupt me as I do that, it will only take longer for me to do so.

BY MS. WRIGHT:

Q. You said the first time that you saw his urine that it was lemonade color.

Was the second time that you saw flakes in the urine, was it also lemonade colored that time?

MR. GIEBEL: I'm going to object to the form of the question; mischaracterization of the testimony.

BY MS. WRIGHT:

Q. The second time that you saw the flakes in his urine, was it lemonade colored at that time?

MR. GIEBEL: Object to the form of the question; mischaracterization of the testimony.

You can answer.

THE WITNESS: Yes.

MS. WRIGHT: It's object to the form of the question --

MR. GIEBEL: Just move on, ma'am.

MS. WRIGHT: -- and then finish.

MR. GIEBEL: Don't argue with me anymore. Just move on. Our objections are on the record.



MS. WRIGHT: Do you intend to keep doing this?

MR. GIEBEL: My objections are on the record.

MS. WRIGHT: Because then we should call Judge Davis.

MR. GIEBEL: My objections are on the record. Please move on.

MS. WRIGHT: If you continue to cue the witness with your objection, because they're not assisting me, they don't make it any clearer because the Federal Rules don't require anything and permit anything more than objection to form, your only purpose in doing it could be to slow down the deposition or signal your witness. You're not permitted to do that. The --

MR. GIEBEL: Ma'am, please --

MS. WRIGHT: -- rules, the law is clear.
MR. GIEBEL: -- please move on with your deposition.
MS. WRIGHT: I'm letting you know --
MR. GIEBEL: We'll argue this later. We'll argue all of this later. Move on.
MS. WRIGHT: Not if you continue to behave as you are.



MR. GIEBEL: Well, then end it.
MRT. GARDNER: We really shouldn't have to be arguing any of this because the Rules only permit objection to form.
MR. GIEBEL: Move on, please.
MS. WRIGHT: You may not be aware what's happened in the Baycol depositions.
MR. GIEBEL: Please move on.
MS. WRIGHT: I know you've been on the periphery of this, but this has been a rule that has been adhered to strictly by both parties.
MR. GIEBEL: Please move on with your deposition.

BY MS. WRIGHT:
Q. Approximately when was it that he first showed you these, as you characterize them, flakes in his urine?
A. I can't remember the date. I'm sorry.
Q. Was it -- it was after you moved back in with him?
A. Yes.
Q. Was it months after you moved back in, years?
A. No.
Q. It was not years, is that what you're saying?
A. Exactly.
Q. Okay. Could it have been a full year?
A. I really don't know. I can't recall the date at this

LORETTA F. HARTMAN

38

time.
Q. Did your --
A. The amount of time.
Q. -- did your husband tell you why he was showing you his urine?
A. Because he found it unusual.
Q. Did he express concern?
A. Yes, and I did too.
Q. Did you encourage him to see a doctor?

A. See a physician, uh-huh.
Q. Do you know whether he did that?
A. I'm sure he did.
Q. Do you know who he saw?
A. I believe he saw Dr. McCamy and also Dr. Ness.
Q. Ness or Neff?
A. Neff.
Q. Did you attend either the visits with Dr. McCamy or Dr. Neff?
A. No.
Q. And did you attend any visits with Dr. McCamy?
A. No.
Q. What about any visits that your husband had to Dr. Neff?
A. No, I did not.
Q. Okay. Did you ever talk to Dr. McCamy on the phone?





A. No.
Q. What about Dr. Neff?
A. No.
Q. Did you ever talk to Dr. Lundsten on the phone?
A. Not that I can remember. I very possibly could have.

Q. Okay. Why do you think you possibly could have talked to Dr. Lundsten?
A. Because there were some doctors that would call for appointments and this sort of thing. But as far as discussing medical problems, I do not -- I did not do that with the doctors.
Q. Okay.
A. I would relay messages.
Q. Would the messages be anything more than Dr. So-and-so called, please call?
MR. GIEBEL: Object to the form of the question.
Go ahead and answer.
THE WITNESS: Pretty, pretty on target there, I would say.
BY MS. WRIGHT:
Q. Would you ever have any discussions about the substance of your husband's medical condition at any point while you were living here in the St. Paul area?



A. That Jack and I --

Q. Yes.
A. -- I don't understand what you're --
Q. While you and your husband were living in the St. Paul area, and let's just say from approximately 1999 on, that time frame, did you have any discussions with any of your husband's physicians about his medical condition?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: Not that I recall at this moment.
BY MS. WRIGHT:
Q. What might refresh your recollection in that regard?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: Maybe if I looked at his medical records.
BY MS. WRIGHT:
Q. Have you ever seen his medical records?
A. Some of them I have.
Q. Which ones have you seen?
A. The ones since we've been in Detroit Lakes,

Minnesota.



Q. Prior to that time you didn't see any of his medical records?
A. (Shakes head.)
Q. You're shaking your head no?
A. Oh, no.
Q. I'm just going to ask the question again.
Prior to the time you moved to Detroit Lakes, you didn't see any of the records from your husband's visits to doctors while you were living in St. Paul?
A. Not that I can recall. I would know about a medicine that he was taking, because I would normally go pick it up for him.
Q. Was your husband experiencing the weakness with his legs at the same time that you observed these flakes in his urine?
A. Yes.
Q. Had he been experiencing the weakness in his legs any time prior to that?
A. Not to my knowledge.
Q. Did the weakness in your husband's legs start

suddenly or did it progress?
A. It started suddenly and then progressed.
Q. How was it when it first started?
MR. GIEBEL: Object to the form of the question; lack of foundation.



You may answer.
THE WITNESS: Will you please repeat?
BY MS. WRIGHT:
Q. Sure. You said that your husband's weakness in his legs started suddenly and --
A. (Nods head.)
Q. -- is that correct?
A. Pretty much, uh-huh.
Q. And then the weakness progressed from there.
A. Yes.
Q. That's what I'm trying to understand.
How did you know that the weakness started suddenly?
A. By the things he'd do.
Q. Okay.
A. And the things he couldn't do.

Q. What things was he initially unable to do when the weakness first started?
A. Walk.
Q. He couldn't walk at all?
A. Oh, he walked but very slow and very noticeable that there was a problem.
He could no longer drive his truck due to the strength in his legs.
He could no longer mow grass.

LORETTA F. HARTMAN

43

Q. And this all came on suddenly?
A. (Nods head.)
Q. Is that yes?
A. Yes. It was suddenly to me.
Q. Did you ever have a discussion with him about the sudden onset of this weakness?
A. Yes, I did.
Q. What did he say to you?
A. Neither one of us knew what was going on as our subject of conversation, and I suggested going to see a doctor.
Q. Do you know whether he did that?

A. Yeah, I'm sure he did.
Q. Do you know who he went to see?
A. In St. Paul, when we were in St. Paul at the time, I believe it was at the Maryland clinic, which would be Dr. McCamy or Neff or -- I believe there were some other doctors, but I can't remember their name.
Q. Did he tell you -- did you raise the conversation about the problems that you had observed he was having with walking and mowing the lawn?
A. I raised them.
Q. Okay. Did he tell you whether the weakness had started before you noticed it?
A. He told me it had a little bit.

LORETTA F. HARTMAN

44

Q. How much before?
A. Like a month.
Q. Did he tell you whether he had any pain or not?
A. He said his legs hurt and his feet occasionally. I'm not sure, not pain every day of his life that I'm aware of.
Q. Did he say what part of his legs hurt?
A. No.

Q. Did you ask him?
A. No.
Q. Did you ever talk to him about what part of his legs hurt?
A. No, I figured legs or legs (sic). If they hurt, they hurt.
Q. And you said his feet occasionally hurt.
Did he describe the pain to you at all?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: He just said his feet were aching.
BY MS. WRIGHT:
Q. Was it both legs that hurt?
A. Yes.
Q. And both legs were weak?





A. Yes.
Q. Was it both feet that ached?
A. Just one he'd tell me about, but I'm sure --
Q. Which one?

A. I believe it was his right.
Q. Was the onset of the right foot aching at the same time that the weakness started in his legs?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I really don't know.
BY MS. WRIGHT:
Q. Did he have -- at the time you were discussing the weakness in his legs, did he tell you about any aches anywhere else in his body?
A. Not to my knowledge. Not that I remember.
Q. Did you discuss with him what you thought the causes might be?
A. No, I didn't. My answer to him was, go see some doctors that knows what's wrong or can give you tests.
Q. Now, do you know whether your husband actually did go see a doctor about the weakness in his legs shortly after you discussed it with him and encouraged him to see a doctor?

A. I believe he did.
Q. What's that belief based on?
A. It's based on my memory.
Q. Okay.
A. But he was seeing a doctor at that time and --
Q. Did he come back and tell you that he had consulted a doctor about the weakness in his legs?
A. I'm sorry, I just don't remember. I remember we talked about it. And I told him to go see a doctor, and I'm quite sure he did, but it's been a while.
Q. Is it possible that he did not see a doctor at the time that you encouraged him to go see a doctor about the weakness in his legs?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: I believe he went to see a doctor because we talk about that, going in to check what the problem was. I believe he did see a doctor.
BY MS. WRIGHT:
Q. Was Dr. McCamy your doctor as well?
A. No.

Q. What about Dr. Neff, was she --
A. No.
Q. -- your doctor?
A. No.



Q. Do you know anything about them?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I'm sorry, I don't.
BY MS. WRIGHT:
Q. You don't know anything about their skills as doctors?
A. No.
Q. Do you know even if they have an area of specialty?
A. I believe Dr. McCamy has been there for a long, long time.
I don't know about Dr. Neff. My doctor was a lady doctor, so --
Q. Do you know --
A. -- I didn't see any of the men doctors or. . .
Q. Do you know what Dr. McCamy's specialty was?

A. No, I don't.
Q. Do you know --
A. I'm sorry.
Q. -- what Dr. Neff's specialty was?
A. No.
Q. As far as you recall, you never met either one of them?
A. I have not. I've met Dr. McCamy. I'm wrong. I'm





sorry, I remember that.
Q. Did you meet him outside of the doctor's office?
A. No, when I was in seeing Dr. Stubb, my doctor --
Q. Oh, okay.
A. -- I saw him.
Q. Did you discuss your husband at all with him?
A. No. He was in a hurry that day and I was.
Q. Do you know anything about Dr. McCamy's reputation as a doctor?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: Absolutely not.
BY MS. WRIGHT:

Q. Okay.
A. I don't.
Q. Do you know anything about Dr. Lundsten's reputation as a doctor?
MR. GIEBEL: Same objection.
THE WITNESS: I don't, I'm sorry.
BY MS. WRIGHT:
Q. Did you ever meet Dr. Lundsten?
A. Never.
Q. And do you know what Dr. Lundsten's specialty, if any, was?
A. No, I'm sorry, I don't.



Q. Did you ever see any correspondence from Dr. Lundsten to your husband?
A. That name isn't even familiar to me, that doctor.
Q. Do you recall seeing any correspondence from Dr. McCamy to your husband?
A. Just appointments and what they're doing and tests and that's all I ever saw.
Q. So you had seen --
A. And scheduling it. And I would tell Jack, you're

scheduled here, here and here.
Q. So just to understand, you've seen tests. Is that --
A. I --
Q. -- appointments to have tests?
A. Exactly.
Q. Have you ever seen test results?
A. No, I have not.
Q. And what about Dr. Neff, did you ever see any written correspondence from Dr. Neff to your husband?
A. No, I didn't.
Q. At the time that your husband first started experiencing the weakness in his legs, was he still able to drive a car?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: Yes, to the best of my



knowledge, he could drive a car.
BY MS. WRIGHT:
Q. Has your husband ever been unable to drive a car?
MR. GIEBEL: Same objection.
THE WITNESS: I would say yes to that

question at one certain time.

BY MS. WRIGHT:

Q. Okay.

A. Not any longer, if you understand what I'm saying.

Q. Yes.

A. But for like two weeks, maybe.

Q. When was that?

A. That's kind of hard to remember too. It was shortly, maybe after he was having so many problems with his legs.

Q. Do you know whether the doctors did any tests to evaluate the weakness in his legs?

MR. GIEBEL: Object to the form of the question.

Go ahead and answer.

THE WITNESS: I really don't know.

BY MS. WRIGHT:

Q. Did your husband ever tell you whether any doctor has ever diagnosed the cause of the weakness in his legs?

A. I don't know.



Q. You don't know if any doctor has done that or you

don't know if your husband has ever told you that a
doctor has done that?
A. I, I think I haven't seen the test results on any
tests --
Q. Okay.
A. -- for his legs.
Q. Has your husband ever told you that a doctor has told
him what caused the weakness in his legs?
A. Yes.
Q. What has he told you?
A. He told me that it was the muscles.
Now, which doctor, I cannot tell you. That was
a conversation between my husband and I.
Q. And --
A. And we sort of dropped it after that.
Q. What did the doctor say was wrong with his muscles,
do you know?
A. Deteriorating, if I recall. I'm not real positive to
tell you that because we talked about so many things.
And to the best of my knowledge right now, that's all
I know.
Q. Do you know whether the -- did he tell you that any
doctor has told him the cause of the muscle

deterioration?



A. No, he didn't tell me.
Q. Have you formed any personal beliefs as to the cause of the muscle -- well, of your husband's muscle weakness?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: Have I formed an opinion?
BY MS. WRIGHT:
Q. Yes, or a belief.
A. The only thing I can tell you is I watched him go after he started taking Baycol. I did not know one thing about it. I didn't even know what a statin was at the time. I watched him go from a strong, healthy person to a weak person that could no longer drive his truck and could no longer could do anything. And that's my opinion, and that's what I looked at --
Q. Okay.
A. -- when I --
Q. Do you know when your husband started taking Baycol?

A. The year?

Q. Yes.

A. I'm sorry, I don't right now. If I have records, I'd know.

Q. So you'd rely on the medical records?



A. Yes, I would.

MR. GIEBEL: Object to the form of the question.

BY MS. WRIGHT:

Q. If the medical records indicated that he started taking it in 1998, would you have any reason to disagree with them?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: I wouldn't.

BY MS. WRIGHT:

Q. Are you able to relate in time how long after your husband started taking Baycol that he started complaining to you about the weakness in his legs?

A. I believe it was months. That's what I can tell you

right now.
Q. Why do you believe it was months?
A. Because I, I remember him telling me he's going to be taking Baycol. That's one thing I do remember. And I remember I didn't think anything of it.
Q. Okay. And it was months after he told you that --
A. Yeah.
Q. -- that he started complaining of muscle weakness?
A. Yeah, I'd say like maybe five, six months.



That's to the best of my knowledge right now. It could be different, you know, if I was looking at all his medical records.
Q. Could it be different by years or by a matter of months?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I would say months.
BY MS. WRIGHT:
Q. So it was about five to six months after he told you that he was taking Baycol that you would have seen

the flakes in his urine as well?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: I believe so.

BY MS. WRIGHT:

Q. Do you recall how long after you encouraged your husband to go see a doctor about the weakness in his legs and the flakes in his urine that he actually did go see a doctor about that?

MR. GIEBEL: Object to the form of the question.

You can answer.





THE WITNESS: I'm sorry, I don't, I, I don't remember.

BY MS. WRIGHT:

Q. Would it have been a period of months?

MR. GIEBEL: Same objection.

THE WITNESS: No, it would have been within a month.

BY MS. WRIGHT:

Q. Okay.
A. Or within weeks.
Q. Now, if I understood what you said earlier, after the weakness started it progressed.
Over what period of time did the leg weakness progress?
A. I would say over months.
Q. Okay. And what kind of changes did you notice?
A. Weak, weak, very weak.
Q. How is it that you were able to determine that he was now weaker?
A. Because he used to be able to jump out of his truck. He used to be able to walk. He used to be able to run. He used to be able to mow the grass and help me. He used to be able to lift things. That's what my basis is on. Not medical, my --
Q. Right.

LORETTA F. HARTMAN



A. -- what I saw with him myself.
Q. I guess what I'm trying to understand is, how did you come to the conclusion that the weakness progressed or got worse?

A. To me, it did.
Q. Yes, and what was it that led you to that conclusion?
A. Well, the truck in not being able to get in and out of that, that was the first clue I watched. And he was very -- it took him a long time to get in and out of the truck the first.
Q. Okay. So after he initially complained to you about weakness, at that time he wasn't actually having a problem getting in and out of the truck, but over time he started to develop that problem, is that what you're telling me?
A. And when I say "truck," I'm talking pickup truck, now --
Q. Okay.
A. -- not semi.
Q. So later on, you noticed that he had started having problems --
A. Uh-huh.
Q. -- getting in and out of the pickup truck, correct?
A. Yes.
Q. Okay. What else did you --

A. And I noticed that when he mowed the lawn he couldn't do it anymore; I would take over and do it for him. He would start, and then I would come and do the mowing. And that was always his job.

Q. Now, was he having any other symptoms at this time, such as shortness of breath?

A. No.

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: No shortness of breath at that time.

BY MS. WRIGHT:

Q. Any other symptoms?

MR. GIEBEL: Same objection.

You can answer if you know.

THE WITNESS: I'm sorry, I don't, I don't recall. There could have been, you know, but I just simply don't recall.

MR. GIEBEL: Would this be a good time for a break?

MS. WRIGHT: Sure.

(A discussion was held off the record.)

BY MS. WRIGHT:



Q. Has the weakness in your husband's legs gone away, to your knowledge?
A. No.
Q. Has it improved?
A. No.
Q. Is it the same as it was at this time, he can't mow the lawn and things like that?
A. He can't.
Q. Okay. I want to talk briefly about his current medical condition, okay?
He's had a pacemaker placed recently, is that correct?
A. And a fribillator.
Q. A defibrillator?
A. Yes.
Q. When was that?
A. In 2005. I would --

Q. October of 2005 sound about right?
A. It was in the fall.
Q. Do you know why he had the pacemaker and defibrillator implanted?
A. To the best of my knowledge, it was for irregular heartbeat.
Q. And have you had discussions with anybody about what the cause of the irregular heartbeat was?





A. Yes.
Q. Who have you talked to about that?
A. A Dr. Newman in Fargo at Mericare Clinic.
Q. What did she tell you was the cause of the irregular heartbeat?
A. I believe she said that it was due to valves leaking, had started leaking on his heart.
Q. Did she say why the valves had started leaking?
A. I don't know, I don't remember.
Q. Did she attribute it to his use of Baycol?
A. I don't recall.
Q. Have you had any conversations with anybody about impaired ventricular function with respect to your

husband's heart?
A. I don't know what you mean.
Q. Okay. Somebody telling you that he has left ventricular dysfunction doesn't mean anything to you?
A. No, heart valves do.
Q. Okay. Does the term "ejection fraction" mean anything to you?
A. No.
Q. When was the last time your husband went to the doctor?
MR. GIEBEL: Object to the form of the question; lack of foundation.



You can answer if you know.
THE WITNESS: Last month.
BY MS. WRIGHT:
Q. In April?
A. March or April.
Q. Okay. Do you know who he went to?
A. Dr. Klessingham at Mericare.
Q. Do you know how that's spelled?
A. K-L-E-S-S-I-N-G-H-A-M.

Q. Do you know what kind of doctor Dr. Klessingham is?
A. I believe he's a diabetes and a general practitioner that specializes in diabetes, I believe, and heart.
Q. Your husband has type II diabetes, is that correct?
A. I don't know.
Q. He has diabetes, is that correct?
A. Yes, he does have diabetes.
Q. And he's had diabetes for decades, is that correct?
A. Yes, but he does not take insulin. He takes a pill.
Q. The doctors have encouraged him to take insulin, haven't they?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: I'm not sure.
BY MS. WRIGHT:
Q. You've had conversations with doctors yourself,





haven't you, where they told you that he needs to be on insulin?
A. I have not.
Q. So if medical records indicate that doctors have talked to you and told you about the importance of

your husband taking insulin, you would say that those records are false?

MR. GIEBEL: Object to the form of the question.

THE WITNESS: I wouldn't say they're false. I don't recall. I recall a lot of conversations about his heart.

BY MS. WRIGHT:

Q. Do you recall having any conversations with any of your husband's physicians about his diabetes?

A. No.

Q. Have you ever heard your husband say that he will never take insulin?

MR. GIEBEL: Object to the form of the question.

THE WITNESS: Yeah.

BY MS. WRIGHT:

Q. Have you heard him tell health care providers that he will never take insulin?

A. No, I have not.



Q. Has your husband ever tested himself at home for

glucose levels?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: He, he tests his blood daily.

BY MS. WRIGHT:

Q. When did he start doing that?

MR. GIEBEL: Same objection.

You can answer.

THE WITNESS: I, I'm actually not sure. It's been a long time since he's done it. Date-wise, I can't tell you.

BY MS. WRIGHT:

Q. Did he start doing it after you moved up to Detroit Lakes?

MR. GIEBEL: Same objections.

You can answer.

THE WITNESS: He was doing it before we moved.

BY MS. WRIGHT:

Q. Did he do it daily before you moved?

MR. GIEBEL: Same objections.

THE WITNESS: I'm not sure.

BY MS. WRIGHT:



Q. Have you ever had conversations with your husband about conversations he's had with his doctors concerning his diabetes?
A. No.
Q. Doses he test his blood daily now?
A. Yes.
MR. GIEBEL: Same objections.
BY MS. WRIGHT:
Q. How long has he been testing his blood daily?
MR. GIEBEL: I'm going to object to the form of the question.
You can answer.
THE WITNESS: I can't give you an exact time, I'm sorry.
BY MS. WRIGHT:
Q. Has it been since you moved up to Detroit Lakes?
A. Before.
Q. That he started testing it daily?
A. Yes.
MR. GIEBEL: Object to the form of the

question; multiple.
BY MS. WRIGHT:
Q. Do you help him with that?
A. No.
Q. Now, you say you are familiar -- or you have had



conversations with your husband's doctors about his heart, correct?
A. Yes.
Q. When did you start having conversations with your husband's doctors about his heart?
A. I'm not sure of the date, but when he started getting shortness of breath.
Q. When was that?
A. I'm not sure of the date.
Q. Was it within the past year?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I'm, I'm not sure.
BY MS. WRIGHT:
Q. You're aware that your husband had triple coronary

artery bypass surgery?
A. Yes.
Q. Was he short of breath prior to that?
A. Yes.
Q. How long before that?
MR. GIEBEL: Object to the form of the question.
You can answer if you know.
THE WITNESS: I'm sorry, I don't, I don't





know.
BY MS. WRIGHT:
Q. Did you ever observe him being short of breath?
A. Yes.
Q. Did you observe him being short of breath before he had the coronary artery bypass surgery?
A. Yes.
Q. How much before he had the surgery did you make that observation?
A. I don't remember.
Q. If his records indicated that the coronary artery bypass surgery was in July of 2002, would you have

any reason to disagree with that?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I wouldn't have any reason --
BY MS. WRIGHT:
Q. Okay.
A. -- to disagree.
Q. Do you have any recollection that that's when it was?
A. I believe it was in the summer.
Q. Of 2002?
A. I'm not sure of the year --
Q. Okay.





A. -- but I know it was in the summer.
Q. Do you recall who did that surgery?
A. Dr. Holter, I think.
Q. Did you talk to Dr. Holter about your husband's heart condition at all?
A. After surgery, he come out and told me everything went wonderful.
Q. Did you have any other conversations with him besides

that?
A. Absolutely not.
Q. Okay. Has anyone ever told you what the complications of diabetes are?
A. No.
Q. Have you learned in any way what the complications of diabetes are?
A. I've read an awful lot on it, yes, literature.
Q. Where did you read that?
A. In doctors' offices and the Internet.
Q. Have you learned that heart disease is a complication of diabetes or can be?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: I've learned it can be.
BY MS. WRIGHT:
Q. Have you learned that stroke can be a complication of



diabetes?
MR. GIEBEL: Same objection.
You can answer.
THE WITNESS: Yes, I have.

BY MS. WRIGHT:
Q. Have you learned that nerve damage can be a complication of diabetes?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I have -- I don't remember reading that.
BY MS. WRIGHT:
Q. Have you learned it from any other source?
A. No.
MR. GIEBEL: Same objection.
BY MS. WRIGHT:
Q. Have you learned that foot problems can be a complication of diabetes?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: No, I have not.
BY MS. WRIGHT:
Q. Has anyone told you that your husband's heart disease

may be a complication of his diabetes?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: They have not told me that. They told me it was faulty valves or leaking valves.
BY MS. WRIGHT:
Q. Have you ever heard of the term "diabetic neuropathy"?
A. No.
Q. Is there a particular Web site you went to on the Internet to learn more about diabetes?
A. My sister-in-law sent me all the information.
Q. Okay. Do you have access to the Internet?
A. No.
Q. Have you ever used it?
A. No.
Q. Okay.
A. We don't have a computer.
Q. I understand that you may not have one at home.
Do you know whether your husband has ever

accessed any Web site on the Internet?
A. Absolutely not.
Q. Who is your sister-in-law? Is this the Donna that we've talked about?



A. No, my sister-in-law is Debra Solund (spelled phonetically).
Q. Okay.
A. And she lives in Moorhead, Minnesota.
Q. Did she send you the information about diabetes at your request?
A. Yes.
Q. Why did you request that information?
A. Because I was researching everything possible that could have been wrong with Jack for my own information.
Q. And when you say "could have been wrong," what do you mean by that?
A. I wanted to know about hearts, and I wanted to know about diabetes.
Q. When did you undertake this research?
A. Last summer.

Q. Now, I believe you said at the beginning of the
deposition you're also familiar with the term
"statin"?
A. Yes, I am.
Q. And you understand that Baycol is a statin?
A. Yes.
MR. GIEBEL: Object to the form of the
question.



You can answer.
THE WITNESS: I heard that.
BY MS. WRIGHT:
Q. And that's what I'm wondering. How have you heard
about statins?
A. I heard it on, on the news what statins are, and they
would name them.
Q. Okay.
A. That's basically all I know, because I have done no
research on it.
Q. Your sister-in-law hasn't sent you any information
about statins?
A. No.

Q. Has she sent you in any information about Baycol?
A. No.
Q. Okay. Has anyone provided you any written information about Baycol?
A. Absolutely not.
Q. Now, has anybody provided you with any written information about myopathy?
A. No.
MR. GIEBEL: Object to the form of that question.
BY MS. WRIGHT:
Q. Do you know what the term "myopathy" means?



A. No, I don't.
Q. Have you heard the term "rhabdomyolisis"?
A. I can't tell you if I've heard a term.
Q. Okay.
A. Maybe I have and didn't know what it was.
Q. Okay. And let me ask you this way: Are you familiar with the term "rhabdomyolisis"?
A. No.
MR. GIEBEL: I assume we're excluding

contacts with my office, too, in terms of any communications and correspondence.

MS. WRIGHT: I wasn't aware that you represented her.

MR. GIEBEL: I do.

MS. WRIGHT: Why?

MR. GIEBEL: Well, I'm not here to -- I'm not being deposed.

Are we clear on the --

MS. WRIGHT: No.

MR. GIEBEL: -- scope of the --

BY MS. WRIGHT:

Q. When did you retain -- have you retained Mr. Giebel to represent you?

MR. GIEBEL: Let me put this on the record --



MS. WRIGHT: No.

MR. GIEBEL: -- first of all.

I made a point that if there's questions relating to attorney-client privileged information that that would be outside the scope of her answers.

But go ahead, you can answer that question.
BY MS. WRIGHT:
Q. Have you retained Mr. Giebel's office to represent you?
MR. GIEBEL: You can answer that.
THE WITNESS: Yes.
BY MS. WRIGHT:
Q. You sound like you're not sure.
MR. GIEBEL: Object to the form of the question.
BY MS. WRIGHT:
Q. Have you ever asked --
A. I have in the sense that my husband's here.
Q. Okay. You know your husband --
A. Uh-huh.
Q. -- has retained Mr. Giebel's office to represent him, correct?
A. Yes.
Q. Okay.
A. I do know that.



Q. Have you ever asked Mr. Giebel or anyone else at his

law firm to represent to you?

MR. GIEBEL: I'm going to object to that, and it's attorney-client privilege, and I instruct her not to answer.

MS. WRIGHT: No, it's not. That does not get to the privilege. It gets to the existence of it and that's not a privileged communication.

MR. GIEBEL: We've already said that we represent her.

MS. WRIGHT: You can't create the attorney-client privilege. Please don't coach your --

MR. GIEBEL: She's already testified that we represent her.

MS. WRIGHT: She has not. She said, yes, questioning, because she doesn't know. I'm now exploring.

MR. GIEBEL: I object to that characterization of her answer.

MS. WRIGHT: Well, everybody in the room heard it.

THE WITNESS: Yes, he does.

BY MS. WRIGHT:

Q. Okay. And that's because he's just told you that he



does, correct?

MR. GIEBEL: Object --

THE WITNESS: No.

MR. GIEBEL: -- to the form.

BY MS. WRIGHT:

Q. When did you ask him to represent you?

MR. GIEBEL: Same thing. She's --

MS. WRIGHT: It's not privileged.

BY MS. WRIGHT:

Q. When did you ask him to represent you?

MR. GIEBEL: I'm going to object to that question as a privileged conversation, and instruct her not to answer.

MS. WRIGHT: It's not privileged.

MR. GIEBEL: It's a communication between her --

MS. WRIGHT: It would be --

MR. GIEBEL: It's a communication between her and her attorney.

MS. WRIGHT: For the purposes of obtaining

legal advice. The events leading --

MR. GIEBEL: That's correct.

MS. WRIGHT: -- up to the formation of the attorney-client privilege are not privileged, and they are completely discoverable. And if we have to



come back here, it will be at your expense.

MR. GIEBEL: Well, we can argue that later.

MS. WRIGHT: No, Judge Davis will decide that.

MR. GIEBEL: Right. Well, we will argue it later.

BY MS. WRIGHT:

Q. When did you ask him to represent you?

MR. GIEBEL: Go ahead and answer it.

THE WITNESS: The exact date?

BY MS. WRIGHT:

Q. Did you ever ask him to represent you?

A. Yes.

Q. Okay. What did you say? Well, did you do it in writing or did you do it orally?

A. Orally.

Q. Did you do it over the phone?
A. Yes.
Q. When?
A. Wow. I'd be safe in saying weeks.
Q. Weeks ago?
A. Yeah.
Q. Did you call him?
A. Yeah, I did.
Q. Did you call him from your home?



A. Yes.
Q. Did you call him from your home phone number?
A. Did I call him from my home phone. I believe I did.
Q. What's your home phone number?
A. 844-7707.
Q. What's the area code?
A. 218.
Q. Did you discuss anything else during this conversation other than asking Mr. Giebel's firm to represent you?
MR. GIEBEL: I'm going to object as calling for attorney-client privileged information, and

instruct her not to answer.

MS. WRIGHT: I haven't asked the subject of it. I've only asked if there were further conversations.

MR. GIEBEL: I'm going to instruct her not to answer.

MS. WRIGHT: You need to bone up on the attorney-client privilege.

MR. GIEBEL: Listen, don't lecture me any more, ma'am, okay? That's extremely arrogant. Move on with your deposition. If you got more questions to ask, go ahead, but don't attack me personally any more, okay? I've already warned you about that



before.

MS. WRIGHT: I don't need warnings from you.

MR. GIEBEL: Well, I think you do.

MS. WRIGHT: Well, I think --

MR. GIEBEL: Why don't we move on.

MS. WRIGHT: -- you need my comments too.

MR. GIEBEL: Well, good, move on.

BY MS. WRIGHT:

Q. Why do you believe you need representation?

MR. GIEBEL: Object to the form of the question.

THE WITNESS: Because of the condition my husband is now in.

BY MS. WRIGHT:

Q. Why do you believe you need legal representation because of your husband's condition?

MR. GIEBEL: Object to the form of the question.

THE WITNESS: Do I have to answer that?

MR. GIEBEL: Yes, you can go ahead and answer.

THE WITNESS: Why do I feel that way? I need to know everything is being done and was done to keep him alive. I need help with him.

LORETTA F. HARTMAN



BY MS. WRIGHT:

Q. Did you have any conversations with Mr. Giebel's firm prior to this phone call you described a few weeks ago where you asked them to represent you?

A. Yes.
Q. Tell me about those conversations.
MR. GIEBEL: Object as calling for attorney-client privileged communication, and I'm going to instruct her not to answer.
MS. WRIGHT: She just testified that she didn't form the --
MR. GIEBEL: I'm not arguing with you anymore.
MS. WRIGHT: -- attorney-client relationship until a few weeks ago.
MR. GIEBEL: Please keep your speaking objections off the record.
MS. WRIGHT: It's not a speaking objection.
MR. GIEBEL: It is a speaking objection.
MS. WRIGHT: Only you can do that in this deposition.
MR. GIEBEL: Well, you're creating your own record and speaking record, then.
Can we move on?
MS. WRIGHT: No, I'm asking her a question

about events that happened before the attorney-client privilege was established and, therefore, they're not privileged.

MR. GIEBEL: Well, I disagree with you as to when the attorney-client privilege attached and when.

All right. I'm going to object to this line of questioning.

MS. WRIGHT: I think the record is now clear on that now, so we will take it to Judge Davis.

MR. GIEBEL: All right. Then let's move on with something else. I'm glad we've cleared that up.

MS. WRIGHT: I actually need to ask all the questions, though, and you need to object to them all.

BY MS. WRIGHT:

Q. How many conversations have you had with Mr. Giebel's firm before this phone conversation a few weeks ago where you asked them to represent you?

A. I, I don't remember.

Q. Was it more than one?

A. Definitely.
Q. More than five?
A. Definitely.
Q. More than 10?



A. Definitely.
Q. Have you had any face-to-face conversations with lawyers from Mr. Giebel's firm prior to this telephone conversation where you asked them to represent you?
A. I don't remember.
Q. At any time during any of those conversations before the telephone conversation, did you ask them to represent you personally?
A. Yes.
Q. When?
MR. GIEBEL: I'll object to the form of the question.
You can answer.
THE WITNESS: I, I can't remember dates and weeks and -- I'm sorry. I can't remember.
BY MS. WRIGHT:

Q. Did you ask Mr. Giebel to represent you or who did
you ask to represent you?
MR. GIEBEL: Object to the form of the
question.
You can answer that.
We're not waiving any privilege.
THE WITNESS: Mr. Giebel.
BY MS. WRIGHT:



Q. Have you had conversations with any other attorneys
at his law firm?
A. I can't remember.
Q. Have you personally paid Mr. Giebel for his
representation?
A. No.
Q. Have you received a bill from Mr. Giebel for his
representation?
A. No.
Q. Did you sign any kind of written representation
agreement with Mr. Giebel?
A. I, I don't remember.
Q. Have you discussed with him at any time how you will

compensate him for your representation of you personally?

MR. GIEBEL: Object to the form of the question.

THE WITNESS: I don't, I don't remember.

MR. GIEBEL: And for the record, none of these answers should be construed to waive the attorney-client privilege.

BY MS. WRIGHT:

Q. When did you first hear of Baycol?

MR. GIEBEL: Object to the form of the question.





THE WITNESS: When my husband was prescribed, when they prescribed Baycol to my husband, I heard of it.

BY MS. WRIGHT:

Q. What did you hear?

A. That it was for controlling cholesterol.

Q. Are you aware of the risks of high cholesterol?

MR. GIEBEL: Object to the form of the question.

THE WITNESS: Yes, I am aware of the risks.
BY MS. WRIGHT:
Q. What risks are you aware of?
A. And this is strictly from research I've done, stroke or heart attack.
Q. Anything else?
A. I'm sure there's much more, but I don't really --
Q. That's what you've learned about it.
A. Uh-huh.
MR. GIEBEL: You need to answer audibly, too, instead of "uh-huh."
BY MS. WRIGHT:
Q. When did you do this research regarding the risks of high cholesterol?
A. At the same time I did the heart research.
Q. Okay, last summer.



A. Uh-huh.
Q. Or I'm sorry -- yes, last summer.
Have you talked to anybody about your husband's use of Baycol?
A. No, other than maybe a family member.

MR. GIEBEL: And your attorney.
THE WITNESS: And my attorney, of course.
BY MS. WRIGHT:
Q. What family member have you talked to?
A. My mom.
Q. What did you discuss with your mother?
A. That I had heard information on the news that one of the pills was taken off the market. That's exactly what I talked to her about.
Q. Did you talk about it in any more detail than what you just told me?
A. No, because I didn't know any more details.
Q. Did you know which of the pills it was?
A. I believe there were two at the time; Baycol was one. I'm not sure what the other one was.
Q. At the time that you heard this pill was taken off the market, were you aware that your husband was taking Baycol?
A. Yes.
Q. Approximately when was it that you heard on the news

that Baycol was being taken off the market?
A. I don't remember.
Q. Do you recall what the substance of the news story was?
A. Not really.
Q. Was it on television news?
A. Yes, it was.
Q. And was this television news report reporting that Baycol had recently been taken off the market?
A. I don't remember.
Q. Was your husband home at the time you heard this report?
A. No.
Q. Did you call him about it?
A. No.
Q. Do you know where your husband was at the time you heard this news report?
A. He was out of town.
Q. Doing what?
A. Working.
Q. As a truck driver?

A. I believe so.
Q. Are you able to get in touch with your husband while he's out of town working as a truck driver?
A. We talk to each other daily.



Q. Does he have a cell phone?
A. No.
Q. Call from a hotel or what?
A. Or from a gas station.
Q. Okay. Did he call you that day or did you call him that day that you heard about Baycol being taken off the market?
A. No.
Q. Did you ever tell your husband about the news report you'd heard?
A. I believe he told me.
Q. What did he tell you?
A. Or I told him. I'm sorry.
Q. Oh.
A. You're asking him if I told --
Q. Did you tell him about the news report you'd heard --
A. Yes.

Q. -- that Baycol was taken off the market?
Okay. When did you do that?
A. Oh, goodness, I can't remember. Probably the same week or whenever I heard about it.
Q. What did you tell him?
A. That there were some concerns with Baycol.
Q. Okay.
A. Not necessarily every one but there were concerns.





Q. And that it was taken off the market.
A. Yes.
Q. Did he indicate to you that he was still taking Baycol at the time you told him this?
A. He was.
Q. Did he stop taking it at that time?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I told him that he should go see his doctor before he got off of anything.
BY MS. WRIGHT:
Q. Do you know whether he did that?

A. Yes, he did.
Q. Do you know who he went to see?
A. I'm not positive, but I would say McCamy.
Q. How do you know that he went to see Dr. McCamy about stopping Baycol?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: He -- when he got home, we discussed it, and I told him to go see Dr. McCamy or one of them and talk to him about it.
BY MS. WRIGHT:





Q. Did you schedule an appointment for him?
A. Very possibly.
Q. Do you have a recollection?
A. I don't have a recollection of the date.
Q. Do you have a recollection of scheduling the appointment at all?
A. Yes.
Q. So you called Dr. McCamy's office to schedule the appointment?

A. I would say yes.
Q. Did you talk to Dr. McCamy or the nurse?
A. I never talk to the doctor, I always talk to the nurse or the girl scheduling.
Q. Did you ask the person that you talked to about the fact that Baycol had been taken off the market?
A. No.
Q. Did you mention that that was the reason for the appointment?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: No, I didn't.
BY MS. WRIGHT:
Q. Do you recall how long it was after you called that your husband was able to get in for this appointment?

LORETTA F. HARTMAN



A. My recollection, which could change if I saw the exact date, would be a week or two weeks, maybe, at the most.
Q. Did you go with your husband on this appointment?
A. No.

Q. What did your husband say when you told him that Baycol had been taken off the market?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: He said "Why?"

BY MS. WRIGHT:

Q. What did you tell him?

A. I didn't know.

Q. Did you discuss it any further?

A. Actually, no.

Q. Did your husband indicate to you that he did not know it had been taken off the market when you gave him the information you had learned from the news report?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: He didn't know.

BY MS. WRIGHT:

Q. Do you know whether he did anything more to find out



whether Baycol had been taken off the market?

A. I'm not sure.
Q. Have you seen any written news reports of Baycol being taken off the market?
A. No, I have not.
Q. Do you have a calendar that shows any of your husband's medical appointments?
A. Pardon me?
Q. Do you have a calendar that shows any of your husband's medical appointments?
A. No.
Q. How do you keep track of those when you make them for him?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I tell him, you have to go to the doctor. And I write the time down on a little piece of paper and the doctor. It's a sticky back.
BY MS. WRIGHT:
Q. Okay.
A. Little sticky note and I put it by his car keys.
Q. Do you know of any other people who have brought lawsuits related to Baycol?

MR. GIEBEL: Object to the form of the



question.
You can answer.
THE WITNESS: Absolutely not.
BY MS. WRIGHT:
Q. Did you discuss with your husband the decision to bring a lawsuit regarding Baycol?
A. Yes.
Q. When did you do that the first time?
A. I don't remember.
Q. Was it more than a year after Baycol was taken off the market?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I simply can't remember dates at --
BY MS. WRIGHT:
Q. I'm not asking for a date. I'm asking --
A. No.
Q. -- you the time frame.

A. Oh, I, I just don't know.
Q. Whose idea was it to bring a lawsuit against the makers of Baycol?
A. Mine.
Q. Okay.



A. Because I was mad.
Q. Did you go out and look for a law firm to represent you?
A. No.
Q. Or your husband?
A. My husband did.
Q. Did you talk to any other law firms besides Mr. Giebel's about representing you?
A. No.
Q. How did you learn of Mr. Giebel's law firm?
A. I don't remember that, either.
Q. Did you see an advertisement in the paper?
A. Or a phone book.
Q. Are any of your family members or your husband's family members involved in any other lawsuits against pharmaceutical companies?

A. Absolutely not.
Q. What kind of papers do you have at home that relate to this lawsuit?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: Oh, wow, a lot of papers.
BY MS. WRIGHT:
Q. Okay. Can you tell me what they are?
A. I really -- I couldn't right now. I know what -- you



know, where they are and -- but I really couldn't.
Q. When you say "a lot," if they were stacked up, how tall are they?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: I'm thinking where I put them.
MS. WRIGHT: Maybe like this (indicating).
BY MS. WRIGHT:
Q. About an inch?
A. (Nods head.)
Q. Is that a yes?

A. Yes.
Q. Do you have any of your husband's medical records at home?
A. Recent records, yes.
Q. Okay.
A. I definitely do.
Q. When you say "recent," how far back do they go?
A. I'm going to guess two years.
Q. Why did you start obtaining your husband's more recent medical records?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: Because I was more involved





with him when we moved to Detroit Lakes. I was more interested, and took him to all his appointments and had the opportunity to talk to the doctors.
BY MS. WRIGHT:
Q. I guess I want to get back to his current medical condition.
We talked about the defibrillator being placed.
A. Yes.

Q. We talked about his recent visit to Dr. Klessingham at Mericare.
What was the purpose of the March or April 2000 visit to Dr. Klessingham?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: Could you please repeat that date.
BY MS. WRIGHT:
Q. Sure. I believe you told me that the last doctor visit that you're aware of that your husband had was in March or April of 2006. And as I understood your testimony, that visit was with Dr. Klessingham at Mericare.
A. Yes.
Q. Is that still your recollection --



A. Yes.
Q. -- of when this last visit was?
A. Yes, it is.
Q. What was the purpose of the visit to Dr. Klessingham?

MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: He was feeling very tired; more so than normal.
BY MS. WRIGHT:
Q. Did you go with him on this visit --
A. No.
Q. -- to Dr. Klessingham?
A. I did not.
Q. How did he get there?
A. He drove. It's exactly two blocks from our house in Detroit Lakes to the clinic.
Q. Did your husband drive down here today with you?
A. I drove. Yes, he's with me.
Q. You drove the whole way?
A. Yes.
Q. Did your husband tell you anything about the visit to Dr. Klessingham?
A. He -- yes, he did.
Q. What did he tell you?

A. He indicated that some of the, the pills that he takes now could possibly be making him tired.
Q. Did he say whether Dr. Klessingham changed the prescription at all?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I don't recall.
BY MS. WRIGHT:
Q. Did he say which pills could be making him tired?
A. I don't recall. There's three or four that he takes now.
Q. What is he currently taking?
A. I, I can't remember all of them.
Q. What do you remember?
A. Glipizide, I remember that very well.
Q. Why do you remember that well?
A. Diabetes pill.
Q. What else?
A. I can name one more: potassium he takes.
Q. Do you know why he takes that?

A. No. He takes Ativan.
Q. Do you know what that's for?
A. I believe it's heart.
Q. Do you know what it does supposedly for his heart?



A. No. And he also takes Coreg.
Q. Do you know what Coreg supposedly does?
A. No, his heart. I know there's more, I just can't remember them.
Q. Did you get a copy of any note that was made from this March or April 2006 visit to Dr. Klessingham?
A. No.
Q. Do you know whether your husband has any other doctor visits currently scheduled?
A. I don't believe so.
Q. Does he have any treatment that has been recommended that he get any time in the future?
MR. GIEBEL: Object to the form of the question.
THE WITNESS: Not that I can think of.
BY MS. WRIGHT:
Q. Has anybody given you a prognosis with respect to

your husband's heart condition?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: Yes.

BY MS. WRIGHT:

Q. What have they told you?

A. The prognosis is horrible.



Q. Can you be more precise?

A. Death.

Q. Right. Have they given you a time frame?

A. Yes.

Q. Have they? What's the time frame?

A. It, it's come and gone. Six months to a year.

Q. When did they give you that time frame?

A. A year ago.

Q. Did they say why it was such a short time frame?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: Because of the heart.

BY MS. WRIGHT:
Q. Did they say what was --
A. The heartbeat. At that time, he did not have his fribillator or, or pacer in.
Q. Have they changed the prognosis, do you know, since they implanted the pacemaker and the defibrillator?
A. No, they haven't.
Q. And who was the doctor that gave you this prognosis?
A. Klessingham.
Q. Is Dr. Klessingham a man or a woman?
A. Man.
Q. When Dr. Klessingham gave you this prognosis, did he





discuss whether Baycol had any impact on his prognosis?
A. No.
Q. Have you ever talked to anybody about the benefits of Baycol?
A. No.
Q. Do you know whether it lowered your husband's cholesterol?
A. No.

Q. Do you know whether anybody talked to your husband about the side effects of Baycol?
A. No.
Q. Did you ever talk to him about whether anyone discussed that with him?
A. No, I didn't.
Q. Did you ever talk to him about anything his doctors may have said about Baycol when they prescribed it?
A. Not to my -- not that I can remember.
Q. Did you fill most of your husband's prescriptions in the 1998-2001 time frame?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I think I'd be safe in saying yes.





BY MS. WRIGHT:
Q. Did you use one single pharmacy or did you use multiple pharmacies?
A. One pharmacy.
Q. And which one was that?

A. Borgstrom's on Payne Avenue, B-O-R-G-S-T-R-O-M, yes.
Q. Do you know whether any of the doctors that prescribed Baycol for your husband ever gave him any samples of Baycol?
A. I, I don't know.
Q. Do you know whether any -- Borgstrom's Pharmacy ever provided any kind of written information about Baycol when it filled the prescription?
A. Oh, I'm sure they probably did.
Q. Did you keep any of that?
A. No.
Q. Did you ever read it?
A. No.
Q. Do you know whether your husband ever read it?
A. I don't know.
Q. Did you ever talk to your pharmacist about Baycol?
A. Did I?
Q. Yes.
A. No.
Q. Do you know if your husband did?

A. I don't know.
Q. Okay.
A. Actually, there'd be no reason to.
Q. Because?
A. When you go on a prescribed medicine from a doctor, I wouldn't discuss it with the pharmacist.
Q. You would rely on the doctor?
A. Yes.
Q. Is that what you understand your husband does as well?
A. Yes.
Q. And you rely on your doctor to tell you about the risks of the drug?
MR. GIEBEL: I'll object to the form of the question.
You can answer.
THE WITNESS: I would rely on my doctor, yes.
BY MS. WRIGHT:
Q. And to tell you the benefits?
A. Yes.

Q. And to help you weigh the risks and benefits of a drug?

MR. GIEBEL: Same objections on both.

THE WITNESS: I would say yes, I'd trust



the doctor, but I've never been on one.

BY MS. WRIGHT:

Q. Okay.

A. Anything, ever, so I don't know.

Q. Do you have any understanding that that's what your husband does?

MR. GIEBEL: Object to the form of the question.

THE WITNESS: I don't know.

BY MS. WRIGHT:

Q. Did you ever see your husband actually take Baycol?

A. Yes.

Q. Do you know what dose he was on?

A. No, I don't.

Q. Do you know whether your husband took Baycol every day?

A. I believe he did.

Q. What's the basis for your belief that he took it every day?
A. I would fill prescriptions, and my -- if I recall back when he was on Baycol, I'd fill it monthly.
Q. Okay.
A. That's my recollection.
Q. And it was your recollection that you did actually have to fill it monthly?



A. Yes.
Q. Now, during the time that your husband was taking Baycol, did he complain of any problems with his liver?
A. I don't remember.
Q. Do you remember him complaining of any problems with his kidneys?
A. No, I don't.
Q. While he was taking Baycol, do you recall him complaining about feeling tired all the time?
A. A backache, I recall.
Q. Was that the entire time he was taking Baycol?
MR. GIEBEL: Object to the form of the

question.

You can answer.

THE WITNESS: I believe he complained about a backache quite often.

BY MS. WRIGHT:

Q. Had he ever complained about a backache before he took Baycol?

A. Not to my recollection because I told him to go see a doctor.

Q. Did he describe in what way his back ached?

A. His lower back where his kidneys were. Other than that, I remember nothing about it.



Q. Did he say how long the backache would last?

A. Periodically.

Q. Do you recall whether he saw a doctor for kidney stones --

A. He --

Q. -- during this time?

A. Yes. I can't give you the date, but he did.

Q. Was this backache something similar to what it felt like when he had kidney stones, do you know?

A. It was --

MR. GIEBEL: Let me object to the form of the question.

Go ahead, you can answer.

THE WITNESS: I believe it was similar. And I believe that probably is what it was at that time. I don't know.

BY MS. WRIGHT:

Q. Do you recall him complaining of nausea or fever or vomiting while he was taking Baycol?

A. I don't recall.

Q. Do you know whether your husband's doctor recommended any treatment for the leg weakness he complained about while taking Baycol?

A. I don't know.

Q. Did you ever hear your husband discuss his problem





with leg weakness with anyone else?

A. No.

Q. Do you recall your husband ever having problems with leg weakness prior to taking Baycol?

A. I really don't.

Q. Do you know whether your husband is still seeing what you've described as flakes in his urine?
A. He certainly hasn't mentioned it recently.
Q. When was the last time he mentioned it?
A. Oh, I, I don't remember.
Q. Has anybody talked to you or have you learned in any way about whether your husband's kidneys are functioning adequately?
A. I believe they are.
Q. Has he had any kidney stones in the past four years?
A. In the past four? I don't think so.
Q. Is that the kind of thing he would tell you about if he was having kidney stones?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: Yes, he would tell me.
BY MS. WRIGHT:
Q. Was your husband ever an exerciser?
MR. GIEBEL: Object to the form of the

question.
    You can answer.
        THE WITNESS: We walked an awful lot all the time.
BY MS. WRIGHT:
Q. Did he ever have a gym membership that you know of?
A. No, but we had a lot of exercise equipment in our basement.
Q. What did you have in your basement?
A. We had a treadmill, and we had two different things for your muscles, I don't know what you call them.
Q. Dumbbells?
A. We have that also. A weight.
Q. Oh, you have a machine that helps you lift --
A. Uh-huh.
Q. -- weights? Is that right?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. Okay.
A. And a bicycle.

MR. GIEBEL: Are we talking exercising yet?
THE WITNESS: Yes.
BY MS. WRIGHT:
Q. And was this in your basement in St. Paul?



A. Yes.
Q. Do you currently have any exercise equipment at home?
A. All the same.
Q. Do you use it?
A. Yes.
Q. Did you use it when it was in St. Paul?
A. Yes, I did.
Q. Did your husband use it with you?
A. Yes, he did.
Q. Did he use it every day?
MR. GIEBEL: Object to the form of the question.
You can answer if you know.
THE WITNESS: When he was home he used it, which wasn't every day, but when he was home he used it.
BY MS. WRIGHT:

Q. Did he have a typical workout routine?
A. Half hour --
MR. GIEBEL: Object to the form of the question.
You can answer the question.
THE WITNESS: Half hour to an hour.
BY MS. WRIGHT:
Q. Doing what?



A. All, all the machines we had. We had like four.
Q. Would he run on the treadmill?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. Was it running or walking?
A. Walking.
Q. When did he start working out a half hour to an hour using all the machines?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I can't remember when. Until

he could no longer do it.

BY MS. WRIGHT:

Q. Had he been doing it for more than 10 years?

A. Yes.

MR. GIEBEL: Object to the form of the question.

BY MS. WRIGHT:

Q. When did he stop using the exercise equipment?

MR. GIEBEL: Object to the form of the question.

You can answer.

THE WITNESS: I, I can't remember.

LORETTA F. HARTMAN



BY MS. WRIGHT:

Q. Can you link it to any particular event?

A. Not really.

Q. Since you moved to Detroit Lakes, have any of your husband's doctors, to your knowledge, recommended that he engage in exercise?

A. To my knowledge?

Q. Yes.

A. No.

Q. Have you seen in any of the medical records that you've obtained over the past two years any kind of recommendation that your husband exercise?

MR. GIEBEL: I'm sorry, that he exercise or was prescribed exercise?

MS. WRIGHT: Just a recommendation, any exercise.

THE WITNESS: They always tell you, doctors always tell us to exercise, so I would have to say yes, probably.

BY MS. WRIGHT:

Q. Do you know whether the doctors that your husband is currently seeing are aware of your husband's complaints of leg weakness?

MR. GIEBEL: Object to the form of the question.

LORETTA F. HARTMAN

109

You can answer.

THE WITNESS: I would believe they are.

BY MS. WRIGHT:

Q. Have you been present when your husband has told them

about his leg weakness?
A. No, I have not.
Q. Has your husband told you that he's informed his current doctors about his leg weakness?
A. Yes, he has.
Q. And is it your understanding that the doctors recommend him to exercise anyway?
A. If possible.
Q. Since moving to the Detroit Lakes area, do you know whether your husband has sought any kind of treatment for his leg weakness?
A. I don't know.
Q. Have you encouraged him to seek any treatment for his leg weakness?
A. No.
Q. Why not?
A. I'm trying to keep him alive and enjoy each day I can.
Q. As a result of your husband's heart condition, do you know whether his physicians have placed any restrictions on his activities?

A. I don't know.
Q. Have you asked them whether there are any restrictions?
A. No.
Q. Have you discussed with your husband whether the doctors have placed any restrictions on his activities as a result of his heart condition?
A. No.
Q. When do you recall your husband first having problems with shortness of breath?
A. It was after his leg weakness and, oh, I'm not sure how long.
Q. Has it ever gone away, the problem with shortness of breath?
MR. GIEBEL: Object to the form of the question.
You can answer if you know.
THE WITNESS: The shortness of breath?
BY MS. WRIGHT:
Q. Correct.
A. Yes, it has now.

Q. It's gone now?
A. With surgery.
Q. Do you recall, when he was having with shortness of breath, that it made it difficult for him to climb



stairs?
A. He didn't complain about climbing stairs as much as walking or sleeping.
Q. Okay. And with walking, he was having a hard time walking even half a block, as I recall --
A. Yes.
Q. -- is that correct?
How did it affect his sleeping?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I believe he couldn't breathe properly when he was sleeping or trying to sleep.
BY MS. WRIGHT:
Q. He couldn't catch his breath, is that your understanding, or what?
A. I'd say so.

Q. Would that be something that would last all night, or would that be kind of short-lived, or how did it manifest itself?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: Maybe off and on.
BY MS. WRIGHT:



Q. Throughout the night?
A. Yes.
Q. Okay. Was this something that happened every night?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I, I probably don't know because I sleep in a different bedroom.
BY MS. WRIGHT:
Q. Oh, you do.
A. Uh-huh.
Q. Okay. Is that because of your husband's health

condition?
A. Yes.
Q. When did you start doing that?
A. Oh, I don't know.
Q. Were you doing that before you moved up to Detroit Lakes?
A. Yes.
Q. Were you doing it for years before you moved?
A. No.
Q. What was it about your husband's health condition that prompted you to move into a different bedroom?
A. He told me his legs were aching, and he'd move around. And I was still working, so therefore I had





to get rest.
Q. So it was while you were still working at MCI, was that the name of --
A. MSI.
Q. MSI, I apologize.
A. I believe that was the last year.
Q. The last year that you were at MSI is when you moved out.

A. (Nods head.)
Q. Is that yes?
A. Yes.
Q. And I'm sorry, it was because his legs were --
A. Aching.
Q. Okay. And he was restless?
A. Yes.
MR. GIEBEL: Is this a good time to break?
MS. WRIGHT: Sure.
(A recess was taken.)
BY MS. WRIGHT:
Q. Do you know whether your husband's been diagnosed with any back or spine problems?
A. Not to my knowledge.
Q. Do you know whether he's been evaluated for any kind of spine problems?
A. I don't know.



Q. The flakes that you observed in your husband's urine, were they floating or had they sunk to the bottom of the bowl?
A. They were like on the very top.

Q. On the surface of the liquid in the bowl?
A. Yes.
Q. Okay. And did your husband tell you whether it was painful when he would urinate when these flakes would appear?
A. I don't remember.
Q. Do you know whether your husband has taken any statin other than Baycol?
A. I don't believe so, but I'm not positive.
Q. Do you recall ever filling a prescription for Lipitor for your husband?
A. Yes, I do. Is that a statin?
Q. Lipitor is a statin.
And you recall filling a prescription for Lipitor?
A. The name's familiar.
Q. Now, just to make sure you're not confusing the names, have you filled a prescription for a drug called Lopid for your husband?
A. I don't recall.
Q. But Lipitor sounds familiar to you?

A. Yes, it does.
Q. Do you recall approximately when you were filling prescriptions for Lipitor for your husband?
A. No, I'm sorry, I don't.
MR. GIEBEL: I'll object to the form of the question.
BY MS. WRIGHT:
Q. Was it before or after he took Baycol?
MR. GIEBEL: I'll object to the form of the question.
You can answer, if you know.
THE WITNESS: I don't remember.
BY MS. WRIGHT:
Q. Do you recall whether your husband actually took the Lipitor?
A. I'm assuming he did.
Q. Do you recall him complaining of any muscle weakness or muscle pain while he was taking the Lipitor?
A. No, I don't.
Q. Have you ever talked to any of his doctors about him taking Lipitor?

A. No.
Q. Have you talked to any of his doctors about taking any kind of statin?
A. No.



Q. Have you talked to your husband about taking any kind of statin other than Baycol?
A. No, because I didn't know that there was a problem with them.
Q. Let me ask you, after your husband stopped taking Baycol, did you ever talk to your husband about taking any statin other than Baycol?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I don't think I understand what you're telling --
BY MS. WRIGHT:
Q. Sure.
A. -- what you're asking.
Q. Well, actually what I'm asking, did you ever talk to your husband about taking a statin other than Baycol

at any time?
A. No.
Q. Okay. Are you aware of whether your husband, since taking Baycol, has been on any kind of medication to control his cholesterol?
A. I believe he is now.
Q. What do you believe he's on now?
A. Zetia.



Q. Do you know how long he's been taking Zetia?
A. No.
Q. Do you know what doctor prescribed that?
A. I'm sorry, I don't.
Q. Have you talked to anybody about how Zetia works to control cholesterol?
A. No.
Q. Do you know whether Zetia is a statin.
A. No.
Q. Do you know whether your husband's cholesterol is currently within what doctors consider to be a normal range?
A. I believe it is.

Q. Do you know whether he's had any side effects from the Zetia?
A. I don't believe he has.
Q. Were you present when the doctor prescribed Zetia?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I'm not sure if I was or not.
BY MS. WRIGHT:
Q. Does your husband take the Zetia every day?
MR. GIEBEL: Object to the form of the question.





You can answer if you know.
THE WITNESS: I'm not sure.
BY MS. WRIGHT:
Q. Do you know whether any doctor has recommended that your husband alter his diet to help control his cholesterol?
A. He's very good about controlling his diet.
Q. Is that for purposes of controlling his cholesterol or controlling his diabetes?

A. I think it had a lot to do with heart-wise and heart -- a healthy heart.
Q. During the time that your husband was taking Baycol, do you know whether he took any kind of over-the-counter medication?
A. I don't believe he did.
Q. Is your husband a person that takes vitamins or food supplements?
A. Yes, he is. He takes a multiple vitamin and so do I.
Q. How long has your husband been taking a multiple vitamin?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: I couldn't tell you.
BY MS. WRIGHT:





Q. Is it as long as --
A. I'm sorry.
Q. -- you've been married to him?
MR. GIEBEL: Object to the form of the question.

You can answer.

BY MS. WRIGHT:

Q. I guess I shouldn't say that. You're not currently married.

Do you recall when he started taking it?

A. A couple years ago --

Q. Okay.

A. -- maybe.

Q. Do you know whether he was taking a multiple vitamin when he was taking Baycol?

A. He wasn't.

Q. Was he taking -- while he was taking Baycol, do you know whether he was taking any kind of vitamins or food supplements?

A. None.

Q. Does your husband drink grapefruit juice?

A. No. He used to maybe.

Q. When was the last time you recall him taking grapefruit juice?

A. Never.



Q. Okay. You haven't seen him do it?

A. No.
Q. Have you ever heard of a medication called Gemfibrozil?
A. I've heard of it.
Q. Do you know whether your husband has ever taken Gemfibrozil?
MR. GIEBEL: Object to the form of the question.
You can answer.
THE WITNESS: Oh, man. I don't remember.
BY MS. WRIGHT:
Q. Have you obtained any materials about Baycol from the Internet? I know you directly have not accessed the Internet, but do you have any materials from the Internet regarding Baycol?
A. No, I don't.
Q. Have you been able to do any research regarding Baycol?
A. No.
MS. WRIGHT: I have nothing further. Thank you for your time.
MR. GIEBEL: Mr. Gardner, any questions?
MRT. GARDNER: No.

MR. GIEBEL: All right then. We'll read



and sign.

(A discussion was held off the record and the deposition was concluded.)

* * * * *

STATE OF MINNESOTA)
) SS:
COUNTY OF HENNEPIN)

BE IT KNOWN THAT I, JAMES M. TRAPSKIN, took the DEPOSITION OF LORETTA HARTMAN;

THAT, I was then and there a notary public in and for the County of Hennepin, State of Minnesota;

THAT, I exercised the power of that office in taking said deposition;

THAT, by virtue thereof I was then and there authorized to administer an oath;

THAT, said witness, before testifying, was duly sworn to testify to the truth, the whole truth, and nothing but the truth, relative to this action;

THAT, said witness reserved the right to read and sign the deposition;

THAT said deposition is a true record of the testimony given by the witness;

THAT, I am neither attorney nor counsel for, nor related to or employed by any of the parties to this action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

WITNESS MY HAND AND SEAL this ________ day of

___________________ 2006

JAMES M. TRAPSKIN, RPR, CM
CALIF. CSR NO. 8407
ILL. CSR 084-004584
Notary Public, Henn. County, Minn.
My Comm. expires January 31, 2010

DEPOSITION CORRECTION SHEET

CASE TITLE: BAYCOL PRODUCTS LITIGATION
DEPOSITION OF: LORETTA F. HARTMAN
DATE TAKEN: MAY 25, 2006

REASON FOR CHANGE A: To Correct Transcription
B: To Correct Spelling
C: To Correct Testimony

| PAGE | LINE | DESIRED CHANGES | REASON |
|---|---|---|---|
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |
| ____ | ____ | ______________________________ | _____ |

Deponent's Signature__________________________________

Subscribed and sworn to before:______________________
a Notary Public, County of ________________, State of

_____________________ on _______________________ 2006

PLEASE PROVIDE ALL OTHER PARTIES WITH A COPY WITHIN 30 DAYS AND RETURN ORIGINAL TO THE TAKING ATTORNEY